**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOYAN DONG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CLOOPEN GROUP HOLDING LIMITED, CHANGXUN SUN, YIPENG LI, KUI ZHOU, QINGSHENG ZHENG, XIAODONG LIANG, ZI YANG, MING LIAO, FENG ZHU, LOK YAN HUI, JIANHONG ZHOU, CHING CHIU, XIEGANG XIONG, CHENG LUO, YUNHAO LIU, COGENCY GLOBAL INC., COLLEEN A. DEVRIES, GOLDMAN SACHS (ASIA) L.L.C., CITIGROUP GLOBAL MARKETS INC., CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, TIGER BROKERS (NZ) LIMITED, and FUTU INC.,<br><br>Defendants. | Case No.: 1:21-cv-10610<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Boyan Dong ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to her own acts and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Cloopen Group Holding Limited ("Cloopen" or the "Company"), press releases, earnings calls, media reports, and other publicly available materials.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who: (a) purchased or otherwise acquired Cloopen American Depositary Shares ("ADSs") pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's February 2021 initial public offering (the "IPO"); and/or (b) purchased or otherwise acquired Cloopen securities between February 9, 2021 and May 10, 2021, inclusive (the "Class Period").  Plaintiff brings strict liability, non-fraud claims under Securities Act of 1933 (the "Securities Act") against all Defendants and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act") against Cloopen and its Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO"), as well as the Company's Chief Financial Officer ("CFO").

2.      Cloopen claims to be the largest multi-capability cloud-based communications solution provider in China.  The Company purportedly is the only Chinese provider that offers a full suite of cloud-based communications solutions covering communications platform as a service (CPaaS), cloud-based contact centers (cloud-based CC), and cloud-based unified communications and collaborations (cloud-based UC&C).  Cloopen claims that it serves a diverse and loyal customer base consisting of enterprises of all sizes across a variety of industries, including internet, telecommunications, financial services, education, industrial manufacturing, and energy.

3.     In its February 2021 U.S. IPO, Cloopen sold 23 million ADSs (including the full exercise of the Underwriter Defendants' over-allotment option) at $16 per ADS, netting approximately $342 million in proceeds from the offering.  However, the Registration Statement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding Cloopen's business, operations, and prospects.

4.     The Registration Statement led Cloopen ADS purchasers to believe that the Company's much-touted growth strategy, which relied upon cross-selling, up-selling, optimizing existing solutions, and developing new features, was effective.  Indeed, as portrayed in the Registration Statement, Cloopen appeared to be retaining and even expanding its customer base, as well as maintaining its key sales metrics such as dollar-based net retention rate, which reflected its ability to increase existing customer revenue.

5.     Yet, Cloopen's representations concerning its successful growth strategy were materially false and misleading.  In fact, Cloopen's growth strategy was not working and its existing customers were abandoning the Company.  Unbeknownst to investors, Cloopen's dollar-based net retention rate had plummeted during the fourth quarter of 2020 ("4Q 2020").  In 4Q 2020, the Company's net retention rate had dropped well below the 94.7% rate reported for the nine months ended September 30, 2020.  The plunging dollar-based net retention rate caused the Company's fiscal year 2020 ("FY 2020") retention rate to tumble to 86.8%, down from the Company's fiscal year 2019 ("FY 2019") retention rate of 102.7%.

6.     Cloopen's Registration Statement further failed to disclose that an increasing number of its customers were refusing to pay, forcing the Company to record massive increases in its accounts receivables and allowance for doubtful accounts.  The Registration Statement also failed to disclose that Cloopen was weighted down by massive liabilities related to the fair value of certain recently-granted warrants.

7.      On March 26, 2021, just over six weeks after its IPO, Cloopen shocked the market when it published its 4Q 2020 and FY 2020 financial results, which closed on December 31, 2020, more than a month before the IPO.  Cloopen reported 4Q 2020 revenues of just $39.6 million, $2 million shy of analysts' consensus, net losses of $46.8 million, representing a staggering 466.9% increase year-over-year, and operating expenses of $27.6 million, representing a 30% increase over 4Q 2019.  Cloopen blamed a "change in fair value of warrant liabilities of . . . US$34.4 million" for Cloopen's remarkable net loss and "an increase in the provision for doubtful accounts resulting from increased in accounts receivables" for the 59.2% increase in general and administrative expenses.

8.      In response to this shocking news, the price of Cloopen's ADSs fell 18.5%, dropping from $14.42 per ADS on March 25, 2021 to $11.75 per ADS on March 26, 2021.

9.      Yet, even then, Cloopen's most senior officers continued to make materially false and misleading statements to the market and failed to reveal the true extent of Cloopen's troubles. In the March 26, 2021 earnings announcement and investor conference call, Cloopen's senior executives continued to misrepresent the Company's expansion strategy, again failing to acknowledge that the strategy was failing and its existing customer base was deteriorating.  Nor did they disclose that Cloopen's dollar-based net retention rate had tumbled in 4Q 2020.

10.      Weeks later, as Cloopen belatedly revealed additional facts about its failed growth strategy and withering customer base, including that its dollar-based net retention rate by year end 2020 fell far below historical periods, Cloopen's share price fell again, closing at $8.97 per ADS on May 12, 2021.

11.      As of the time of this Complaint, Cloopen's share price has dropped as low as $2.70 per ADS, a decline of more than 80% from the $16 IPO price.

