**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOYAN DONG, Individually and On Behalf of All Others Similarly Situated, | Case No.: 1:21-cv-10610-JGK |
| Plaintiff, | |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| CLOOPEN GROUP HOLDING LIMITED, CHANGXUN SUN, YIPENG LI, KUI ZHOU, QINGSHENG ZHENG, XIAODONG LIANG, ZI YANG, MING LIAO, FENG ZHU, LOK YAN HUI, JIANHONG ZHOU, CHING CHIU, XIEGANG XIONG, CHENG LUO, YUNHAO LIU, COGENCY GLOBAL INC., COLLEEN A. DEVRIES, GOLDMAN SACHS (ASIA) L.L.C., CITIGROUP GLOBAL MARKETS INC., CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, TIGER BROKERS (NZ) LIMITED, and FUTU INC., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.      NATURE OF THE ACTION ........................................................................ 1

II.     JURISDICTION AND VENUE ................................................................... 6

III.    PARTIES ...................................................................................................... 7

IV.     FACTUAL BACKGROUND ..................................................................... 12

        A.    Cloopen's Pre-IPO Financing .................................................... 14

        B.    Cloopen's IPO ............................................................................ 16

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS IN,
        AND OMISSIONS FROM, THE REGISTRATION STATEMENT ............ 17

        A.    Cloopen Failed to Disclose the Existing Fair Value of the Series F Warrant ....... 17

        B.    Cloopen Was Losing Business From Existing Customers ................... 21

        C.    Cloopen's Customers Were Not Paying ........................................ 35

        D.    Cloopen Failed to Disclose "Known Trends or Uncertainties"
              as Required by Item 303 of SEC Regulation S-K ............................ 37

        E.    Cloopen Failed to Comply with Item 105 of Reg S-K ...................... 39

VI.     SUBSEQUENT EVENTS AND ADDITIONAL
        MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS DURING THE CLASS PERIOD ............................... 39

VII.    CLASS ACTION ALLEGATIONS ........................................................... 44

VIII.   NO SAFE HARBOR ................................................................................. 47

COUNT I  Violations of § 11 of the Securities Act Against All Defendants ............... 47

COUNT II  Violations of § 15 of the Securities Act Against the Securities Act
        Individual Defendants, Cloopen, and Cogency Global ........................... 49

COUNT III  Violations of § 10(b) of the Exchange Act and
        Rule 10b-5 Against the Exchange Act Defendants .............................. 50

        A.    Loss Causation ........................................................................... 53

        B.    Scienter Allegations .................................................................... 56

        C.    Applicability Of Presumption Of Reliance (Fraud-On-The-Market Doctrine) .... 59

COUNT IV  Violations of § 20(a) of the Exchange Act
        Against the Exchange Act Defendants ................................................ 61

PRAYER FOR RELIEF ........................................................................................................... 62

JURY DEMAND ..................................................................................................................... 62

Court appointed Lead Plaintiff Guozhang Wang ("Plaintiff"), ECF No. 71, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to his own acts and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Cloopen Group Holding Limited ("Cloopen" or the "Company"), press releases, earnings calls, media reports, and other publicly available materials and consultation with experts.

## I.    NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who: (a) purchased or otherwise acquired Cloopen American Depositary Shares ("ADSs") pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with Cloopen's February 9, 2021 initial public offering (the "IPO" or the "Offering"); and/or (b) purchased or otherwise acquired Cloopen securities between February 9, 2021 and May 10, 2021, inclusive (the "Class Period"). Plaintiff brings strict liability, non-fraud claims under the Securities Act of 1933 (the "Securities Act") against all Defendants and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act") against Cloopen and its Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO"), as well as the Company's Chief Financial Officer ("CFO").

2.     Cloopen claims to be the largest multi-capability cloud-based communications solution provider in China. The Company purportedly is the only Chinese provider that offers a full suite of cloud-based solutions covering Communications Platforms as a Service ("CPaaS"), cloud-based Contact Centers ("cloud-based CC"), and cloud-based Unified Communications and Collaborations ("cloud-based UC&C"). Cloopen claims that it serves a diverse and loyal customer base consisting of enterprises of all sizes across a variety of industries, including internet,

telecommunications, financial services, education, industrial manufacturing, and energy.

3.      In its February 2021 U.S. IPO, Cloopen sold 23 million ADSs pursuant to the Registration Statement (including the full exercise of the Underwriter Defendants' over-allotment option) at $16 per ADS, netting approximately $340.2 million in proceeds from the Offering. However, the Registration Statement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding Cloopen's business, operations, and prospects.

4.      Specifically, the Registration Statement concealed from investors that Cloopen had incurred a massive liability related to the increased fair value of a recently granted Series F Warrant. These undisclosed costs, which materialized as of January 7, 2021—one month **before** the IPO—meant that Cloopen had experienced a net loss of $46.8 million for the fourth quarter 2020 ("4Q 2020"). Although this massive loss – an increase in net loss for the Company of 466.9% year-over-year – was fully calculable once the Series F Warrant had been fully exercised on January 7, 2021, Defendants nevertheless kept it from investors. This omission was brazen because the Registration Statement contained a section on "subsequent events" regarding the exercise of the Series F Warrant. In other words, Defendants included in the Offering documents material facts that had arisen subsequent to the most recent financial reporting – **and still failed to include** the tremendous costs stemming from the increase in fair value of the Series F Warrant.

5.      Defendants did not report Cloopen's 4Q 2020 and full-year 2020 ("FY 2020") financials until March 26, 2021 **more than six weeks after the IPO** even though the enormous loss relating to the increase in the fair value of the Series F Warrant existed well in advance of the IPO.

6.      The Registration Statement also misled investors into believing that Cloopen's "land and expand" growth strategy, predicated on "cross-selling and up-selling," "optimiz[ing]

existing solutions," and "develop[ing] new features," was effective at the time of the IPO in helping to both retain Cloopen's existing customer base and maintain its dollar-based net customer retention rate at a "stable" level, showing Cloopen's vital ability to increase revenue generated from its existing customer base.

7.      Defendants' representations in the Registration Statement regarding Cloopen's growth strategy were false and misleading because, as of February 8, 2021, the effective date of the Registration Statement, Cloopen had already lost a material percentage of existing customer business during 4Q 2020, ended December 31, 2020, and had done so at an exponentially increasing rate over the rate reported in the Registration Statement for first nine months of 2020.

8.      One of Cloopen's key operational metrics is its dollar-based net customer retention rate. This metric, which according to the Company's SEC filings, "illustrates our ability to increase revenue generated from our existing customer base," is cited repeatedly in the Registration Statement. While the Company has consistently touted this metric as a reflection of its ability to retain customers, the Registration Statement fails to disclose that Cloopen's dollar-based net customer retention rate had plummeted during 4Q 2020, the reporting period prior to the IPO, to 63.1% − *more than 30% below* the 94.7% rate reported in the Registration Statement for the nine months ended September 30, 2020.

9.      The omission of 4Q 2020  dollar-based net customer retention rate from the Registration Statement was materially misleading since the Registration Statement included *other* selected facts that were up to date as of the Registration Statement's effective date (*i.e.*, February 8, 2021).  Indeed, the Registration Statement contained other information represented to be "as of the date of this prospectus" and "current[]."  Thus, the inclusion of the more favorable net customer retention metric as of September 30, 2020—to the exclusion of the then current 4Q 2020 rate—

renders the Registration Statement per se misleading because it concealed the 4Q 2020 trend showing a precipitous decline in that rate.

10.     Not only was Cloopen losing existing customers at the time of the IPO, but an increasing number of customers were not paying. This required Cloopen to recognize material increases in its accounts receivables and allowance for doubtful accounts, which resulted in general and administrative expenses increasing dramatically.  The Registration Statement concealed this adverse trend by claiming that Cloopen's customer base was "stay[ing] with [the Company]." Such representation was false and misleading because, according to the Registration Statement, the Company "closely monitor[ed] our outstanding accounts receivables and follow[ed] up with relevant customers on a continuous basis in order to collect overdue balances."

11.     By failing to disclose the material facts alleged herein, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), which requires disclosure of "any known trends or uncertainties that have had or that [the] registrant reasonably expects will have a material favorable or unfavorable impact on the sales and revenues or income from continuing operations" of the registrant. Cloopen's existing customer exodus, evidenced by the precipitous drop in the 4Q 2020 dollar-based net customer retention rate and the uncollectability of customer accounts at the time of the IPO, were existing trends or uncertainties that Cloopen reasonably expected would (and did) impact sales, revenue, and income from continuing operations.

12.     Defendants also violated Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), which requires the "Risk Factor" section of registration statements and prospectuses to include "a discussion of the material factors that make [the offering] . . . speculative or risky," and further requires that the discussion of each risk factor "adequately describe the risk." Here, the Registration Statement failed to adequately disclose several then- existing   risks, including: the

risks to the Company's financial performance posed by the massive loss Cloopen suffered upon the exercise of the Series F Warrant on January 7, 2021; the fact of Cloopen's then current deterioration of its dollar-based net customer retention rate by over 30% for 4Q 2020; and the uncollectability of customer accounts which Cloopen claimed to "closely monitor[]" by following up with delinquent customers on a "continuous basis."  The risk warnings in the Registration Statement were inadequate and ineffective to inform investors of the true risks of investing in Cloopen because although that document couched some of the risks as hypothetical, or that they "may" occur, the risks warned of had, in fact, already occurred at the time of the IPO.

13.     On March 26, 2021, Cloopen shocked the market when it published its financial results for 4Q 2020 and FY 2020, which had closed on December 31, 2020, more than a month before the IPO.  In stark contrast to the optimistic financial picture presented in connection with the IPO *just six weeks earlier*, Cloopen reported 4Q 2020 revenues of just $39.6 million ($2 million shy of analysts' consensus), net losses of $46.8 million (representing a staggering loss increase of 466.9% year-over-year), and operating expenses of $27.6 million (representing a 30% increase over 4Q 2019). Cloopen blamed its surge in net loss on a "change in fair value of warrant liabilities of . . . US$34.4 million" and attributed the remarkable (59.2%) increase in general and administrative expenses to "an increase in the provision for doubtful accounts resulting from increases in accounts receivables."

14.     In response to the Company's stunning about-face, Cloopen's ADSs fell 18.5% in a single day from $14.42 per ADS on March 25, 2021, to close at $11.75 per ADS on March 26, 2021.

15.     Still, Cloopen's most senior officers continued to mislead investors and concealed the true extent of Cloopen's troubles. In the March 26, 2021, earnings announcement and

corresponding investor conference call, Defendants were silent on the fact that Cloopen's existing customer base was deteriorating.  Nor did they disclose that Cloopen's dollar-based net retention rate had tumbled in 4Q 2020 to 63.1% – a decline of approximately 30%.

16.     On May 10, 2021, Cloopen belatedly revealed that its  dollar-based net customer retention rate dropped by year-end 2020 ----far below historical periods---- to 86.8%. Cloopen's stock fell again, closing at $8.97 per share on May 12, 2021, or 9.3% below its previous day close.

17.     As of the date of the filing of the complaint on December 10, 2021, Cloopen's ADSs traded as low as $3.10 per ADS, representing a decline of approximately 80% from the $16 IPO offering price.

18.     Cloopen investors have lost hundreds of millions of dollars because of Defendants' wrongdoing, which prevented Plaintiff and other ADS purchasers from adequately assessing the value of the ADSs offered in connection with the IPO.

19.     Furthermore, recent disclosures by Cloopen raise additional questions regarding the accuracy of the Company's Class Period disclosures. Specifically, on May 3, 2022, Cloopen announced that it had formed an independent special committee to investigate certain employee misconduct and transaction irregularities and the issues that were brought to the Board's attention by KPMG Huazhen LLP ("KPMG"). The Company also disclosed that KPMG "identified irregularities relating to certain customers' transactions for previous years," including during the Class Period. Further, the Company admitted that it still "***has not concluded on the potential implications on its consolidated financial statements of previous years.***" Further, the Company disclosed that "KPMG notified the Board of its resignation as the Company's independent registered public accounting firm."

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the

Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v(a)), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).

## III.   PARTIES

23.     As set forth in his Certification, incorporated by reference herein, ECF No. 48-1, Plaintiff Wang purchased Cloopen ADSs during the Class Period and pursuant and/or traceable to the Registration Statement, and has been damaged thereby.