**JURISDICTION AND VENUE**

12.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v(a)), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).

**PARTIES**

15.     As set forth in the accompanying certification, incorporated by reference herein, Plaintiff Boyan Dong purchased Cloopen ADSs during the Class Period and pursuant and/or traceable to the Registration Statement, and has been damaged thereby.

16.     Defendant Cloopen's executive offices are located at 16/F, Tower A, Fairmont Tower, 33 Guangshun North Main Street, Chaoyang District, Beijing, China.  Its agent for service of process in the United States is Defendant Cogency Global Inc. ("Cogency Global"), located at 122 East 42nd Street, 18th Floor, New York, New York 10168.  The Company's ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "RAAS."

17.     Defendant Changxun Sun ("Sun") founded Cloopen in 2014 and has been Cloopen's CEO and Chairman of Cloopen's Board since inception.  Defendant Sun signed the false and misleading Registration Statement.

18.     Defendant Yipeng Li ("Li") has been Cloopen's CFO since May 2020.  Defendant Li was named in the Registration Statement, with his consent, as having accepted appointment as

a Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement.  Defendant Li also signed the false and misleading Registration Statement.

19.     Defendants Cloopen, Sun, and Li are collectively the "Exchange Act Defendants."

20.     Defendant Kui Zhou ("Zhou") was at the time of the IPO a member of Cloopen's Board.  Defendant Zhou signed the false and misleading Registration Statement.

21.     Defendant Qingsheng Zheng ("Zheng") was at the time of the IPO a member of Cloopen's Board.  Defendant Zheng signed the false and misleading Registration Statement.

22.     Defendant Xiaodong Liang ("Liang") was at the time of the IPO a member of Cloopen's Board.  Defendant Liang signed the false and misleading Registration Statement.

23.     Defendant Zi Yang ("Yang") was at the time of the IPO a member of Cloopen's Board.  Defendant Yang signed the false and misleading Registration Statement.

24.     Defendant Ming Liao ("Liao") was at the time of the IPO a member of Cloopen's Board.  Defendant Liao signed the false and misleading Registration Statement.

25.     Defendant Feng Zhu ("Zhu") was at the time of the IPO a member of Cloopen's Board.  Defendant Zhu signed the false and misleading Registration Statement.

26.     Defendant Lok Yan Hui ("Hui") was at the time of the IPO a member of Cloopen's Board.  Defendant Hui signed the false and misleading Registration Statement.

27.     Defendant Jianhong Zhou ("J. Zhou") was at the time of the IPO a member of Cloopen's Board.  Defendant J. Zhou signed the false and misleading Registration Statement.

28.     Defendant Ching Chiu ("Chiu") was at the time of the IPO a member of Cloopen's Board.  Defendant Chiu signed the false and misleading Registration Statement.

29.     Defendant Xiegang Xiong ("Xiong") has served as Cloopen's Chief Product Officer since November 2018 and its Chief Technology Officer since May 2020.  Xiong was named in the Registration Statement, with his consent, as having accepted appointment as a

Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement.

30.    Defendant Cheng Luo ("Luo") has served as Cloopen's Chief Executive Officer Assistant since June 2015.  Luo was named in the Registration Statement, with his consent, as having accepted appointment as a Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement.

31.    Defendant Yunhao Liu ("Liu") was named in the Registration Statement, with his consent, as having accepted appointment as a Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement.

32.    Defendant Cogency Global was Cloopen's authorized U.S. representative for purposes of the IPO through its employee Defendant Colleen A. DeVries ("DeVries").  Defendant DeVries signed the Registration Statement for the IPO as an employee of Defendant Cogency Global as the authorized representative for Cloopen in connection with the IPO.  Defendant Cogency Global is additionally liable for the securities law violations alleged herein to have been committed by Defendant DeVries as it controlled Defendant Devries at the time of the IPO.

33.    Defendants Sun, Li, Zhou, Zheng, Liang, Yang, Liao, Zhu, Hui, J. Zhou, Chiu, Xiong, Luo, Liu, and DeVries are collectively the "Securities Act Individual Defendants."  The Securities Act Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and/or attended road shows and other promotions to meet with and present favorable information to potential Cloopen investors, all motivated by their own, and the Company's, financial interests.

34.    Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter for the Company's IPO.

35.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the Company's IPO.

36.     Defendant China International Capital Corporation Hong Kong Securities Limited ("CIC") served as an underwriter for the Company's IPO.

37.     Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") served as an underwriter for the Company's IPO.

38.     Defendant Futu Inc. ("Futu") served as an underwriter for the Company's IPO.

39.     Defendants Goldman Sachs, Citigroup, CIC, Tiger Brokers, and Futu are collectively the "Underwriter Defendants."   The Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement.  In connection with the IPO, the Underwriter Defendants drafted and disseminated the Registration Statement and were collectively paid nearly $26 million in underwriting discounts and fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## BACKGROUND

40.     Cloopen began providing cloud-based communications solutions in 2014.  Because Chinese laws and regulations impose restrictions on foreign ownership and investment in companies that engage in value-added telecommunication services, like Cloopen, the Company primarily operates its business through Beijing Ronglian Yitong Information Technology Co. Ltd., an entity controlled by Defendants Sun and Zhou whom possess 71.01% and 26.46% interests, respectively.