24.     Defendant Cloopen's executive offices are located at 16/F, Tower A, Fairmont Tower, 33 Guangshun North Main Street, Chaoyang District, Beijing, China. Its agent for service of process in the United States is Defendant Cogency Global Inc. ("Cogency Global"), located at 122 East 42nd Street, 18th Floor, New York, New York 10168. The Company's ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "RAAS."

25.     Defendant Changxun Sun ("Sun") founded Cloopen in 2014 and has been Cloopen's CEO and Chairman of Cloopen's Board since inception. Defendant Sun signed the false and misleading Registration Statement.

26.     Defendant Yipeng Li ("Li") has been Cloopen's CFO since May 2020. Defendant Li was named in the Registration Statement, with his consent, as having accepted appointment as a Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement. Defendant Li also signed the false and misleading Registration Statement.

27. Defendants Cloopen, Sun, and Li are collectively the "Exchange Act Defendants."

28. Defendant Kui Zhou ("Zhou") was at the time of the IPO a member of Cloopen's Board. Defendant Zhou signed the false and misleading Registration Statement.

29. Defendant Qingsheng Zheng ("Zheng") was at the time of the IPO a member of Cloopen's Board. Defendant Zheng signed the false and misleading Registration Statement.

30. Defendant Xiaodong Liang ("Liang") was at the time of the IPO a member of Cloopen's Board. Defendant Liang signed the false and misleading Registration Statement.

31. Defendant Zi Yang ("Yang") was at the time of the IPO a member of Cloopen's Board. Defendant Yang signed the false and misleading Registration Statement.

32. Defendant Ming Liao ("Liao") was at the time of the IPO a member of Cloopen's Board. Defendant Liao signed the false and misleading Registration Statement.

33. Defendant Feng Zhu ("Zhu") was at the time of the IPO a member of Cloopen's Board. Defendant Zhu signed the false and misleading Registration Statement.

34. Defendant Lok Yan Hui ("Hui") was at the time of the IPO a member of Cloopen's Board. Defendant Hui signed the false and misleading Registration Statement.

35. Defendant Jianhong Zhou ("J. Zhou") was at the time of the IPO a member of Cloopen's Board. Defendant J. Zhou signed the false and misleading Registration Statement.

36. Defendant Ching Chiu ("Chiu") was at the time of the IPO a member of Cloopen's Board. Defendant Chiu signed the false and misleading Registration Statement.

37. Defendant Xiegang Xiong ("Xiong") has served as Cloopen's Chief Product Officer since November 2018 and its Chief Technology Officer since May 2020. Xiong was named in the Registration Statement, with his consent, as having accepted appointment as a Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement.

38.     Defendant Cheng Luo ("Luo") has served as Cloopen's Chief Executive Officer Assistant since June 2015. Luo was named in the Registration Statement, with his consent, as having accepted appointment as a Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement.

39.     Defendant Yunhao Liu ("Liu") was named in the Registration Statement, with his consent, as having accepted appointment as a Company Director effective upon the SEC's declaration of effectiveness of the Registration Statement.

40.     Defendant Cogency Global was Cloopen's authorized U.S. representative for purposes of the IPO through its employee Defendant Colleen A. DeVries ("DeVries"). Defendant DeVries signed the Registration Statement for the IPO as an employee of Defendant Cogency Global as the authorized representative for Cloopen in connection with the IPO. Defendant Cogency Global is additionally liable for the securities law violations alleged herein to have been committed by Defendant DeVries as it controlled Defendant Devries at the time of the IPO.

41.     Defendants Sun, Li, Zhou, Zheng, Liang, Yang, Liao, Zhu, Hui, J. Zhou, Chiu, Xiong, Luo, Liu, and DeVries are collectively the "Securities Act Individual Defendants." The Securities Act Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned, and contributed to the IPO and Registration Statement, and/or attended road shows and other promotions to meet with and present favorable information to potential Cloopen investors, all motivated by their own, and the Company's, financial interests.

42.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter for the Company's IPO.

43.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter

for the Company's IPO.

44.     Defendant China International Capital Corporation Hong Kong Securities Limited ("CIC") served as an underwriter for the Company's IPO.

45.     Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") served as an underwriter for the Company's IPO.

46.     Defendant Futu Inc. ("Futu") served as an underwriter for the Company's IPO.

47.     Defendants Goldman Sachs, Citigroup, CIC, Tiger Brokers, and Futu are collectively the "Underwriter Defendants." The Underwriter Defendants are financial services companies that acted as underwriters for Cloopen's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Cloopen ADSs issued pursuant thereto.

48.     The Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement. In connection with the IPO, the Underwriter Defendants drafted and disseminated the Registration Statement and were collectively paid nearly $26 million in underwriting discounts and fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

49.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

        a.      The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and received millions of dollars in fees (collectively) for their service. The Underwriter Defendants arranged a multi-city road show prior to the IPO, during which they, and representatives from Cloopen, met with potential investors and presented highly

favorable information about Cloopen, its operations and its financial prospects.

      b.     The Underwriter Defendants also demanded and obtained an agreement from Cloopen and the Individual Defendants, that Cloopen would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Cloopen had purchased millions of dollars in directors and officers liability insurance.

      c.     Representatives of the Underwriter Defendants also assisted Cloopen and the Individual Defendants in planning the IPO and were required to conduct an adequate and reasonable due diligence investigation into the business and operations of Cloopen. The due diligence investigation was required of the Underwriter Defendants in order to participate in the IPO. During the course of their purported due diligence, the Underwriter Defendants had continual access to internal, confidential, then current corporate information concerning Cloopen's most up-to-date operational and financial results and prospects, including the representations in the Registration Statement.

      d.     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Cloopen's lawyers, management and top executives and engaged in drafting sessions ahead of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Cloopen ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Cloopen would be made in the Registration Statement; and (v) what responses would be made to the SEC, in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants'

representatives and Cloopen's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Cloopen's existing problems and the misrepresentations and nondisclosures in the Registration Statement alleged herein.

      e.      Finally, the Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of the ADSs registered and sold to Plaintiff and the other members of the Class.

## IV.    FACTUAL BACKGROUND

50.    Cloopen began providing cloud-based communications solutions in 2014. Because Chinese laws and regulations impose restrictions on foreign ownership and investment in companies like Cloopen that engage in value-added telecommunication services, Cloopen primarily operates its business through Beijing Ronglian Yitong Information Technology Co. Ltd., an entity controlled by Defendants Sun and Zhou who possess 71.01% and 26.46% interests, respectively.

51.    Cloopen claims to be the largest multi-capability cloud-based communications solution provider in China. Cloopen purportedly is the only provider in China that offers a full suite of cloud-based communications solutions covering CPaaS, cloud-based CC, and cloud-based UC&C. Cloopen claims that it serves a diverse and loyal customer base consisting of enterprises of all sizes across a variety of industries, including internet, telecommunications, financial services, education, industrial manufacturing, and energy.

52.    Cloopen generates revenues primarily from its CPaaS, cloud-based CC and cloud-based UC&C solutions. In general, Cloopen charges its customers using its CPaaS solutions on a recurring basis, based on the monthly number of text messages and call minutes facilitated. Cloopen charges its customers using its cloud-based CC solutions deployed on public clouds on a

recurring basis, with a combination of seat subscription fees and related resource fees. Cloopen charges its customers using its cloud-based CC solution deployed on a private cloud and cloud-based UC&C solutions on a project basis.

53.     In the years leading up to the IPO, Cloopen experienced significant growth, progressing from a reported 10,200 enterprise customers in 2018, to 11,500 in 2019, and to 13,000 as of December 31, 2020.

54.     The Registration Statement emphasizes that "[o]ur results of operations are highly dependent on the total number and the lifetime value of our customers." This fact highlights the importance of Cloopen's dollar-based net customer retention rate as a key operational metric. Cloopen generates revenues primarily from its CPaaS, cloud-based CC, and cloud-based UC&C solutions.  The solutions measured by the dollar- based net customer retention rate are Cloopen's CPaaS and cloud-based CC solutions, Therefore, the dollar-based net customer retention rate tracks a key component of that Cloopen's core business. As defined in the Registration Statement, the dollar-based net customer retention rate:

> ***illustrates our ability to increase revenue generated from our existing customer base.*** To calculate dollar-based net customer retention rate for a given period, we first identify all customers for solutions that we offer on a recurring basis, unless otherwise specified, with over RMB1,000 in monthly spending in the preceding period, then calculate the quotient from dividing the revenue generated from such customers in the given period by the revenue generated from the same group of customers in the preceding period. ***Solutions that we offer on a recurring basis include our CPaaS solutions and cloud-based CC solutions*** deployed primarily on public cloud, for which we change a combination of seat subscription fees and related resource usage fees.[1]

55.     According to the Registration Statement, in 2018, 2019, and the nine months ended September 30, 2020, the dollar-based net customer retention rate was 135.7%, 102.7%, and 94.7%,

---

[1] Unless otherwise noted, all emphasis is added.

respectively. Defendants did not disclose in the Registration Statement that Cloopen's key metric of its dollar-based net customer retention rate had dropped dramatically to 63.1%[2] during 4Q 2020---- a material negative trend in that key metric prior to the IPO.

56.     The Registration Statement couched some representations regarding customer retention as "[w]e believe," "expect," or "intend." This was false and misleading in view of the then-existing fact that the Company had experienced a drop in the dollar-based net customer retention rate of more than 30% in 4Q 2020, the reporting period immediately prior to the IPO. Although the Registration Statement claimed to present "current[]" information "as of the date of this prospectus" for certain metrics,   the Registration Statement  selectively presented information about the dollar-based net customer retention rate based only on the first nine months of 2020, omitting more recent – and considerably less favorable – customer retention data of a 30% drop in 4Q 2020.  Accordingly, the Registration Statement was per se misleading.

**A.     Cloopen's Pre-IPO Financing**

57.     In October 2019, in exchange for $15 million in loans to its Chinese operating unit, Cloopen issued warrants to Guizhou Province Yunli High-tech Industry Investment Partnership (Limited Partnership) and Guizhou Province Chuangxin Chuangye Equity Investment Fund (Limited Partnership) with the right to purchase 6,112,570 Series E preferred shares for $15 million.

58.     In March 2020 and July 2020, Cloopen issued additional warrants to the Series E warrant holders, affording them rights to purchase 314,274 Series E preferred shares at nominal value for anti-dilution purposes. Also, in March 2020 and July 2020, Cloopen issued 3,706,745 and 3,036,187 pre-offering Class A ordinary shares to Kastle Limited at nominal consideration. In

---

[2] The 63.1% dollar-based net customer retention rate for 4Q 2020 can be calculated as follows: 94.7+ 94.7+ 94.7 + 63.1 divided by 4 equals 86.8 .Cloopen never disclosed the 4Q 2020 rate.

July 2020, Cloopen issued 464,900 pre-offering Class A ordinary shares to Will Hunting Capital Fund I, L.P. for $1.14 million.

59.    In November 2020, Cloopen issued 1.7 million pre-offering Class A ordinary shares to Wisdom Legend Investment Limited. It also issued a Series F Warrant to Novo Investment HK Limited ("Novo") in the aggregate principal amount of $34 million ("Series F Warrant"). The Series F Warrant allowed the holder to, within six months, subscribe for 11,799,685 Series F preferred shares at the exercise price of $2.8814 per share. The Series F Warrant was transferrable, and the warrant shares issuable thereunder were to be converted and re-designated into Class A ordinary shares after Cloopen's IPO.

60.    Under generally accepted accounting principles ("GAAP"), Cloopen was obligated to treat its warrants as either equity instruments or as liabilities. By classifying the warrants to purchase redeemable convertible preferred shares as warrant liabilities, Cloopen was required to adjust the carrying value of the warrant liabilities to fair value. According to Cloopen, it recorded its warrant liabilities on its consolidated balance sheets at estimated "fair value[s]," calculated using "unobservable inputs which are supported by little or no market activity." Cloopen claimed that it remeasured its warrant liabilities on a routine basis.

61.    Cloopen's Series E warrants were exercised in full in November 2020. Cloopen recorded the fair value of the Series E Redeemable Convertible Preferred Shares underlying the Series E warrants as $2.70 per share.