41.     Cloopen claims to be the largest multi-capability cloud-based communications solution provider in China.  The Company purportedly is the only provider in China that offers a full suite of cloud-based communications solutions covering CPaaS, cloud-based CC, and cloud-

based UC&C.  Cloopen claims that it serves a diverse and loyal customer base consisting of enterprises of all sizes across a variety of industries, including internet, telecommunications, financial services, education, industrial manufacturing, and energy.

42.    Cloopen generates revenues primarily from its CPaaS, cloud-based CC and cloud-based UC&C solutions.  In general, Cloopen charges its customers using its CPaaS solutions on a recurring basis, based on the monthly number of text messages and call minutes facilitated. Cloopen charges its customers using its cloud-based CC solutions deployed on public clouds on a recurring basis, with a combination of seat subscription fees and related resource fees.  And Cloopen charges its customers using its cloud-based CC solution deployed on a private cloud and cloud-based UC&C solutions on a project basis.

43.    Cloopen has experienced significant growth in recent years, going from a reported 10,200 enterprise customers in 2018, to 11,500 in 2019, and to 13,000 as of December 31, 2020.

44.    According to Cloopen, its sales and marketing team, which consists of more than 471 members (as of December 31, 2020), many well-versed in China's cloud-based communications industry, drove this increase in active customers.  In addition to contacting prospective customers, Cloopen's sales and marketing team is also charged with maintaining current customer relationships, reviewing existing customer subscriptions, and expanding cross-selling and up-selling opportunities as part of the Company's "land and expand" strategy.

45.    Moreover, as part of Cloopen's go-to-market strategy, the Company established sales representative offices in more than 20 cities distributed across China (as of December 31, 2020).  In addition to expanding its sales network, these offices enable Cloopen to stay closer to its customers, to receive honest feedback and insights into evolving communication needs, and to otherwise keep tabs on its existing customer relationships.  Effectively, these offices serve as geographic hubs that collect relevant regional information in real time.

46.     In part, as a result of the foregoing, Cloopen's revenues rose in 2018, 2019, and the nine months ended September 30, 2019 and 2020, increasing 29.7% from RMB501.5 million in 2018 to RMB650.3 million ($95.8 million) in 2019, and by 19.4% from RMB426.3 million in the nine months ended September 30, 2019 to RMB509.0 million ($75.0 million) in the nine months ended September 30, 2020, of which 72.3%, 75.0%, 74.9%, and 76.5% were recurring revenues, respectively.  At the same time, Cloopen's net losses increased.  In 2018 and 2019, and the nine months ended September 30, 2019 and 2020, Cloopen incurred net loss of RMB155.5 million, RMB183.5 million ($27.0 million), RMB129.6 million and RMB203.7 million ($30.0 million), respectively.

### CLOOPEN'S PRE-IPO FINANCING

47.     In October 2019, in exchange for $15 million in loans to its Chinese operating unit, Cloopen issued warrants to Guizhou Province Yunli High-tech Industry Investment Partnership (Limited Partnership) and Guizhou Province Chuangxin Chuangye Equity Investment Fund (Limited Partnership) with the right to purchase 6,112,570 Series E preferred shares for $15 million.

48.     In March 2020 and July 2020, Cloopen issued additional warrants to the Series E warrant holders, affording them rights to purchase 314,274 Series E preferred shares at nominal value for anti-dilution purposes.  Also, in March 2020 and July 2020, Cloopen issued 3,706,745 and 3,036,187 pre-offering Class A ordinary shares to Kastle Limited at nominal consideration. In July 2020, Cloopen issued 464,900 pre-offering Class A ordinary shares to Will Hunting Capital Fund I, L.P. for $1.14 million.

49.     In November 2020, Cloopen issued 1.7 million pre-offering Class A ordinary shares to Wisdom Legend Investment Limited.  It also issued a Series F warrant to Novo Investment HK Limited ("Novo") in the aggregate principal amount of $34 million.  The Series F

warrant allowed the holder to, within six months, subscribe for 11,799,685 Series F preferred shares at the exercise price of $2.8814 per share.  The Series F warrant was transferrable and the warrant shares issuable thereunder were to be converted and re-designated into Class A ordinary shares after Cloopen's IPO.

50.     Under generally accepted accounting principles ("GAAP"), Cloopen was obligated to treat its warrants as either equity instruments or as liabilities.  By classifying the warrants to purchase redeemable convertible preferred shares as warrant liabilities, Cloopen was required to adjust the carrying value of the warrant liabilities to fair value.  According to Cloopen, it recorded its warrant liabilities on its consolidated balance sheets at estimated "fair value[s]," calculated using "unobservable inputs which are supported by little or no market activity."  Cloopen claimed that it remeasured its warrant liabilities on a routine basis.

51.     Cloopen's Series E warrants were exercised in full in November 2020.  Cloopen recorded the fair value of the Series E Redeemable Convertible Preferred Shares underlying the Series E warrants as $2.70 per share.

52.     Cloopen's Series F warrant was exercised in full on January 7, 2021 and the Company issued 11,799,685 Series F Redeemable Convertible Preferred Shares to Novo.  Notwithstanding, Cloopen did not record or otherwise report the fair value of the Series F Redeemable Convertible Preferred Shares underlying the Series F warrant in the Registration Statement.

53.     Cloopen also continued to issue pre-offering Class A ordinary shares in January and February 2021, affording, for example, Kastle Limited 1,424,312 shares and 6,410,750 shares and 15,065,118 pre-offering Class A ordinary shares to Flawless Success Limited and Flawless Wisdom Limited, respectively, due to the exercise of options by certain grantees under a 2016 share incentive plan.