62.    Cloopen's Series F Warrant was exercised in full on January 7, 2021, and Cloopen issued 11,799,685 Series F Redeemable Convertible Preferred Shares to Novo. Notwithstanding, Cloopen did not record or otherwise report the fair value of the Series F Redeemable Convertible Preferred Shares underlying the Series F Warrant or the massive loss Cloopen incurred on the

exercise of the Series F Warrant on January 7, 2021, in the Registration Statement.

63.     Cloopen also continued to issue pre-offering Class A ordinary shares in January and February 2021, affording, for example, Kastle Limited 1,424,312 shares and 6,410,750 shares and 15,065,118 pre-offering Class A ordinary shares to Flawless Success Limited and Flawless Wisdom Limited, respectively, due to the exercise of options by certain grantees under a 2016 share incentive plan.

### B.     Cloopen's IPO

64.     On November 13, 2020, Cloopen confidentially submitted a draft Registration Statement on Form F-1 to the SEC relating to a proposed IPO of its ADSs.

65.     After reviewing the draft Registration Statement, on December 10, 2020, in a letter addressed to Defendant Sun, the SEC provided its comments, focusing on customer retention. Under "Key Operating Metrics," the letter stated, "***Please include a discussion of the underlying reasons for the decreases in the dollar-based net customer retention rate in 2019 and the six-months ended June 30, 2020***." The letter also referenced Cloopen's reportedly increasing "average revenue per customer" for the six-month period ended June 30, 2020.

66.     Thereafter, on December 21, 2020, Cloopen filed a revised draft Registration Statement on Form DRS/A with the SEC.

67.     On January 19 and 29, 2021, Cloopen again filed updated Registration Statements with the SEC relating to its IPO. At the time, the number of ADSs to be offered and the price range for the proposed offering had not yet been determined.

68.     On February 3, 2021, Cloopen filed its final amendment to the Registration Statement with the SEC on Form F-1/A, which stated that the offering would be for 20 million ADSs, with an option for the Underwriter Defendants to purchase up to 3 million additional ADSs, at an anticipated offering price of between $13 and $15 per ADS. Each ADS represented two of

the Company's ordinary shares.

69.     On February 8, 2021, the SEC declared the Registration Statement effective.

70.     On February 9, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement.

71.     In the IPO, Defendants offered and sold 23 million Cloopen ADSs (which includes the Underwriter Defendants' over-allotment) at $16 per ADS. Thus, the IPO raised over $340.2 million in total net proceeds from investors.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS IN, AND OMISSIONS FROM, THE REGISTRATION STATEMENT

72.     The Registration Statement for the IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose material facts required to be disclosed therein under the rules and regulations governing its preparation.

### A.     Cloopen Failed to Disclose the Existing Fair Value of the Series F Warrant

73.     The description in the Registration Statement of Cloopen's capitalization efforts leading up to the IPO was misleading. According to the Registration Statement:

> In October 2019, we issued warrants to Guizhou Province Yunli High-tech Industry Investment Partnership (Limited Partnership) and Guizhou Province Chuangxin Chuangye Equity Investment Fund (Limited Partnership) with the right to purchase an aggregate of 6,112,570 series E preferred shares, as adjusted, at the aggregate exercise price of US$15,000,000. . . . In March 2020 and July 2020, we issued additional warrants to such warrant holders with rights to purchase an aggregate of 314,274 series E preferred shares at nominal value for anti-dilution purpose. The series E warrants were exercised in full in November 2020.
>
> * * *
>
> In November 2020, *we issued a warrant* to Novo Investment HK Limited with *the value of US$34,000,000, or the series F warrant. The warrant holder may, within six months commencing from the issuance date, subscribe for an aggregate of 11,799,685 series F preferred shares of our company, par value of US$0.0001 per share, at the exercise price of US$2.8814 per share, subject to adjustment.* The series F warrant is, prior to the expiration date, transferrable,

subject to certain restrictions, and the warrant shares issuable thereunder will be converted and redesignated into Class A ordinary shares after this offering. . . . ***The series F warrant was exercised in full in January 2021.***

74.    The representation in the Registration Statement that "[i]n November 2020, we issued a warrant . . . with the value of $34,000,000 on the series F warrant" was misleading because $34 million was *not* the recorded fair value of the Series F Warrant when it was issued in November 2020. Instead, the original fair value recorded for the Series F Warrant at issuance in November was $4.8 million − a fact existing at the time of the IPO which was not disclosed until Cloopen filed its Form 20-F with the SEC on May 10, 2021, approximately two months after the IPO. Without knowing the crucial $4.8 million fair value at issuance, investors in the IPO could not calculate the massive increase in the fair value of the warrant of $26 million ($31 million fair value at December 31, 2020 minus $4.8 million fair value in November 2020), which was required to be treated as a loss of $26 million. Since the Series F Warrant was treated as a liability by Cloopen in its balance sheet, any increase in liabilities would be recorded as a loss. The amount of the original fair value of the Series F Warrant ($4.8 million) was recorded and available when the Series F Warrant was issued in November 2020—approximately 3 months before the IPO, but it was not disclosed in the Registration Statement, thus making it impossible for investors in the IPO to calculate the increase in fair value and resulting loss through December 31, 2020.

75.    The Registration Statement also explained how Cloopen accounted for the Series E and Series F warrants as liabilities using their estimated fair value, which, critically, ***was to be remeasured and recorded routinely***.  Specifically:

> ***At initial recognition, [Cloopen] recorded the warrant liabilities on the consolidated balance sheets at their estimated fair value and changes in estimated fair values were included in the change in fair value of warrant liabilities on the consolidated statement of comprehensive loss or and allocated to the proceeds from the issuance of the debt instrument to the warrants based on the warrant liabilities fair value. The warrant liabilities are subject to remeasurement at each reporting period and [Cloopen] adjusted the***

18

***carrying value of the warrant liabilities to fair value at the end of each reporting period*** utilizing the binominal option pricing model, with changes in estimated fair value included in the change in fair value of warrant liabilities on the consolidated statement of comprehensive loss.

76.     According to the Registration Statement, the fair value of the Series E preferred shares underlying the Series E Warrants as of December 31, 2019, and September 30, 2020, were $2.49 and $2.70, respectively. Though the fair value of the Series F preferred shares underlying the Series F Warrant was not provided, the exercise price of the preferred shares underlying the Series F Warrant was $2.8814 per share.

77.     The statements above misled prospective investors in that they failed to disclose that, because Cloopen had valued the Series F Warrant at an extremely low value ($4.8 million) when it was issued and originally recorded, Cloopen had massive expenses associated with the Series F Warrant that needed to be recognized in 4Q 2020, due to the increase of the fair value of the Warrant, which was classified as a liability by Cloopen on its balance sheet.

78.     In the "Subsequent Events" section of the Registration Statement, Defendants described the full exercise of the Series F Warrant on January 7, 2020 but omitted the material fact of the original $4.8 million fair value, without which investors were not in a position to calculate the resulting loss.  The Registration Statement provided as follows:

Series F Warrants

Pursuant to the Series F preferred share purchase agreement, the Company agreed to issue a warrant to Novo Investment HK Limited ("Novo Investment") with the exercise price of US$34,000,000. Novo Investment may, within six months commencing from the issuance date, subscribe for an aggregate of 11,799,685 Series F Redeemable Convertible Preferred Shares of the Company, par value of US$0.0001 per share, at the exercise price of US$2.8814 per share, subject to adjustment.

***On January 7, 2021, Series F warrant was fully exercised with the exercise price of US$34,000,000 and the Company issued 11,799,685 Series F Redeemable Convertible Preferred Shares to Novo Investment.***

79.     When the Series F Warrant was fully exercised on January 7, 2021, Cloopen

suffered a massive $26 million loss as a result of the increase in fair value of the warrant (treated

on the balance sheet as a liability) from $4.8 million in November 2020 to $31 million at December

31, 2020 and ultimately $34 million when exercised in January 2021. Nonetheless, Cloopen failed

to disclose the existing loss in the Registration Statement and did not disclose it until more than a

month later, on March 26, 2021. All the facts necessary to calculate this $26 million loss existed

at the time of the issuance of the Registration Statement – including the $4.8 million fair value at

issuance – as confirmed in the Form 20-F filed with the SEC on May 10, 2021, which stated:

> On November 13, 2020, the Company agreed to issue a warrant to Novo
> Investment HK Limited ("Novo Investment") with the exercise price of
> US$34,000,000. Novo Investment may, within six months commencing from
> the issuance date, subscribe for an aggregate of 11,799,685 Series F Redeemable
> Convertible Preferred Shares of the Company, par value of US$0.0001 per
> share, at the exercise price of US$2.8814 per share, subject to adjustment. On
> January 7, 2021, the Series F warrant was fully exercised with the exercise price
> of US$34,000,000 and the Company issued 11,799,685 Series F Redeemable
> Convertible Preferred Shares to Novo Investment (Note 21(c)). At initial
> recognition, the Group recorded the warrant liabilities on the consolidated
> balance sheet at its estimated fair value and subsequently, at each reporting date,
> recorded changes in estimated fair value included in the change in fair value of
> warrant liabilities on the consolidated statement of comprehensive loss.

> **The fair value of the warrant to purchase 11,799,685 Series F Redeemable**
> **Convertible Preferred Shares is US$4,800,000 (equivalent to RMB31,816,800)**
> **at the issuance date** and US$31,000,000 (RMB202,271,900) as of December
> 31, 2020.

> The fair value of the warrant liability issued to Novo Investment for purchasing
> Series F Redeemable Convertible Preferred Shares as of December 31, 2020, are
> estimated with the following assumptions used:

| | December 31, 2020 |
|---|---|
| Risk-free rate of return | 1.07% |
| Volatility | 30% |
| Expected dividend yield | 0% |
| Fair value of underlying Series F Redeemable Convertible Preferred Shares | US$5.50 |
| Expected term | 0.36 years |

80.     The combination of the "deep-in-the-money" aspect of the Series F Warrant, the

20

low volatility ascribed to the preferred stock and common stock, and short time to expiration of the warrant (only approximately three months at the time of the IPO) resulted in the Series F Warrant trading "as-if" it was the stock. Therefore, the value of the Warrant would equal the fair value of the stock less the exercise price of the option, multiplied by the number of warrants. When the $4.8 million original value of the Warrant at the issuance date (November 13, 2020) is subtracted from the $31 million value as of December 31, 2020, the increase in value of the warrant is considered a loss, in view of the warrant being reflected as a liability. On January 7, 2021, when the Series F Warrant was fully exercised – and prior to the IPO – the loss of approximately $26 million on the Series F Warrant was an existing fact, yet Defendants omitted this existing massive loss from the Registration Statement and the original fair value of $4.8 million which would have allowed investors to calculate the loss.

81.    Defendants were obligated to disclose in the Registration Statement the existing $26 million loss as a result of the exercise of the Series F Warrant on January 7, 2021, notwithstanding that the Registration Statement generally contained financial data as of September 30, 2020. Indeed, throughout the Registration Statement, Defendants disclosed a number of material facts and events "as of the date of this Prospectus" and explicitly disclosed "Subsequent Events" relating to the valuation of the Series F Warrant yet concealed the crucial $4.8 million fair value recorded at issuance until May 10, 2021. This fair value was the essential missing piece that prevented investors from calculating the loss on the exercise of the Series F Warrant.

### B.    Cloopen Was Losing Business From Existing Customers

82.    The Registration Statement omitted the precipitous 4Q 2020 drop in its dollar-based net customer retention rate. It also misrepresented the strength of Cloopen's "diverse and loyal customer base" and how Cloopen's "land and expand" strategy – including its efforts to "cross-sell" and "up-sell," "optimize existing solutions," and "develop new features" – was working to

retain existing customers at the time of the IPO.

83.     The Registration Statement claimed that Cloopen's sales and marketing team enjoyed "considerable opportunities" to cross-sell and up-sell Cloopen's solutions to its "diverse and loyal customer base," which represented only "a small fraction of [Cloopen's] total addressable market in China," and consisted of enterprises that "stay with [the Company] due to the critical role [Cloopen's] solutions play in their business." To support the claim in the Registration Statement about the retention of Cloopen's loyal existing customers, the Company touted Cloopen's history of, and ability to maintain, a dollar-based net customer retention rate of more than 94%. Despite representing that Cloopen had "a steady revenue stream from repeat customers," and that "our dollar-based net customer retention rate will remain stable at a relatively high level," in fact, the Company's customer retention rate and efforts were then failing.