**CLOOPEN'S IPO**

54.     On November 13, 2020, Cloopen confidentially submitted a draft Registration Statement on Form F-1 to the SEC relating to a proposed IPO of its ADSs.

55.     After reviewing the draft Registration Statement, on December 10, 2020, in a letter addressed to Defendant Sun, the SEC provided its comments.  Under "Key Operating Metrics," the letter stated, "Please include a discussion of the underlying reasons for the decreases in the dollar-based net customer retention rate in 2019 and the six-months ended June 30, 2020."  The letter also referenced Cloopen's reportedly increasing "average revenue per customer" for the six month period ended June 30, 2020.

56.     Thereafter, on December 21, 2020, Cloopen filed a revised draft Registration Statement on Form DRS/A with the SEC.

57.     On January 19 and 29, 2021, Cloopen again filed updated Registration Statements with the SEC relating to its IPO.  At the time, the number of ADSs to be offered and the price range for the proposed offering had not yet been determined.

58.     On February 3, 2021, Cloopen filed its final amendment to the Registration Statement with the SEC on Form F-1/A, which stated that the offering would be for 20 million ADSs, with an option for the Underwriter Defendants to purchase up to 3 million additional ADSs, at an anticipated offering price of between $13 and $15 per ADS.  Each ADS represented two of the Company's ordinary shares.

59.     On February 8, 2021, the SEC declared the Registration Statement effective.

60.     On February 9, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement.

61.     In the IPO, Defendants offered and sold 23 million Cloopen ADSs (which includes the Underwriter Defendants' over-allotment) at $16 per ADS.  Thus, the IPO raised over $342 million in total net proceeds from investors.

**MATERIALLY FALSE AND MISLEADING STATEMENTS IN AND OMISSIONS FROM THE REGISTRATION STATEMENT**

62.     The Registration Statement for the IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations governing its preparation.

63.     The Registration Statement misrepresented the strength of Cloopen's "diverse and loyal customer base" and how the Company's "land and expand" strategy, including its efforts to "cross-sell" and "up-sell," "optimize existing solutions," and "develop new features," was working to both retain existing customers and expand Cloopen's customer base at the time of the IPO.

64.     The Registration Statement stated that the Company "intend[s] to continuously innovate and expand [its] solutions to empower the digital transformation and integration in modern enterprises seeking to enhance their operational productivity."  To these ends, the Registration Statement claimed that Cloopen would pursue the following growth strategies:

- continuously innovate our solutions and capture new growth opportunities;

- continuously optimize our product offering mix;

- expand sales to existing customers;

- grow customer base; . . .

65.     The Registration Statement further claimed that Cloopen's sales and marketing team enjoyed "considerable opportunities" to cross-sell and up-sell Cloopen's solutions to its "diverse and loyal customer base," which represented only "a small fraction of [Cloopen's] total addressable market in China," and consisted of enterprises that "stay with [the Company] due to the critical role [Cloopen's] solutions play in their business."  To support this claim, the

Registration Statement touted Cloopen's history of, and ability to maintain, an over 94% dollar-based net retention rate.

66.     For example, under a section entitled "Our Customers," the Registration Statement stated:

> *We serve a diverse and loyal customer base* consisting of enterprises of all sizes and across a variety of industries, such as internet, telecommunications, financial services, education, industrial manufacturing and energy.   As of December 31, 2018 and 2019 and September 30, 2020, we had an active customer base of over 10,200, 11,500 and 12,000 enterprises, respectively, among which 125, 152 and 173 were large-enterprise customers, respectively.   *We believe our capabilities in attracting and retaining these large-enterprise customers rest on our ability to develop and offer industry-specific features and functionalities that satisfy their disparate needs and complex internal deployment and integration requirements.*   We also serve small- to medium-sized enterprises leveraging our comprehensive business portfolio and ready-to-use solution deployment.

> *We have implemented a "land and expand" strategy to encourage existing customers to explore and expand into other solutions leveraging our multi-capability offering mix.*  In 2018 and 2019, approximately one-third of our large-enterprise customers had employed more than one category of our solutions, which increased to 37.9% in the nine months ended September 30, 2020.  For example, we initiated our business collaboration with a financial institution customer by satisfying its basic instant messaging needs and, as our relationship deepens, up-sold our video-enabled solutions to provide them with capabilities in multi-format internal communications and a novel use case in real-time financial transaction monitoring.  *For solutions that we offer on a recurring basis, such as CPaaS and cloud-based CC solutions deployed primarily on public cloud, we achieved a dollar-based net customer retention rate of 135.7%, 102.7% and 94.7% in 2018, 2019 and the nine months ended September 30, 2020, respectively.   We believe these solutions and our net customer retention present significant cross-selling and up-selling potential as customers tend to stay with us due to the critical role our solutions play in their business operations.*

> *We have developed a full-coverage customer support and success system for large enterprises designed to drive customer satisfaction and expand cross-selling and up-selling opportunities.*  We place great emphasis on improving customer experience at each step.  We provide pre-sale consultation, onboarding implementation support and training at the initial stage.  With ongoing 24/7/365 live chat and phone support, we help customers configure and use our solutions. We also offer operation maintenance services to ensure reliable performance.  For smaller customers, our intuitive user interfaces serve to reduce our customers' need for human support, and we offer various self-service options on our websites, including a complimentary knowledge base with detailed documentation and sample code.   We believe high customer satisfaction and close customer

relationship can keep us posted of their honest feedback and evolving communications needs, which drives innovation and facilitates more targeted services to further increase customer loyalty.[1]

67.     The Registration Statement further represented that Cloopen expected its dollar-based net retention rate to "remain stable at a relatively high level," as the Company "continuously optimize[s] [its] existing solutions and develop[s] new features and solutions."