84.     The Registration Statement stated that:

"we intend to continuously innovate and expand our solutions to empower the digital transformation and integration in modern enterprises seeking to enhance their operational productivity" by implementing growth strategies that included but were not limited to:

- continuously innovate our solutions and capture new growth opportunities;

- continuously optimize our product offering mix;

- ***expand sales to existing customers***;

- grow customer base; . . .

85.     The statement about "expanding sales to existing customers" was materially false and misleading because Cloopen's then existing dollar-based net customer retention rate had dropped dramatically. Specifically, this key metric plunged from 94.7% for the nine months ended September 30, 2020 (as represented in the Registration Statement) to 63.1% during 4Q 2020 — a drop of ***over 30%*** that was ***not*** disclosed in the Registration Statement.

22

86.     In a section of the Registration Statement titled "Our Customers," Defendants represented that Cloopen enjoys a "diverse and loyal customer base" and that Cloopen's "land and expand strategy" encourages existing customers to expand into other solutions and "customers tend to stay with us."  Specifically, the Registration Statement stated:

*We serve a diverse and loyal customer base* consisting of enterprises of all sizes and across a variety of industries, such as internet, telecommunications, financial services, education, industrial manufacturing, and energy. As of December 31, 2018 and 2019 and September 30, 2020, we had an active customer base of over 10,200, 11,500 and 12,000 enterprises, respectively, among which 125, 152 and 173 were large-enterprise customers, respectively. *We believe our capabilities in attracting and retaining these large-enterprise customers rest on our ability to develop and offer industry-specific features and functionalities that satisfy their disparate needs and complex internal deployment and integration requirements.* We also serve small- to medium-sized enterprises leveraging our comprehensive business portfolio and ready-to-use solution deployment.

*We have implemented a "land and expand" strategy to encourage existing customers to explore and expand into other solutions leveraging our multi-capability offering mix.* In 2018 and 2019, approximately one-third of our large enterprise customers had employed more than one category of our solutions, which increased to 37.9% in the nine months ended September 30, 2020. For example, we initiated our business collaboration with a financial institution customer by satisfying its basic instant messaging needs and, as our relationship deepens, upsold our video-enabled solutions to provide them with capabilities in multi-format internal communications and a novel use case in real-time financial transaction monitoring. *For solutions that we offer on a recurring basis, such as CPaaS and cloud-based CC solutions deployed primarily on public cloud, we achieved a dollar-based net customer retention rate of 135.7%, 102.7% and 94.7% in 2018, 2019 and the nine months ended September 30, 2020, respectively. We believe these solutions and our net customer retention present significant cross-selling and up-selling potential as customers tend to stay with us due to the critical role our solutions play in their business operations.*

*We have developed a full-coverage customer support and success system for large enterprises designed to drive customer satisfaction and expand cross-selling and up-selling opportunities.* We place great emphasis on improving customer experience at each step. We provide pre-sale consultation, onboarding implementation support and training at the initial stage. *With ongoing 24/7/365 live chat and phone support, we help customers configure and use our solutions*. We also offer operation maintenance services to ensure reliable performance. For smaller customers, our intuitive user interfaces serve to reduce our customers' need for human support, and we offer various self-service

options on our websites, including a complimentary knowledge base with detailed documentation and sample code. ***We believe high customer satisfaction and close customer relationship can keep us posted of their honest feedback and evolving communications needs, which drives innovation and facilitates more targeted services to further increase customer loyalty***

87.     The statements that Cloopen "serve[s] a diverse and loyal customer base," that "high customer satisfaction and close customer relationship" can "further increase customer loyalty," that "customers tend to stay with us due to the critical role our solutions play in their business operations," and the 94.7% dollar-based net customer retention rate for the nine months ended September 30, 2020 were all materially false and/or misleading.   In fact, when the Registration Statement was filed with the SEC, Cloopen's dollar-based net customer retention rate had dropped to 63.1% during 4Q 2020.   Further, Cloopen's beliefs and expectations about the potential of Cloopen's "land and expand strategy" and "cross-selling" and "up-selling potential" were materially false and misleading for the same reason.

88.     The Registration Statement contained repeated claims regarding Cloopen's "diverse and loyal customer base" and its "superior customer support and success system designed to drive customer satisfaction and expand cross-selling and up-selling opportunities." However, these representations were unsustainable – and hence, materially false and misleading – given the undisclosed fact that Cloopen's dollar-based net customer retention rate had dropped by more than 30% between during Q4 2020.   The Registration Statement represented as follows:

**Diverse and loyal customer base**

***We have developed a large and diverse customer base of enterprises of all sizes and various industries,*** such as internet, telecommunications, financial services, education, industrial manufacturing and energy. As of December 31, 2018 and 2019 and September 30, 2020, we served 125, 152 and 173 large enterprise customers, respectfully. We believe our capabilities in attracting and retaining these large-enterprise customers rest on our ability to develop and offer industry-specific features and functionalities that satisfy their disparate needs and complex internal deployment and integration requirements.

24

We also serve small to medium-sized enterprises leveraging our comprehensive business portfolio and ready-to-use solution deployment. For solutions that we offer on a recurring basis, including CPaaS and cloud-based CC solutions deployed primarily on public cloud, we achieved a dollar-based net customer retention rate of 135.7%, 102.7% and 94.7% in 2018, 2019 and the nine months ended September 30, 2020, respectively. We served 160, 193 and 128 customers for our project-based solutions in 2018, 2019 and the nine months ended September 30, 2020, respectively.

*We have developed a superior customer support and success system designed to drive customer satisfaction and expand cross-selling and up-selling opportunities. Our customer support team is dedicated to improving customer experience at each step from pre-sale consultations to post-sale support and services, through 24/7/365 live chat and phone support. For smaller customers, we offer various self-service options on our websites, including a complimentary knowledge base with detailed documentation and sample codes. We believe high customer satisfaction and close customer relationship can keep us posted of their honest feedback and evolving communications needs, which drives innovation and facilitates more targeted services to further increase customer loyalty.*

89. The Registration Statement falsely and misleadingly emphasized Cloopen's intention and belief that it could expand "sales to existing customers" by "cross sell[ing]" and "upsell[ing] our solutions:" and growing the current customer base which "only represents a small fraction of our total addressable market in China." These statements of belief and intention were false and misleading because they failed to disclose the then-existing fact that Cloopen's key metric of dollar-based net customer retention rate had dropped dramatically from 94.7% for the nine months ended September 30, 2020, as represented in the Registration Statement, to 63.1% during 4Q 2020—a drop of over 30%:

**Expand sales to existing customers**

*The constantly evolving communication needs of our customers present a significant opportunity for us to expand sales to our existing customers*. To that end, we intend to strengthen our sales efforts in cross-selling and up-selling our solutions. We will also leverage our comprehensive business portfolio and feature-rich solutions to provide enterprises with integrated communications solutions, covering both cloud-based CC and cloud-based UC&C, to help them enhance operational efficiency by unifying intra- and extra-organizational communications.

> ***We also intend to optimize our incentive structure to encourage our sales and customer support teams to actively and regularly interact with existing customers, in order to identify changes in customer needs that would enable us to more effectively cross-sell and up-sell our solutions.***
>
> **Grow customer base**
>
> ***We believe our current customer base only represents a small fraction of our total addressable market in China.*** Enterprises in China are going through digital transformation to replace their hardware-based legacy communications systems with cloud-based communications solutions, according to the CIC report. We intend to strengthen our direct sales capabilities to cover more key accounts and tap into more industries. In addition, leveraging our accumulated industry expertise, we intend to serve more customers from similar industries to lower the additional costs in industry customization as we scale, with a focus on financial services, industrial manufacturing, energy, education and government sectors. We also intend to strategically establish business relationships with enterprises in second- and lower-tier cities to capitalize on the increasing penetration of cloud-based communications solutions into these areas. Moreover, we plan to collaborate with an increasing number of channel partners, especially the mobile network operators' local branches, to further expand our geographical coverage in China.

90.     The Registration Statement falsely and misleadingly touted Cloopen's "robust growth in recent years" and a 94.7% dollar-based net customer retention rate for the nine months ended September 30, 2020, without disclosing that the key metric of customer retention had dropped precipitously for 4Q 2020. The Registration Statement also noted the "Reliable customer experience" and "consistently high service levels," which statements were false or misleading, as they were unaccompanied by the additional fact of the dramatic 4Q 2020 drop in dollar-based net customer retention rate:

> **Reliable customer experience**
>
> We have independently developed many of the core technologies underlying our solutions, which we believe enables consistently high service levels. In particular, our solutions are capable of maintaining stable and safe connections with over 99.95% uptime service level commitments even in cases of sudden spikes in the amount of simultaneous communications. In addition, our robust research and development capabilities and accumulated industry experience allow us to introduce new and enhanced features and functionalities to meet evolving customer needs amid dynamic market conditions. ***We also provide***

*ongoing customer support and operation maintenance services to ensure superior customer experience.*

*We have developed a highly efficient product development ecosystem, which enables us to capture complex and evolving customer demands* and develop new and enhanced features and products that continue to represent compelling value propositions across our customer base. Moreover, we have developed industry-specific solutions with targeted features and functionalities for players in a number of industries, *making it efficient for us to scale expediently among enterprises within the same industries*.

*We have experienced robust growth in recent years*. As of December 31, 2018 and 2019 and September 30, 2020, we had an active customer base of over 10,200, 11,500 and 12,000 enterprises, respectively, among which 125, 152 and 173 were large-enterprise customers, respectively. *In 2018, 2019 and the nine months ended September 30, 2020, the dollar-based net customer retention rate in relation to solutions that we offer on a recurring basis was 135.7%, 102.7% and 94.7%, respectively.* We served 160, 193 and 128 customers for our project-based solutions in 2018, 2019 and the nine months ended September 30, 2020, respectively. Our revenues increased by 29.7% from RMB501.5 million in 2018 to RMB650.3 million (US$95.8 million) in 2019, and increased by 19.4% from RMB426.3 million in the nine months ended September 30, 2019 to RMB509.0 million (US$75.0 million) in the nine months ended September 30, 2020, of which 72.3%, 75.0%, 74.9% and 76.5% were recurring revenues in the same periods, respectively. In 2018 and 2019, we incurred net loss of RMB155.5 million and RMB183.5 million (US$27.0 million), respectively. In the nine months ended September 30, 2019 and 2020, we incurred net loss of RMB129.6 million and RMB203.7 million (US$30.0 million), respectively. We estimate that the year-on-year growth of our revenues and increase of costs and expenses in the fourth quarter of 2020 to be slightly below those of the first nine months of 2020 as compared with the first nine months of 2019.

91.     The Registration Statement enumerated the "Risks related to our business and industry", including "our ability to attract new customers or retain existing ones" and "our ability to collect accounts receivables from our customers in a timely manner" without disclosing that Cloopen had lost business from existing customers in the 4Q 2020, prior to the IPO. This nondisclosure of a material fact rendered the Registration Statement's risk warnings ineffective to inform investors of the true risks of investing in Cloopen because the risks that were warned of as hypothetical or "may" happen had actually occurred prior to the IPO.

92.     The Registration Statement stated in the "Risk Factors" section a number of other

factors that could adversely affect Cloopen's ability to retain customers. Such risk disclosures were

materially misleading and were inadequate and ineffective to inform investors of the actual risks

because risks represented as hypothetical had, in fact, already occurred prior to the IPO.  Namely,

Cloopen's dollar-based net customer retention rate had dropped more than 30%. Specifically, the

Registration Statement represented that:

> We have developed a customer support and success system designed to drive
> customer satisfaction and expand cross-selling and up-selling opportunities.
> Many of our customers depend on our customer support team to assist them in
> deploying or using our solutions effectively, help them resolve post-deployment
> issues quickly, and provide ongoing support. ***If we do not devote sufficient***
> ***resources or are otherwise unsuccessful in assisting our customers effectively,***
> ***it could adversely affect our ability to retain existing customers*** and could
> prevent prospective customers from adopting our solutions. We may be unable
> to respond quickly enough to accommodate short-term increases in demand for
> customer support. We also may be unable to modify the nature, scope and
> delivery of our customer support to compete with changes in the support services
> provided by our competitors. Increased demand for customer support, without
> corresponding revenues, could increase costs and adversely affect our business,
> results of operations and financial condition. ***Our business is highly dependent***
> ***on our reputation and on positive recommendations from existing customers***.
> Any failure to deliver and maintain high-quality customer support, or a market
> perception that we do not maintain high-quality customer support, could
> adversely affect our ability to attract new customers, and therefore our business,
> results of operations and financial condition.