68.     The foregoing statements were false and materially misleading because, at the time of the IPO, Cloopen's "land and expand" strategy was failing and its customer base deteriorating. Cloopen's dollar-based net retention rate was not "stable," but rather had dropped significantly by the end of 2020, plummeting well below the 94.7% figure the Company observed in the nine months ended September 30, 2020.  In fact, 4Q 2020 dollar-based net retention rate, reflecting the period immediately preceding the Company's IPO, fell so drastically that it caused the Company's FY 2020 retention rate to tumble to 86.8%, a marked decline from the Company's FY 2019 retention rate of 102.7%.  This meant, Cloopen's purportedly "loyal" existing customer base was not "expand[ing]" into additional solutions and that Cloopen's "strong customer acquisition capability [and] steady revenue stream from repeat customers," was waning.

69.     For these same reasons, the Registration Statement's claims about Cloopen's strategies to "strengthen [its] sales efforts" by "optimiz[ing] [its] incentive structure to encourage [Cloopen's] sales and customer support teams to actively and regularly interact with existing customers, in order to identify changes in customer needs . . . to more effectively cross-sell and up-sell [its] solutions[,]" "strengthen [its] direct sales capabilities to cover more key accounts and tap into more industries[,]" "serve more customers from similar industries to lower the additional costs in industry customization as [Cloopen] scale[s]," "strategically establish business

---

[1] Unless otherwise noted all emphasis in quotations in this Complaint is added.

relationships with enterprises in second- and lower-tier cities to capitalize on the increasing penetration of cloud-based communications solutions into these areas[,]" and "collaborate with an increasing number of channel partners . . . to further expand [Cloopen's] geographical coverage in China," were false and misleading.  These statements failed to disclose that these initiatives were not working and its existing customer base was deteriorating.

70.     The misrepresentations in ¶¶ 63-67, 69 above were further misleading because, at the time of the IPO, an increasing number of customers were not paying Cloopen for the services and/or solutions it provided, forcing Cloopen to recognize massive increases in its accounts receivables and its allowance for doubtful accounts, the latter of which reflects Cloopen's determination that these accounts were uncollectible.  As such, the supposed "opportunity" to "up-sell and cross-sell" existing customers was greatly diminished, explaining why revenues for the period ending December 31, 2020 were, according to analysts, "soft," and general and administrative expenses had grown by 59.2% year-over-year.

71.     Furthermore, although the risk factors in the Registration Statement mentioned the possibility that Cloopen's customers "*may* delay or even be unable to pay [the Company] in accordance with the payment terms included in [its] agreements with them," that "[a]ny change in [its] customers' business and financial conditions *may* affect [Cloopen's] collection of accounts receivables," or that its "efforts to cross-sell and up-sell [*may*] not [be] as successful as [Cloopen] anticipates," these risk warnings were themselves materially false and misleading because the risks warned of had already come to pass.

72.     The Registration Statement's summary of Cloopen's capitalization efforts leading up to the IPO also misled investors.  According to the Registration Statement:

> In October 2019, ***we issued warrants*** to Guizhou Province Yunli High-tech Industry Investment Partnership (Limited Partnership) and Guizhou Province Chuangxin Chuangye Equity Investment Fund (Limited Partnership) ***with the right to purchase an aggregate of 6,112,570 series E preferred shares, as adjusted, at***

*the aggregate exercise price of US$15,000,000* . . . . In March 2020 and July 2020, we issued *additional warrants* to such warrant holders *with rights to purchase an aggregate of 314,274 series E preferred shares at nominal value for anti-dilution purpose*. *The series E warrants were exercised in full in November 2020.*

\*     \*     \*

In November 2020, *we issued a warrant* to Novo Investment HK Limited with the value of US$34,000,000, or the series F warrant. *The warrant holder may, within six months commencing from the issuance date, subscribe for an aggregate of 11,799,685 series F preferred shares of our company, par value of US$0.0001 per share, at the exercise price of US$2.8814 per share, subject to adjustment.* The series F warrant is, prior to the expiration date, transferrable, subject to certain restrictions, and the warrant shares issuable thereunder will be converted and redesignated into Class A ordinary shares after this offering . . . . *The series F warrant was exercised in full in January 2021.*

73.     The Registration Statement also noted how Cloopen accounted for the Series E and Series F warrants as liabilities using their estimated fair value, which was to be remeasured routinely:

> At initial recognition, [Cloopen] recorded the warrant liabilities on the consolidated balance sheets at their estimated fair value and changes in estimated fair values were included in the change in fair value of warrant liabilities on the consolidated statement of comprehensive loss or and allocated to the proceeds from the issuance of the debt instrument to the warrants based on the warrant liabilities fair value. The warrant liabilities are subject to remeasurement at each reporting period and [Cloopen] adjusted the carrying value of the warrant liabilities to fair value at the end of each reporting period utilizing the binominal option pricing model, with changes in estimated fair value included in the change in fair value of warrant liabilities on the consolidated statement of comprehensive loss.