93.     The "Risk Factors" in the Registration Statement also noted the risk of "customer

terminations," which was misleading, inadequate, and ineffective for the reasons stated above. In

particular, the Registration Statement stated:

> ***Most of our agreements with customers contain service level commitments***. If
> we are unable to meet the stated service level commitments, including failure to
> meet the uptime and other requirements under the agreements, we may be
> contractually obligated to provide the affected customers with service credits
> which could significantly affect revenue of the periods in which the uptime or
> delivery failure occurs, and the credits are applied. ***We could also face customer***
> ***terminations, which could significantly affect both our current and future***
> ***revenue.*** Any service level failures could harm our business and reputation.

94.     Among the other misleading "Risk Factors" in the Registration Statement was the

purported fact that "we may be subject to further negative impact on our business operations" as a result of COVID-19. In fact, the negative impact – *i.e.*, the loss of existing customers and/or their business – had already occurred. Here, the Registration Statement provided that:

> Specifically, we experienced customer loss in the nine months ended September 30, 2020, primarily due to a decrease in the number of enterprise customers of smaller sizes that are less equipped to withstand the impact of COVID-19. We have also experienced delayed service delivery, extended payment cycles and delayed collection of accounts receivables. As a result of the COVID-19 outbreak, the Chinese economy is subject to the risk of a general slowdown in 2020 and beyond, all of which would have a material adverse effect on our results of operations and financial condition in the near term. Moreover, if the outbreak persists or escalates, *we may be subject to further negative impact on our business operations*. In addition, our business and results of operations could also be adversely affected to the extent the COVID-19 outbreak harms the business of our customers, which may reduce or cease their use of our solutions.

95.    Among the additional misleading and inadequate risks identified in the Registration Statement were "Risks Related to Our Business and Industry," which identified a hypothetical risk that customer retention ***could*** be affected by a failure to provide high quality customer support when, in fact, customer retention had already dropped precipitously in 4Q 2020, prior to the IPO:

> ***If we fail to attract new customers or retain existing ones, our business, results of operations and financial condition could be materially and adversely affected***.
>
> In order to increase our revenues and maintain future growth, we must attract new customers and encourage existing customers to continue their subscriptions, increase their usage, and purchase additional features and solutions from us. For customer demand and the adoption of our solutions to grow, the quality, cost and features of these solutions must compare favorably to those of competing products and services. To that end, we must continue to offer high-quality solutions and features at competitive prices. As our target markets mature, or as competitors introduce more differentiated products or services at lower costs that compete or are perceived to compete with ours, we may be unable to attract new customers or retain existing ones on favorable terms or at all, which could have an adverse effect on our revenues and future growth. The rate at which our existing customers purchase any new or enhanced feature and solution we may offer also depends on a number of factors, including the importance of these additional features and solutions to our customers, their quality and performance, the prices at which we offer them, and the general economic

29

condition and specific industry landscape in relation to our customers. ***If our customers react negatively to our new and enhanced features and solutions, or our efforts to cross-sell and up-sell are otherwise not as successful as we anticipate, we may fail to maintain or grow our revenues and our customer base***.

Our sales and marketing strategies must also continue to evolve and adapt, including through various online and offline channels and direct and indirect sales efforts. In addition, marketing and selling new and enhanced features and solutions may require increasingly sophisticated and costly marketing campaigns. ***If we fail to do so cost-effectively, we may be unable to attract new customers or sell additional features and solutions to existing customers in a cost-effective manner***.

We must also continue to offer high-quality training, implementation and other customer support services in order to attract new customers and retain existing ones. These services require customer support personnel with industry-specific technical knowledge and expertise which may be difficult and costly to locate and hire. We also need to provide our customer support personnel with extensive training on our solutions and their features, which could make it difficult to scale up our operations rapidly or effectively, especially when we expand our business across different geographical markets or industries. ***If we fail to provide effective ongoing support and help our customers promptly resolve product issues, our ability to attract new customers and retain existing ones could be negatively affected, which, in turn, could materially and adversely affect our business, results of operations and financial condition***.

96.     The Registration Statement identified the following risk of losing customers and failing to attract new customers as a result of complaints or negative publicity without disclosing that Cloopen's key metric of dollar-based net customer retention rate had already dropped dramatically:

[O]ur customers may, from time to time, complain about our solutions, such as complaints about the quality of our solutions, our pricing and customer support. If we fail to handle customer complaints effectively, our brand and reputation may suffer, our customers may lose confidence in us, and they may reduce or cease their use of our solutions. In addition, many of our customers post and discuss on social media their experience with internet-based products and services, including ours. Our success depends, in part, on our ability to generate positive customer feedback and minimize negative feedback on social media channels where existing and potential customers seek and share information. If our customers are dissatisfied with any action we take or change we implement in our solutions, their online commentary to this effect could negatively affect our brand and reputation. ***Complaints or negative publicity about us or our***

30

*solutions could materially and adversely affect our reputation and ability to attract and retain customers, and as a result, our business, results of operations and financial condition.*

97.     The Registration Statement inadequately identified the risk that "we may not be able to sustain revenue growth consistent with recent history or at all" without disclosing that Cloopen had already suffered a drop in its dollar-based net customer retention over 30% from the nine months ended September 30, 2020. The Registration Statement misleadingly stated beliefs which were contradicted by then existing facts by stating that "[w]e believe our revenue growth depends on a number of factors, including our ability to . . . retain our existing customers, expand usage of our solutions, and cross-sell and up-sell to our existing customers:"

> We have experienced rapid growth in recent periods. Our total revenues increased by 29.7% from RMB501.5 million in 2018 to RMB650.3 million (US$95.8 million) in 2019. Our total revenues increased by 19.4% from RMB426.3 million in the nine months ended September 30, 2019 to RMB509.0 million (US$75.0 million) in the nine months ended September 30, 2020. In future periods, *we may not be able to sustain revenue growth consistent with recent history or at all*. Further, as we operate in a new and rapidly changing industry, widespread acceptance and use of our solutions are critical to our future growth and success. *We believe our revenue growth depends on a number of factors, including our ability to:*
>
> • attract new customers;
>
> • provide excellent customer experience;
>
> • *retain our existing customers, expand usage of our solutions, and cross-sell and up-sell to our existing customers*.

98.     In the Registration Statement's Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), Defendants falsely and misleadingly touted Cloopen's "robust growth in recent years," without disclosing that Cloopen's key metric of dollar-based net customer retention rate had dropped dramatically to 63.1% during 4Q 2020.:

> *We have experienced robust growth in recent years.* As of December 31, 2018 and 2019 and September 30, 2020, we had an active customer base of over 10,200, 11,500 and 12,000 enterprises, respectively, among which 125, 152 and

31

173 were large-enterprise customers, respectively. In 2018, 2019 and the nine months ended September 30, 2020, the dollar-based net customer retention rate in relation to solutions we offer on a recurring basis was 135.7%, 102.7% and 94.7%, respectively. We served 160, 193 and 128 customers for our project-based solutions in 2018, 2019 and the nine months ended September 30, 2020, respectively. Our revenues increased by 29.7% from RMB501.5 million in 2018 to RMB650.3 million (US$95.8 million) in 2019 and increased by 19.4% from RMB426.3 million in the nine months ended September 30, 2019 to RMB509.0 million (US$75.0 million) in the nine months ended September 30, 2020, of which 72.3%, 75.0%, 74.9% and 76.5% were recurring revenues in the same periods. In 2018 and 2019, we incurred net loss of RMB155.5 million and RMB183.5 million (US$27.0 million), respectively. In the nine months ended September 30, 2019 and 2020, we incurred net loss of RMB129.6 million and RMB203.7 million (US$30.0 million), respectively.

99.     The MD&A also falsely and misleadingly represented Cloopen's dependence on "the total number and the lifetime value of our customers," and its "plan to expand our cross-selling with and up-selling efforts to existing customers" without disclosing that it was then losing existing customers and/or their business at a dramatically increasing rate in 4Q 2020, prior to the IPO:

**Improving customer acquisition, retention and lifetime value**

***Our results of operations are highly dependent on the total number and the lifetime value of our customers. We have cultivated a large and diverse customer base of enterprises of all sizes and various industries***, including internet, telecommunications, financial services, education, industrial manufacturing and energy. As of December 31, 2018 and 2019 and September 30, 2020, we had an active customer base of over 10,200, 11,500 and 12,000 enterprises, respectively, among which 125, 152 and 173 were large-enterprise customers, respectively. To retain and grow our customer base, we need to predict future market acceptance and customer demand and continue to invest in sales and marketing to penetrate into more industry verticals and second- and lower-tier cities and further promote our brand image and recognition in China's cloud-based communications industry. ***We also plan to expand our cross-selling and up-selling efforts to existing customers***.

100.    The MD&A falsely and misleadingly represented Cloopen's "highly scalable business model" and its belief that "customers tend to stay with us" without disclosing the then existing fact that customer retention had been unsuccessful during the 4Q 2020, immediately prior

32

to the IPO, which directly contradicted such belief:

**Highly scalable business model**

***We operate a highly scalable business model with significant potential for improvement in customer lifetime value and profit margin***. The robust cloud infrastructure of our solutions allows customers to scale rapidly to serve bulk communications needs. We also enable our customers to improve the features and functionalities of their communications by offering hundreds of APIs and SDKs that can be easily deployed and integrated as building blocks. Moreover, ***we have implemented a "land and expand" strategy by which we encourage our customers to explore and expand into other solutions leveraging our multi-capability offering mix.*** In 2018 and 2019, approximately one-third of our large-enterprise customers had employed more than one category of our solutions, which increased to 37.9% in the nine months ended September 30, 2020. ***We believe there is considerable cross-selling and up-selling potential as customers tend to stay with us due to the critical role our solutions play in their business operations***. While CPaaS business is currently our largest source of revenues, we are in the process of strategically shifting our product offering mix towards cloud-based CC solutions and cloud-based UC&C solutions which demonstrate higher profit margins.

***In addition to maximizing the lifetime value of the same customer, we are also able to rapidly scale our business among new customers within the same industry***. For certain industry-specific solutions, as we serve more customers from the same industry, we can minimize marginal costs and achieve greater economies of scale leveraging replicable technology infrastructure and experience. To date, we have accumulated extensive experience in serving enterprises from various industries, including internet, telecommunications, financial services, education, industrial manufacturing and energy.

101.    The MD&A also represented the seasonality of results, with higher revenues in the second half of the year, without disclosing the then existing fact that that dollar-based net customer retention rate dropped dramatically during the second half of the year—specifically, 4Q 2020:

**Seasonality**

Our business is subject to seasonal fluctuations. We believe that our quarterly sales are affected by industry buying patterns. ***Our customers, especially large enterprises, tend to enter into contracts with us in the second half of each year in accordance with their budget cycles. As such, we generally record higher revenues during such periods***. In addition, we typically generate lower revenues in the first quarter during or around Chinese New Year holiday. Changes in seasonal trends may cause fluctuations in our results of operations and financial condition.