74.     According to the Registration Statement, the fair value of the Series E preferred shares underlying the Series E Warrants as of December 31, 2019 and September 30, 2020 were $2.49 and $2.70, respectively.  Though the fair value of the Series F preferred shares underlying the Series F Warrant were not provided, the exercise price of the preferred shares underlying the Series F warrant was $2.8814 per share.

75.     The statements in ¶¶ 72-74 above misled prospective investors in that they failed to disclose that, due to the fact that Cloopen had valued these warrants at extremely low levels, Cloopen had massive additional costs associated with the warrants that needed to be recognized.

76.     In addition to the materially false and misleading statements and omissions in the Registration Statement identified above, Defendants also violated their affirmative obligations to provide certain material information in the Registration Statement as required by applicable SEC rules and regulations.

77.     Specifically, Item 303 of SEC Regulation S-K required the Company to disclose "any known trends or uncertainties that have had or that [Cloopen] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *       *       *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

78.     Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)     Is the trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty,

on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

79.     Defendants were thus required to disclose that Cloopen's growth strategy was not working and that its existing customers were: (i) leaving; (ii) dramatically decreasing their usage of Cloopen's solutions, so much so that the Company's dollar-based net retention rate fell significantly below the Company's historical levels; and (iii) increasingly failing to pay for the services or solutions that Cloopen rendered.  The omitted material facts alleged herein were reasonably expected to (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations at the time of the IPO.  By failing to disclose this information, Defendants violated Item 303.  Defendants also had an obligation to disclose the massive warrant liabilities facing the Company at the time of the IPO in violation of Item 303.

80.     Moreover, Item 105 of Regulation S-K required disclosure in the Registration Statement of the most significant "factors that ma[d]e an investment in [the IPO] speculative or risky," and an explanation of "how the risk affect[ed] [Cloopen] or the securities being offered." As detailed herein, the Registration Statement violated Item 105 because it failed to disclose material facts necessary to apprise ADS purchasers of the true risks inherent in investing in the Company and of known adverse trends and uncertainties.

81.     Cloopen's discussion of risk factors inadequately described the risks posed by Cloopen's deteriorating customer base, ineffective growth strategy, and large warrant liabilities. It also failed to warn of the likely and consequent materially adverse effects such risks posed on the Company's future results, share price, and prospects.  Without adequate disclosure of the specific risks then facing Cloopen related to its customers and growth initiatives, investors could not adequately ascribe a value for the Company's ADSs in connection with the IPO.

**SUBSEQUENT EVENTS AND ADDITIONAL MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

82.     On March 26, 2021, Cloopen shocked the market when it disclosed its 4Q 2020 and
FY 2020 financial results, which closed on December 31, 2020, more than a month prior to the
IPO.

83.     Cloopen reported 4Q 2020 revenues of RMB258.7 million ($39.6 million), $2
million shy of analysts' consensus, net losses of RMB305.4 million ($46.8 million), representing
a staggering 466.9% increase year-over-year, and operating expenses of RMB180.4 million ($27.6
million), representing a 30% increase from the 4Q 2019 (RMB138.8 million).

84.     In both the Form 6-K filed with the SEC on March 26, 2021 and during the analyst
earnings call that took place later the same day, Cloopen blamed a "change in fair value of warrant
liabilities of RMB224.8 million (US$34.4 million)" for its remarkable net loss, and an "increase
in the provision for doubtful accounts resulting from increased accounts receivables" for the 59.2%
increase recorded in general and administrative expenses.

85.     These disappointing 4Q 2020 results also dragged down the Company's full year
performance, which resulted in revenues increasing only 18.1%, net losses of RMB509.1 million
($78.0 million), representing an increase of 177.5% year-over-year, and a 90.1% increase in
general and administrative expenses.  Cloopen again blamed an "increase in the change in fair
value of warrant liabilities," this time to the tune of RMB227.5 million ($34.9 million) and "a
significant increase in provision for doubtful accounts resulting from an increase in accounts
receivables."

86.     In the earnings conference call that same day, Cloopen continued to misrepresent
its "land and expand" strategy.  It again failed to acknowledge that the strategy was failing and
that its existing customer base was deteriorating.  Moreover, Cloopen again failed to disclose that

its dollar-based net retention rate had plummeted during 4Q 2020.  For example, on the March 26, 2021 conference call, Defendant Li stated as follows

> Our prime customers in China are large enterprises with a broad range of communication demands.  With our comprehensive business portfolio, we are better positioned to fulfill those business demands.  ***In 2020, we generated about 70% of our total revenues from large enterprise customers: About 1/3 of these customers employed more than 1 category of our solutions, providing us considerable cross-selling and upselling potential.***  In addition, the migration of the communications industry to cloud-based solutions has only just begun in China.  The penetration of cloud-based communications in China was just 2.7% in 2019 compared to roughly 10% in U.S.  The market is also very fragmented, and therefore, ripe for consolidation.  ***We are confident that our recognized leadership position and comprehensive cloud-based communications solutions put us in a position to adapt to market dynamics and capitalize on the tremendous growth opportunity.***

87.    In response to the Company's March 26, 2021 disclosures, and despite the Company's continuing misrepresentations and omissions, Cloopen's share price plunged from $14.42 per ADS on March 25, 2021 to close at $11.75 per ADS on March 26, 2021, a decline of 18.5%.