102.    The MD&A further falsely and misleadingly represented Cloopen's expectation that its dollar-based net retention rate would "remain stable at a relatively high level," as Cloopen "continuously optimize[s] [its] existing solutions and develop[s] new features and solutions." These expectations were false and misleading because the Registration Statement failed to disclose that Cloopen's then current 4Q 2020 dollar-based net customer retention rate was neither "stable" nor "at a relatively high level":

> Our dollar-based net customer retention rate decreased from 135.7% in 2018 to 102.7% in 2019, primarily because (1) relevant PRC authorities took stringent government measures in 2019 to regulate the operation of P2P online lending platforms, and we, after assessing potential risks, chose to voluntarily terminate certain transactions with existing customers in the online consumer finance industry to ensure compliance with relevant laws and regulations, which led to a decrease in our existing customer base and our revenues primarily related to cloud-based CC solutions that we offer on a recurring basis, which decreased by 24.8% as compared to 2018, in 2019; and (2) relevant regulatory authorities promulgated enhanced regulations on application-to-person voice calls in China out of concerns of consumer harassment, which reduced enterprise customers' usages of voice calls in general and adversely affected our related operations. See "Risk Factors — Risks Related to Our Business and Industry — Certain of our customers, such as internet finance companies, may be subject to more stringent laws and regulations, which could adversely affect their operations and therefore their IT spending levels, and in turn could cause our customer base to shrink" and "Regulation — Regulations Relating to Cyber Security and Privacy Protection — Unauthorized calls and text messages." Our dollar-based net customer retention rate further decreased to 94.7% in the nine months ended September 30, 2020, primarily due to a decrease in the number of enterprise customers of smaller sizes that are less equipped to withstand the impact of COVID-19.
>
> We expect that, as the applicable regulatory framework becomes more established and China's economy recovers from the COVID-19 pandemic, and as we continuously optimize our existing solutions and develop new features and solutions, ***our dollar-based net customer retention rate will remain stable at a relatively high level***.

103.    All of the foregoing statements, including expressions of beliefs, plans, expectations and intentions, were materially false and misleading, and further were inadequate and ineffective as risk warnings because, at the time of the IPO, Cloopen's existing customer business,

as reflected in the key metric of dollar-based net customer retention rate,  had deteriorated materially from 94.7%, as represented in the Registration Statement for the nine months ended September 30, 2020, to 63.1% for 4Q 2020. This fact was omitted. Consequently, Cloopen's then current dollar-based net retention rate was not "stable," but rather had dropped significantly by the end of 2020 to 63.1% for 4Q2020—well below the reported 94.7% rate. Likewise, Cloopen failed to disclose that its purportedly "loyal" existing customer base was not "expand[ing]" into additional solutions, but instead was regressing, and that Cloopen's "strong customer acquisition capability [and] steady revenue stream from repeat customers," was waning.

104.    For these same reasons, the Registration Statement's claims about Cloopen's strategies to "strengthen [its] sales efforts" by "optimiz[ing] [its] incentive structure to encourage [Cloopen's] sales and customer support teams to actively and regularly interact with existing customers, in order to identify changes in customer needs . . . to more effectively cross-sell and up-sell [its] solutions[,]" and "strengthen [its] direct sales capabilities to cover more key accounts and tap into more industries[,]" were false and misleading. These statements failed to disclose that these initiatives were not effective to maintain Cloopen's existing customer  business, which  was deteriorating at the time of the IPO. In addition, the hypothetical warning that "*we may be subject to further negative impact on our business operations*," was misleading and ineffective because Cloopen had already experienced a material negative impact at the time of the IPO.

### C.    Cloopen's Customers Were Not Paying

105.    Among the risks of customer non-payment identified in the Registration Statement were the following:

> Based upon service type and our assessment of customers' credit and ongoing relationships, our payment terms typically range from 60 to 150 days after our customers have been billed. Days sales outstanding, calculated by gross accounts receivables outstanding as of the period end divided by net revenues for the period and multiplied by the number of days in such period, were

123 days, 136 days and 142 days for 2018, 2019 and the nine months ended September 30, 2020, respectively. Our days sales outstanding increased from 136 days in 2019 to 142 days in the nine months ended September 30, 2020, primarily due to the extended payment cycles caused by the COVID-19 outbreak. ***We will closely monitor our outstanding accounts receivables and follow up with relevant customers on a continuous basis in order to collect overdue balances.***

***If we fail to collect contract assets and accounts receivables from our customers in a timely manner, our business, results of operations and financial condition may be materially and adversely affected***. Our contract assets represented our right to consideration for work performed but not invoiced. When our right to consideration becomes unconditional, we reclassify the contract assets to accounts receivables. We had contract assets of RMB18.0 million, RMB25.2 million (US$3.7 million) and RMB30.3 million (US$4.5 million) as of December 31, 2018 and 2019 and September 30, 2020, respectively. We recorded allowance for contract assets of RMB0.9 million, RMB1.5 million (US$0.2 million) and RMB2.6 million (US$0.4 million), respectively, as of December 31, 2018 and 2019 and September 30, 2020. We typically extend to our customers payments terms ranging from 60 to 150 days after our customers have been billed, resulting in accounts receivables. We had accounts receivables, net of RMB150.3 million, RMB219.1 million (US$32.3 million) and RMB232.0 million (US$34.2 million) as of December 31, 2018 and 2019 and September 30, 2020, respectively. We recorded allowance for doubtful accounts in relation to accounts receivables RMB19.3 million, RMB22.4 million (US$3.3 million) and RMB31.6 million (US$4.7 million), respectively, as of December 31, 2018 and 2019 and September 30, 2020.

We cannot assure you that we will be able to receive the full amount of contract assets as our works may not be fully accepted by our customers. ***We are also exposed to the risks that our customers may delay or even be unable to pay us in accordance with the payment terms included in our agreements with them.*** We make a credit assessment of our customers before entering into an agreement with them. Nevertheless, we cannot assure you that we are or will be able to accurately assess the creditworthiness of each customer. In particular, customers that are large enterprises generally have longer payment cycles, which may result in increased contract assets and accounts receivables. Furthermore, we also serve customers in certain rapidly evolving and competitive industries, some of which have also been highly regulated. Such customers' financial soundness is subject to changes in the industry trend or relevant laws and regulations, which are beyond our control. In particular, we experienced extended payment cycles and delayed collection of accounts receivables as a result of the COVID-19 outbreak. Any change in our customers' business and financial conditions may affect our collection of accounts receivables. Any delay in payment or failed payment may adversely affect our liquidity and cash flows, which in turn may have a material adverse effect on our business, results of operations and financial condition. In addition, as our business continues to scale

36

up, our contract assets and accounts receivables may continue to grow, which may increase our credit risk exposure.

106.    The foregoing representations concerning the hypothetical risk of uncollectability of customer accounts were materially false and misleading because, at the time of the IPO, an increasing number of customers were not paying for the services and/or solutions provided.  This forced Cloopen to recognize massive increases in its accounts receivable and its allowance for doubtful accounts, the latter of which reflected Cloopen's determination that these accounts were uncollectible. As such, the supposed "opportunity" to "upsell and cross-sell" existing customers was greatly diminished, explaining why revenues for the period ending December 31, 2020, were, according to analysts, "soft," and general and administrative expenses had grown by 59.2% year-over-year, as belatedly disclosed after the IPO on March 26, 2021.

107.    Furthermore, although the risk factors in the Registration Statement mentioned the possibility that Cloopen's customers "*may* delay or even be unable to pay [the Company] in accordance with the payment terms included in [its] agreements with them," that "[a]ny change in [its] customers' business and financial conditions *may* affect [Cloopen's] collection of accounts receivables," or that its "efforts to cross-sell and up-sell [*may*] not [be] as successful as [Cloopen] anticipates," these hypothetical risk warnings were themselves materially false and misleading and ineffective and inadequate because the risks warned of had already occurred in 4Q 2020.

### D.    Cloopen Failed to Disclose "Known Trends or Uncertainties" as Required by Item 303 of SEC Regulation S-K

108.    In addition to the materially false and misleading statements and omissions in the Registration Statement identified above, Defendants also violated their affirmative obligations to provide certain material information in the Registration Statement as required by applicable SEC rules and regulations.

109.    Specifically, Item 303 of SEC Regulation S-K required Cloopen to disclose "any

known trends or uncertainties that have had or that [Cloopen] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> **Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects**, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

110.    Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)     Is the trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

111.    Defendants were thus required to disclose that Cloopen's growth strategy was not working and that its existing customers were: (i) leaving; (ii) dramatically decreasing their usage of Cloopen's solutions, so much so that Cloopen's 4Q 2020 dollar-based net customer retention rate fell significantly below Cloopen's historical levels; and (iii) increasingly failing to pay for the services or solutions that Cloopen rendered. The omitted material facts alleged herein were

reasonably expected to (and did) have an unfavorable impact on Cloopen's sales, revenues, and income from continuing operations at the time of the IPO. By failing to disclose this information, Defendants violated Item 303.

112.    Defendants also violated Item 303 by failing to disclose in the Registration Statement the increase in fair value of the Series F Warrant, carried as a liability by Cloopen in its financial statements.

### E.    Cloopen Failed to Comply with Item 105 of Reg S-K

113.    Item 105 of Regulation S-K required disclosure in the Registration Statement of the most significant "factors that ma[d]e an investment in [the IPO] speculative or risky," as well as an explanation of "how the risk affect[ed] [Cloopen] or the securities being offered." As detailed herein, Defendants violated Item 105 because the Registration Statement failed to disclose material facts necessary to apprise ADS purchasers of the true risks inherent in investing in Cloopen and of existing adverse trends and uncertainties.

114.    Defendants' discussion of risk factors in the Registration Statement inadequately described the risks posed by Cloopen's deteriorating existing customer business, ineffective growth strategy, and large Series F Warrant liability. The Registration Statement also failed to warn of the likely and consequent materially adverse effects such risks posed on the Cloopen's future results, ADS price, and prospects. Without adequate disclosure of the specific risks then facing Cloopen related to its existing customers and growth initiatives directed to them and the Series F Warrant liability, investors could not adequately ascribe a value for the Cloopen's ADSs in connection with the IPO.

## VI.    SUBSEQUENT EVENTS AND ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

115.    On March 26, 2021, Cloopen shocked the market when it disclosed its 4Q 2020 and

FY 2020 financial results, which closed on December 31, 2020, more than a month *prior* to the IPO.

116.    Cloopen reported 4Q 2020 revenues of RMB258.7 million ($39.6 million), $2 million shy of analysts' consensus, net losses of RMB305.4 million ($46.8 million), representing a staggering 466.9% increase year-over-year, and operating expenses of RMB180.4 million ($27.6 million), representing a 30% increase from the 4Q 2019 (RMB138.8 million).  The Company stated as follows:#

> Net loss was RMB305.4 million (US$46.8 million), representing a 466.9% increase year-over-year
>
> Net loss for the fourth quarter of 2020 was RMB305.4 million (US$46.8 million), compared with RMB53.9 million in the fourth quarter of 2019 with the increase primarily driven by increases in non-cash items of RMB240.1 million (US$36.8 million), including *change in fair value of warrant liabilities* of RMB224.8 million (US$34.4 million) and share-based compensation of RMB15.4 million (US$2.4 million).
>
> Net loss for 2020 was RMB509.1 million (US$78.0 million), compared with RMB183.5 million in 2019, an increase of 177.5% year over year due to the forgoing as well as a RMB324.5 million (US$49.7 million) increase in non-cash items mainly due to a RMB227.5 million (US$34.9 million) increase in the *change in fair value of warrant liabilities*, a RMB 89.6 million (US$13.7 million) increase in share-based compensation.
>
> General and administrative expenses increased by 59.2% to RMB67.1 million (US$10.3 million) in the fourth quarter of 2020 from RMB42.1 million in the fourth quarter of 2019, primarily due to (1) an increase in share-based compensation expenses relating to certain restricted shares of the Company's founders under the share restriction agreements and waiver of subscription receivable due from Mr. Changxun Sun, (2) *an increase in the provision for doubtful accounts resulting from increased accounts receivables*, and (3) an increase in professional services fees relating to the preparation for the Company's IPO.

117.    In the press release issued on March 26, 2021, Defendant Li omitted Cloopen's material loss of existing customer business, stating:

> In 2020, we steadily focused on our initiatives to drive transformation in the enterprise communications industry and further cultivated our cloud- and AI-

based communications solutions, amidst the tumultuous COVID market environment. Looking at 2021, we are well positioned to take advantage of pent-up demand from enterprise activities delayed in 2020 and capture expanding cloud communications service deployment opportunities, the positive impacts of which we've already begun to witness in the first quarter of 2021.

118.    In both the Form 6-K filed with the SEC on March 26, 2021, and during the analyst earnings call that took place later the same day, Cloopen blamed a "change in fair value of warrant liabilities of RMB224.8 million (US\$34.4 million)" for its remarkable net loss, and an "increase in the provision for doubtful accounts resulting from increased accounts receivables" for the 59.2% increase recorded in general and administrative expenses.