88.    As further information emerged about how poorly Cloopen's growth strategy was performing, how Cloopen's customer base was deteriorating, and how Cloopen was estimating the fair value of certain warrants, all ahead of the IPO, the value of Cloopen's shares continued to decline.  For example, on May 10, 2021, after the market closed, Cloopen filed its Annual Report on SEC Form 20-F, revealing for the first time that its dollar-based net customer retention rate for recurring solutions had hemorrhaged from 102.7% in 2019 to 86.8% by year end 2020.  This meant Cloopen's purportedly "loyal" existing customer base was not "expand[ing]" into additional solutions — a fact Defendants had to have known given how Cloopen "built a sales and marketing team well-versed in China's cloud-based communications industry," tasked its team members with "***renewing existing subscriptions***[] and ***maintaining customer relationships***," and established strategically-located sales representative offices to "***stay closer to potential [and existing]***

*customers,* and capture and accommodate specific needs . . . more effectively."  In other words, Cloopen finally admitted that its growth strategy was not working.

89.    In addition, the Annual Report disclosed for the first time that the fair value of the Series F Redeemable Convertible Preferred Shares underlying the Series F warrant, issued and exercised in full ahead of the IPO, was, as of December 31, 2020, $5.50 per share.

90.    As the market absorbed this news, the value of Cloopen's shares fell from $9.89 per ADS on May 11, 2021 (and $9.59 per ADS on May 10th) to close at $8.97 per ADS on May 12, 2021.  Since then, Cloopen's shares have continued to decline.  As of December 8, 2021, Cloopen's ADSs had traded as low as $2.70 per ADS, representing a decline of over 80% from the $16 IPO price.

## CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who: (a) purchased or otherwise acquired Cloopen ADSs pursuant and/or traceable to the Registration Statement; and/or (b) purchased or otherwise acquired Cloopen securities between the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

92.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cloopen's shares actively traded on the NYSE.  Twenty-three million ADSs were offered and sold in the IPO and millions were publicly traded during the Class Period.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Record owners and other members

of the Class may be identified from records maintained by Cloopen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Registration Statement or otherwise during the Class Period misrepresented material facts about the business, operations, and prospects of Cloopen;

- whether the Securities Act Individual Defendants negligently prepared the Registration Statement for the IPO and, as a result, whether the Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading;

- whether the Exchange Act Defendants caused Cloopen to issue false and misleading statements;

- whether the Exchange Act Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material facts;

- whether the prices of Cloopen securities were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

97.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine (for Exchange Act claims) in that:

- The Exchange Act Defendants made public misrepresentations or failed to disclose;

- the omissions and misrepresentations were material;

- at relevant times Cloopen securities traded in an efficient market;

- the Company's shares were liquid and traded with significant volume during the Class Period;

- the Company traded on the NYSE and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Cloopen securities between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

98.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah et al. v. United States et al.*, 406 U.S. 128, 92 S. Ct. 1456 (1972), as the Exchange Act Defendants omitted material information in their statements in violation of a duty to disclose such information, as detailed above.

## LOSS CAUSATION

100.   This paragraph applies to Plaintiff's Exchange Act claims only since Plaintiff's Securities Act claims do not require the pleading of loss causation.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  During the Class Period, Plaintiff and the Class purchased Cloopen securities at artificially inflated prices and were damaged thereby.   The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

101.   This paragraph applies to Plaintiff's Exchange Act claims only since Plaintiff's Securities Act claims do not require the pleading of scienter.  The Exchange Act Defendants acted with scienter since these defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding Cloopen, their control over, and/or receipt and/or modification of Cloopen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cloopen, participated in the scheme alleged herein.

## NO SAFE HARBOR

102.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

103.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

104.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cloopen who knew that the statement was false when made.

## COUNT I

### Violations of § 11 of the Securities Act
### Against All Defendants

105.    Plaintiff repeats and realleges each and every allegation contained above with the exception of the sections entitled "Loss Causation" and "Scienter Allegations."  Additionally, for purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

106.    This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

107.    The Registration Statement was false and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

108.     Cloopen is the registrant for the IPO.  As issuer of the shares, Cloopen is strictly liable to Plaintiff and the Class for the misstatements and omissions.

109.     The Securities Act Individual Defendants were responsible for the contents and dissemination of the Registration Statement.  Each of the Securities Act Individual Defendants signed the Registration Statement, was a director of Cloopen at the time of filing, and/or was named in the Registration Statement, with their consent, as about to become a director.

110.     Defendant Cogency Global, as a signer of the Registration Statement (by its agent and employee, Defendant DeVries, who signed the Registration Statement on DeVries's own behalf and on behalf of Cogency Global), is also strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.  Cogency Global is also liable for the securities law violations committed by Defendant DeVries in its capacity as DeVries's employer, based on principles of agency and *respondeat superior*.

111.     The Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.

112.     None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

113.     By reason of the conduct herein alleged, each Defendant violated and/or controlled a person who violated § 11 of the Securities Act.

114.     Plaintiff acquired her ADSs pursuant and/or traceable to the Registration Statement for the IPO.

115.     Plaintiff and the Class have sustained damages.  The value of Cloopen ADSs has declined substantially subsequent to and due to Defendants' violations.

116.     At the time of their purchases or acquisitions of Cloopen ADSs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

117.     Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time Plaintiff commenced this action.