119.    These disappointing 4Q 2020 results also dragged down Cloopen's full year performance, which resulted in revenues increasing only 18.1%, net losses of RMB509.1 million (\$78.0 million), representing an increase of 177.5% year-over-year, and a 90.1% increase in general and administrative expenses. Cloopen again blamed an "increase in the change in fair value of warrant liabilities," this time to the tune of RMB227.5 million (\$34.9 million) and "a significant increase in provision for doubtful accounts resulting from an increase in accounts receivables."

120.    In the earnings conference call on March 26, 2021, Cloopen continued to misrepresent its "land and expand" strategy. Defendants again failed to acknowledge that the strategy was failing and that Cloopen's existing customer business was deteriorating. Moreover, Cloopen again failed to disclose that its dollar-based net retention rate had plummeted during 4Q 2020. For example, on the March 26, 2021, conference call, Defendant Li stated as follows:

> Our prime customers in China are large enterprises with a broad range of communication demands. With our comprehensive business portfolio, we are better positioned to fulfill those business demands. ***In 2020, we generated about 70% of our total revenues from large enterprise customers: About 1/3 of these customers employed more than 1 category of our solutions, providing us considerable cross-selling and upselling potential.*** In addition, the migration of the communications industry to cloud-based solutions has only just begun in China. The penetration of cloud-based communications in China was just 2.7% in 2019 compared to roughly 10% in U.S. The market is also very fragmented,

and therefore, ripe for consolidation. ***We are confident that our recognized leadership position and comprehensive cloud-based communications solutions put us in a position to adapt to market dynamics and capitalize on the tremendous growth opportunity.***

121.     In response to Cloopen's March 26, 2021 disclosures, and despite Cloopen's continuing misrepresentations and omissions, Cloopen's share price plunged from $14.42 per ADS on March 25, 2021, to close at $11.75 per ADS on March 26, 2021, a decline of 18.5%.

122.     On May 10, 2021, after the market closed, Cloopen filed its Annual Report on SEC Form 20-F, revealing for the first time that its dollar based net customer retention rate had dropped from 102.7% in 2019 to 86.8% by year end 2020, stating: "In 2018, 2019 and 2020, the dollar-based net customer retention rate in relation to solutions that we offer on a recurring basis was 135.7%, 102.7% and 86.8%." This established that Cloopen's purportedly "loyal" existing customer base was not "expand[ing]" into additional solutions − a then existing fact at the time of the IPO, given that Cloopen represented that it had "built a sales and marketing team well-versed in China's cloud-based communications industry," tasked its team members with "*renewing existing subscriptions*[] and *maintaining customer relationships*," and established strategically-located sales representative offices to "*stay closer to potential [and existing] customers,* and capture and accommodate specific needs . . . more effectively." In other words, it was not until May 10, 2021, that Cloopen finally admitted a fact that existed at the time of the IPO − that it was losing existing customer business  during 4Q 2020 at a rapidly increasing rate. It was not until May 10, 2021 that investors were able to calculate the dramatic decline in dollar-based net customer retention rate in 4Q 2020.

123.     In addition, the Annual Report on Form 20-F disclosed for the first time that the fair value of the Series F Redeemable Convertible Preferred Shares underlying the Series F Warrant, issued and exercised in full on January 7, 2021 − ahead of the IPO − was, as of December

31, 2020, $5.50 per share and the fair value at issuance of the Series F Warrant was $4.8 million, resulting in an approximately $26 million loss for 4Q 2020.

124.    As the market absorbed this news, the value of Cloopen's ADSs fell from $9.89 on May 11, 2021 (and $9.59 on May 10th) to close at $ 8.97 per on May 12, 2021. Since then, Cloopen's shares have continued to decline.

125.    On May 3, 2022, Cloopen announced that it had formed an independent special committee to investigate certain employee misconduct and transaction irregularities and the issues that were brought to the Board's attention by KPMG Huazhen LLP ("KPMG"), which had resigned as Cloopen's independent registered public accounting firm. Cloopen's press release on May 3, 2022 noted the uncertainty of the impact of these issues on Cloopen's financial statements of previous years:

> During its audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2021, KPMG raised to the Company's management certain misconduct of several employees of the Company, including fabricating certain documents. ***In addition, KPMG advised the Company that they identified irregularities relating to certain customers' transactions for previous years. The Company currently expects that the impact from such employee misconduct and transaction irregularities would be 5%-10% of the revenue for the three-month period ended June 30, 2021*** and 15%-20% of the revenue for the three-month period ended September 30, 2021. These figures have not been independently verified by the Special Committee or its advisors and are subject to change as the Independent Investigation proceeds. ***The Company has not concluded on the potential implications on its consolidated financial statements of previous years.***

> *    *    *

> On April 29, 2022, ***KPMG notified the Board of its resignation as the Company's independent registered public accounting firm***. KPMG advised the Company, prior to its resignation, of the following material weaknesses:(1) insufficient accounting personnel with appropriate U.S. GAAP knowledge for accounting of complex transactions, presentation and disclosure of financial statements in accordance with U.S. GAAP and SEC reporting requirements; (2) lack of sufficient documented financial closing policies and procedures; and (3) insufficient authorization or review controls in the revenue and the purchase processes.

126.    In addition, on May 18, 2022, Cloopen disclosed that Defendants Ching Chiu and Yunhao Liu resigned from the Company's Board of Directors. On May 20, 2022, Cloopen "announced that, on May 18, 2022, it received a letter from the New York Stock Exchange (the 'NYSE') notifying the Company that it is not in compliance with the NYSE's continued listing standards as a result of the Company's failure to timely file its annual report on Form 20-F for the fiscal year ended December 31, 2021 (the '2021 Annual Report')."

## VII.    CLASS ACTION ALLEGATIONS

127.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who: (a) purchased or otherwise acquired Cloopen ADSs pursuant and/or traceable to the Registration Statement; and/or (b) purchased or otherwise acquired Cloopen ADSs during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Cloopen, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

128.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cloopen's shares actively traded on the NYSE. Twenty-three million ADSs were offered and sold in the IPO and millions were publicly traded during the Class Period. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cloopen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

129.    Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

130.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

131.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts, as alleged herein;

- whether statements made by Defendants to the investing public in the Registration Statement or otherwise during the Class Period misrepresented and/or omitted material facts about the business, operations, and prospects of Cloopen;

- whether the Securities Act Individual Defendants negligently prepared the Registration Statement for the IPO and, as a result, whether the Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading;

- whether the Exchange Act Defendants caused Cloopen to issue false and misleading statements;

- whether the Exchange Act Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material facts;

- whether the prices of Cloopen ADSs were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, the proper measure of damages.

132.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

133.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine (for Exchange Act claims) (*see* Count III *infra*) in that:

- The Exchange Act Defendants made public misrepresentations or failed to disclose;

- the omissions and misrepresentations were material;

- at relevant times Cloopen ADSs traded in an efficient market;

- the Company's ADSs were liquid and traded with significant volume during the Class Period;

- the Company traded on the NYSE and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Cloopen's ADSs; and

- Plaintiff and members of the Class purchased, acquired and/or sold Cloopen's ADSs between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

134.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

135.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah et al. v. United States et al.*, 406 U.S. 128, 92 S. Ct. 1456 (1972), as the Exchange Act Defendants omitted material information in their statements in violation of a duty to disclose such information, as detailed above.

## VIII.   NO SAFE HARBOR

136.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

137.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent that certain of the statements alleged to be false or misleading may be characterized as forward- looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

138.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cloopen who knew that the statement was false when made.

## COUNT I

### Violations of § 11 of the Securities Act
### Against All Defendants

139.    Plaintiff repeats and realleges each and every allegation contained above.

Additionally, for purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

140.   This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

141.   The Registration Statement was false and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

142.   Cloopen is the registrant for the IPO. As issuer of the shares, Cloopen is strictly liable to Plaintiff and the Class for the misstatements and omissions.

143.   The Securities Act Individual Defendants were responsible for the contents and dissemination of the Registration Statement. Each of the Securities Act Individual Defendants signed the Registration Statement, was a director of Cloopen at the time of filing, and/or was named in the Registration Statement, with their consent, as about to become a director.

144.   Defendant Cogency Global, as a signer of the Registration Statement (by its agent and employee, Defendant DeVries, who signed the Registration Statement on DeVries's own behalf and on behalf of Cogency Global), is also strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. Cogency Global is also liable for the securities law violations committed by Defendant DeVries in its capacity as DeVries's employer, based on principles of agency and *respondent superior*.

145.   The Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.

146.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

147.    By reason of the conduct herein alleged, each Defendant violated and/or controlled a person who violated § 11 of the Securities Act.

148.    Plaintiff acquired his ADSs pursuant and/or traceable to the Registration Statement for the IPO.

149.    Plaintiff and the Class have sustained damages. The value of Cloopen ADSs has declined substantially subsequent to and due to Defendants' violations.

150.    At the time of their purchases or acquisitions of Cloopen ADSs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

151.    Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which the Complaint is based to the time that this action was commenced. Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time this action was commenced.

152.    By reason of their conduct alleged herein, Defendants violated § 11 of the Securities Act.

## COUNT II

### Violations of § 15 of the Securities Act
### Against the Securities Act Individual Defendants, Cloopen, and Cogency Global

153.    Plaintiff repeats and realleges each and every allegation contained above. Additionally, for purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action

is based solely on claims of strict liability and/or negligence under the Securities Act.

154.    This Cause of Action is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o, against the Securities Act Individual Defendants, Cloopen, and Cogency Global.

155.    The Securities Act Individual Defendants were control persons of Cloopen by virtue of their positions as directors, senior officers, and/or Cloopen's authorized U.S. representative, which allowed each of the Securities Act Individual Defendants to exercise control over Cloopen, its operations, and the Registration Statement.

156.    Defendant Cloopen controlled the Securities Act Individual Defendants, other than Defendant DeVries, and all of its employees.

157.    Defendant Cogency Global controlled Defendant DeVries and all of its employees and served as the authorized U.S. representative for Cloopen.

158.    Each of the Defendants named herein was a culpable participant in the violations of § 11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement, having been named with their consent in the Registration Statement as a director, serving as Cloopen's authorized U.S. representative, and/or having otherwise participated in the process that allowed the IPO to be completed.

### COUNT III

#### Violations of § 10(b) of the Exchange Act and Rule 10b-5
#### Against the Exchange Act Defendants

159.    Plaintiff repeats and realleges each and every allegation contained above. For purposes of this Cause of Action, Plaintiff does not expressly exclude or disclaim any allegation of fraud or intentional or reckless misconduct.

160.    This Count is asserted against the Exchange Act Defendants and is based upon § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

161.     The Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Cloopen ADSs; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cloopen ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

162.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cloopen ADSs. Such filings, reports, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cloopen's business, operations, and prospects.

163.     By virtue of their positions at Cloopen, Defendants Sun and Li had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended hereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or

refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

164.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of Cloopen, Defendants Sun and Li had knowledge of the details of Cloopen's internal affairs.

165.    The Exchange Act Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Defendants were able to and did, directly or indirectly, control the content of the statements of Cloopen. As officers and/or directors of a publicly held company, Defendants Sun and Li had a duty to disseminate timely, accurate, and truthful information with respect to Cloopen's businesses, operations, and prospects. As a result of the dissemination of the aforementioned false and misleading Registration Statement and other public statements, the market price of Cloopen's ADSs was artificially inflated throughout the Class Period.

166.    In ignorance of the adverse facts concerning Cloopen's business, operations, and prospects which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cloopen ADSs at artificially inflated prices and relied upon the price of the ADSs, the integrity of the market for the ADSs and/or upon statements disseminated by the Exchange Act Defendants and were damaged thereby.

167.    During the Class Period, Cloopen ADSs were traded on an active and efficient

market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Cloopen ADSs at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired Cloopen ADSs or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Cloopen ADSs was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Cloopen ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

168.   By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

169.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of Cloopen ADSs during the Class Period.

A.     **Loss Causation**

170.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

171.   During the Class Period, Plaintiff and the Class purchased Cloopen's ADSs at artificially inflated prices and were damaged thereby. The price of Cloopen's ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, thus causing investors' losses.