118.     By reason of their conduct alleged herein, Defendants violated § 11 of the Securities Act.

## COUNT II

### Violations of § 15 of the Securities Act
### Against the Securities Act Individual Defendants, Cloopen, and Cogency Global

119.     Plaintiff repeats and realleges each and every allegation contained above with the exception of the Sections entitled "Loss Causation" and "Scienter Allegations."  Additionally, for purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

120.     This Cause of Action is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o, against the Securities Act Individual Defendants, Cloopen, and Cogency Global.

121.     The Securities Act Individual Defendants were control persons of Cloopen by virtue of their positions as directors, senior officers, and/or Cloopen's authorized U.S. representative, which allowed each of the Securities Act Individual Defendants to exercise control over the Company, its operations, and the Registration Statement.

122.   Defendant Cloopen controlled the Securities Act Individual Defendants, other than Defendant DeVries, and all of its employees.

123.   Defendant Cogency Global controlled Defendant DeVries and all of its employees, and served as the authorized U.S. representative for the Company.

124.   Each of the Defendants named herein was a culpable participant in the violations of § 11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement, having been named with their consent in the Registration Statement as a director, serving as Cloopen's authorized U.S. representative, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

## COUNT III

### Violations of § 10(b) of the Exchange Act and Rule 10b-5
### Against the Exchange Act Defendants

125.   Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Cause of Action, Plaintiff does not expressly exclude or disclaim any allegation of fraud or intentional or reckless misconduct.

126.   This Count is asserted against the Exchange Act Defendants and is based upon § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

127.   The Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as

alleged herein; (ii) artificially inflate and maintain the market price of Cloopen securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cloopen securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

128.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cloopen securities.  Such filings, reports, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cloopen's business, operations, and prospects.

129.    By virtue of their positions at Cloopen, Defendants Sun and Li had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

130.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and

control.   As the senior managers and/or directors of Cloopen, Defendants Sun and Li had knowledge of the details of Cloopen's internal affairs.

131.    The Exchange Act Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Exchange Act Defendants were able to and did, directly or indirectly, control the content of the statements of Cloopen.   As officers and/or directors of a publicly-held company, Defendants Sun and Li had a duty to disseminate timely, accurate, and truthful information with respect to Cloopen's businesses, operations, and prospects.   As a result of the dissemination of the aforementioned false and misleading Registration Statement and other public statements, the market price of Cloopen securities was artificially inflated throughout the Class Period.

132.    In ignorance of the adverse facts concerning Cloopen's business, operations, and prospects which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cloopen securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

133.    During the Class Period, Cloopen securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cloopen securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Cloopen securities was substantially lower than the

prices paid by Plaintiff and the other members of the Class.  The market price of Cloopen securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

134.   By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

135.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period.

**COUNT IV**

**Violations of § 20(a) of the Exchange Act**
**Against the Exchange Act Defendants**

136.   Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Cause of Action, Plaintiff does not expressly exclude or disclaim any allegation of fraud or intentional or reckless misconduct.

137.   During the Class Period, Defendants Sun and Li participated in the operation and management of Cloopen, and conducted and participated, directly and indirectly, in the conduct of Cloopen's business affairs.  Because of their senior positions, they knew the adverse non-public information about Cloopen's misstatements and omissions.

138.   As officers and directors of a publicly owned company, Defendants Sun and Li had a duty to disseminate accurate and truthful information with respect to Cloopen's business, operations, and prospects, and to correct promptly any public statements issued by Cloopen which had become materially false or misleading.

139.   Because of their positions of control and authority as senior officers and directors, Defendants Sun and Li were able to, and did, control the contents of the Registration Statement

and other public filings and statements which Cloopen disseminated in the marketplace. At all relevant times, Defendants Sun and Li exercised their power and authority to cause Cloopen to engage in the wrongful acts complained of herein.

140.    Defendant Cloopen also controlled Sun and Li.

141.    Each of the Defendants named herein was a culpable participant in the violations of § 10(b) of the Exchange Act and Rule 10b-5 as alleged in the Cause of Action above

142.    The Exchange Act Defendants therefore, were "controlling persons" within the meaning of § 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cloopen securities.

143.    By reason of the above conduct, the Exchange Act Defendants are liable pursuant to § 20(a) of the Exchange Act for the violations committed by Cloopen.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a Class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  December 10, 2021         JOHNSON FISTEL, LLP

         */s/ Ralph M. Stone*

         RALPH M. STONE
         1700 Broadway, 41st Floor
         New York, NY  10019
         Telephone:  212/292-5690
         212/292-5680 (fax)
         ralphs@johnsonfistel.com

         JOHNSON FISTEL, LLP
         MICHAEL I. FISTEL, JR.
         40 Powder Springs Street
         Marietta, GA  30064
         Telephone:  470/632-6000
         770/200-3101 (fax)
         michaelf@johnsonfistel.com

         *Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Boyan Dong, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the complaint and authorize its filing.

2.     I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.     I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 2/11/2021 | 200 | $31.01 |
| 2/12/2021 | 150 | $45.41 |
| 2/12/2021 | 200 | $39.69 |
| 2/12/2021 | 150 | $34.06 |
| 2/12/2021 | 200 | $31.25 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 2/11/2021 | 200 | $35.75 |
|  |  |  |

5.     I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 11/18/2021

_____
Boyan Dong