172.    As alleged herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Cloopen's ADSs and operated as a fraud or deceit on purchasers of Cloopen's ADSs. When the truth about Defendants' misconduct was revealed, the value of Cloopen's ADSs declined precipitously as the prior artificial inflation no longer propped up the prices of such securities. The declines in the prices of Cloopen's ADSs were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

173.    The timing and magnitude of the ADS price declines negate any inference that the losses suffered by Plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors, or non-Cloopen-specific facts unrelated to the Defendants' fraudulent conduct, as illustrated in the following chart comparing Cloopen's stock price performance to relevant comparable indices:



174.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Plaintiff and the Class purchased Cloopen ADSs at artificially inflated prices and were damaged thereby. The price

of Cloopen's ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

175.    The economic loss, i.e., damages, suffered by Plaintiff and members of the Class, was a direct result of Defendants' material misrepresentations and omissions to artificially inflate the prices of Cloopen's ADSs, as well as the subsequent significant decline in the value of the Cloopen's ADSs when Defendants' prior misrepresentations and omissions were revealed.

176.    At all relevant times, Defendants' materially false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Cloopen's finances, customer retention and uncollectability of payments and the loss resulting from the increase in fair value of the Series F Warrant carried as a liability by Cloopen in its balance sheet, as alleged herein. Before and during the time of Plaintiff's and Class members' purchases of Cloopen's ADSs, Defendants issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of Cloopen's ADSs to be artificially inflated.

177.    Plaintiff and members of the Class purchased Cloopen's ADSs at artificially inflated prices, causing them to suffer damages, as complained of herein. Specifically, on March 26, 2021, Cloopen published its 4Q 2020 and FY 2020 financial results and investors learned the truth about, *inter alia*, fourth quarter 2020 revenue, accounts receivables and allowance for doubtful accounts, and the massive loss as a result of its Series F Warrant liabilities. Cloopen's ADS price fell 18.5% from $14.42 per ADS on March 25, 2021, to close at $11.75 per ADS on March 26, 2021. Further, on May 10, 2021, after the market closed, Cloopen filed its Annual

Report on SEC Form 20-F, revealing for the first time that its dollar-based net customer retention rate for recurring solutions had fallen from 102.7% in 2019 to 86.8% by year end 2020. As the market absorbed this news, the price of Cloopen's ADSs fell from $9.89 per ADS on May 11, 2021 (and $9.59 per ADS on May 10th) to close at $8.97 per ADS on May 12, 2021.

**B.     Scienter Allegations**

178.    The Exchange Act Defendants acted with scienter since these Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Cloopen were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Exchange Act Defendants participated in the scheme alleged herein by virtue of their receipt of information reflecting the true facts regarding Cloopen, their control over, and/or receipt and/or modification of Cloopen's allegedly materially misleading misstatements and/or their associations with Cloopen which made them privy to confidential proprietary information concerning Cloopen

179.    Specifically, Defendants knew or recklessly disregarded, but concealed from investors in the Registration Statement and throughout the Class Period, that Cloopen's 4Q 2020 dollar based net customer retention rate during the quarter prior to the IPO was only 63.1% − an approximate 30% drop from the materially higher 94.7% net customer retention rate for the nine months ended September 30, 2020, represented repeatedly in the Registration Statement and throughout the Class Period. The dollar based net customer retention rate was a key operational metric for Cloopen because it "***illustrates our ability to increase revenue generated from our existing customer base.***" This key metric which measured a core aspect of Cloopen's business, was crucial to measure the effectiveness of Cloopen's growth strategies as to existing customers

and just as crucial for investors to evaluate Cloopen's existing business and prospects.

180.    Defendants knew or recklessly disregarded that Cloopen was losing existing customer business and that its growth strategies for its purported "loyal" existing customers were not working because for its core business solutions, Cloopen had a "full-coverage customer support and success system," had a "great emphasis on improving customer experience at each step," had "ongoing 24/7/365 live chat and phone support" and "high customer satisfaction and close customer relationship can keep us posted of their honest feedback:"

> We have developed a ***full-coverage customer support and success system*** for large enterprises designed to drive customer satisfaction and expand cross-selling and up-selling opportunities. We place ***great emphasis on improving customer experience at each step***. We provide pre-sale consultation, onboarding implementation support and training at the initial stage. ***With ongoing 24/7/365 live chat and phone support, we help customers configure and use our solutions***. We also offer operation maintenance services to ensure reliable performance. For smaller customers, our intuitive user interfaces serve to reduce our customers' need for human support, and we offer various self-service options on our websites, including a complimentary knowledge base with detailed documentation and sample code. ***We believe high customer satisfaction and close customer relationship can keep us posted of their honest feedback and evolving communications needs, which drives innovation and facilitates more targeted services to further increase customer loyalty.***
>
> *    *    *
>
> ***Our customer support team is dedicated to improving customer experience at each step from pre-sale consultations to post-sale support and services, through 24/7/365 live chat and phone support.***
>
> *    *    *
>
> ***We also intend to optimize our incentive structure to encourage our sales and customer support teams to actively and regularly interact with existing customers, in order to identify changes in customer needs that would enable us to more effectively cross-sell and up-sell our solutions.***
>
> *    *    *
>
> ***We also provide ongoing customer support and operation maintenance services to ensure superior customer experience.***
>
> *    *    *

57

*We have developed a customer support and success system designed to drive customer satisfaction and expand cross-selling and up-selling opportunities. Many of our customers depend on our customer support team to assist them in deploying or using our solutions effectively, help them resolve post-deployment issues quickly, and provide ongoing support.*

181.    Defendants knew or recklessly disregarded that the statements, including beliefs, expectations, plans and intentions, in the Registration Statement about customer retention, as alleged herein, were false and misleading and risk warnings were inadequate because Cloopen's sales and marketing team, which consists of more than 471 members (as of December 31, 2020), many well-versed in China's cloud-based communications industry, contacted prospective customers and was charged with maintaining current customer relationships, reviewing existing customer subscriptions, and expanding cross-selling and up-selling opportunities to existing customers as part of Cloopen's "land and expand" and go-to-market strategies. In addition, Cloopen established sales representative offices in more than 20 cities distributed across China (as of December 31, 2020). In addition to expanding its sales network, these offices purportedly enabled Cloopen to stay closer to its customers, receive honest feedback and insights into evolving communication needs, and otherwise keep tabs on its existing customer relationships. Effectively, these offices serve as geographic hubs that regularly collected relevant regional information in real time.

182.    Moreover, the Class Period started on February 9, 2021, more than one month after the end of 4Q 2020. As such, Defendants were well aware of the declining customer retention numbers from the already completed 4Q 2020. Defendants also knew as of January 7, 2021 −approximately one month before the IPO − but concealed from investors in the Registration Statement, the then existing fact that of a massive $26 million loss as a result of the increase in fair value of the Series F Warrant. Once the Series F Warrant was exercised on January 7, 2021, Defendants had all of the information needed to determine the existing loss that would be recorded

on this Warrant.

183.     Defendants also knew or recklessly disregarded, but concealed, at the time of the IPO, as a result of their representation that "[*w]e will closely monitor our outstanding accounts receivables and follow up with relevant customers on a continuous basis in order to collect overdue balances,*" that Cloopen's customers were not paying, and their accounts were uncollectable.

### C.     Applicability Of Presumption Of Reliance (Fraud-On-The-Market Doctrine)

184.     The market for Cloopen's ADSs was open, well-developed and efficient at all relevant times. Cloopen's ADSs traded on the NYSE. As a result of the materially false and/or misleading statements and/or failures to disclose, Cloopen's ADSs traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Cloopen's ADSs, relying upon the integrity of the market price of Cloopen's ADSs and market information relating to Cloopen and have been damaged thereby.

185.     During the Class Period, the artificial inflation of Cloopen's ADSs was caused by the material misrepresentations and/or omissions alleged herein, causing the damages sustained by Plaintiff and other members of the Class. As alleged herein, during the Class Period, Defendants made or caused to be made materially false and/or misleading statements and omissions about Cloopen's finances, customer retention and uncollectability of payments and loss resulting from the increase in fair value of the Series F Warrant carried as a liability by Cloopen in its balance sheet, as alleged herein. These material misstatements and omissions created an unrealistically positive assessment of Cloopen, thus causing the price of Cloopen's ADSs to be artificially inflated at all relevant times, and when the truth was disclosed, negatively affected the value of Cloopen's ADSs. Defendants' materially false and/or misleading statements and omissions during the Class

Period resulted in Plaintiff and other members of the Class purchasing Cloopen's ADSs at such artificially inflated prices, and each of them has been damaged as a result.

186.    At all relevant times, the market for Cloopen's ADSs was an efficient market for the following reasons, among others:

(a)    Cloopen's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Cloopen filed periodic public reports with the SEC and/or the NYSE;

(c)    Cloopen regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, investor conference calls and through other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)    Cloopen was followed by securities analysts employed by brokerage firms who wrote reports about Cloopen, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. The analysts who regularly followed Cloopen and published reports regarding Cloopen included Aequitas Research, Validea Guru Stock Report, Watchlist News, American Banking and Market News, Ticker Report, Computers, Networks & Communications Daily, Market Line Financial Deals Trader, M & A Navigator, Zolmax.com, Benzinga and NoticiasFinancieras.

187.    As a result of the foregoing, the market for Cloopen's ADSs promptly digested current information regarding Cloopen from all publicly available sources and reflected such information in Cloopen's ADS price. Under these circumstances, all purchasers of Cloopen's ADSs during the Class Period suffered similar injury through their purchase of Cloopen's ADSs at artificially inflated prices and a presumption of reliance applies.

188.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding

Cloopen's finances, customer retention and uncollectability of payments and the increase in fair value of the Series F Warrant, as alleged herein—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**COUNT IV**

**Violations of § 20(a) of the Exchange Act**
**Against the Exchange Act Defendants**

189.    Plaintiff repeats and realleges each and every allegation contained above. For purposes of this Cause of Action, Plaintiff does not expressly exclude or disclaim any allegation of fraud or intentional or reckless misconduct.

190.    During the Class Period, Defendants Sun and Li participated in the operation and management of Cloopen, and conducted and participated, directly and indirectly, in the conduct of Cloopen's business affairs. Because of their senior positions, they knew the adverse non-public information about Cloopen's misstatements and omissions.

191.    As officers and directors of a publicly owned company, Defendants Sun and Li had a duty to disseminate accurate and truthful information with respect to Cloopen's business, operations, and prospects, and to correct promptly any public statements issued by Cloopen which had become materially false or misleading.

192.    Because of their positions of control and authority as senior officers and directors, Defendants Sun and Li were able to, and did, control the contents of the Registration Statement and other public filings and statements which Cloopen disseminated in the marketplace. At all relevant times, Defendants Sun and Li exercised their power and authority to cause Cloopen to

engage in the wrongful acts complained of herein.

193.    Defendant Cloopen also controlled Sun and Li.

194.    Each of the Defendants named herein was a culpable participant in the violations of § 10(b) of the Exchange Act and Rule 10b-5 as alleged in the Cause of Action above 142. The Exchange Act Defendants, therefore, were "controlling persons" within the meaning of § 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cloopen securities.

195.    By reason of the above conduct, the Exchange Act Defendants are liable pursuant to § 20(a) of the Exchange Act for the violations committed by Cloopen.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a Class representative and his counsel as class counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 31, 2022                     Respectfully submitted,

                                        **KIRBY McINERNEY LLP**

                                        /s/*Ira M. Press*
                                        Ira M. Press
                                        Thomas W. Elrod
                                        250 Park Avenue, Suite 820
                                        New York, NY 10177
                                        Tel: (212) 371-6600
                                        Email: ipress@kmllp.com
                                                telrod@kmllp.com


                                        *Local Counsel for Court Appointed Lead Plaintiff*
                                        *Guozhang Wang and Proposed Local Counsel for*
                                        *the Class*

                                        **BERGER MONTAGUE PC**
                                        Michael Dell'Angelo
                                        Barbara Podell
                                        1818 Market Street, Suite 3600
                                        Philadelphia, PA 19103
                                        Tel: (215) 875-3000
                                        Email: mdellangelo@bm.net
                                                bpodell@bm.net

                                        *Counsel for Court Appointed Lead Plaintiff*
                                        *Guozhang Wang and Proposed Lead Counsel for*
                                        *the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2022 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Ira M. Press*
Ira M. Press