# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 53

-----------------------------------------------------------------------------------X

SONNY ST. JOHN,

          Plaintiff,

       - v -

CLOOPEN GROUP HOLDING LIMITED, CHANGXUN
SUN, YIPENG LI, KUI ZHOU, QINGSHENG ZHENG,
XIAODONG LIANG, ZI YANG, MING LIAO, FENG ZHU,
LOK YAN HUI, JIANHONG ZHOU, CHING CHIU,
COGENCY GLOBAL INC., COLLEEN DEVRIES,
GOLDMAN SACHS (ASIA) L.L.C., CITIGROUP GLOBAL
MARKETS, INC., CHINA INTERNATIONAL CAPITAL
CORPORATION HONG KONG SECURITIES LIMITED,
TIGER BROKERS (NZ) LIMITED, FUTU, INC.

          Defendant.

-----------------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 652617/2021 |
| MOTION DATE | |
| MOTION SEQ. NO. | 003 004 005 |

**DECISION + ORDER ON
MOTION**

HON. ANDREW BORROK:

The following e-filed documents, listed by NYSCEF document number (Motion 003) 24, 25, 26, 27, 28, 29, 30, 31, 44, 45, 46, 47, 48, 49, 50, 51, 55

were read on this motion to/for       DISMISSAL          .

The following e-filed documents, listed by NYSCEF document number (Motion 004) 32, 33, 53

were read on this motion to/for       DISMISSAL          .

The following e-filed documents, listed by NYSCEF document number (Motion 005) 34, 35, 36, 37, 38, 39, 40, 52

were read on this motion to/for       DISMISSAL          .

This is a putative class action alleging strict liability and negligence claims pursuant to Sections

11, 12(a)(2) and 15(a) of the Securities Act of 1933 (the **1933 Act**) based on the final registration

statement (the **Registration Statement**; NYSCEF Doc. No. 46) and Prospectus (the **Prospectus;**

NYSCEF Doc. No. 28; the Prospectus together with the Registration Statement, hereinafter,

collectively, the **Offering Documents**) issued by Cloopen Group Holding Limited (the

**Company**) in connection with its February 9, 2021 initial public offering (the **IPO**) of 23 million

652617/2021  vs.
Motion No. 003 004 005

**Page 1 of 15**

Case 1:21-cv-10610-JGK-RWL    Document 105-1    Filed 08/15/22    Page 3 of 16

American Depositary Shares (**ADSs**) at $16.000 per share where it raised $340.2 million in net proceeds. Dismissal is not warranted.

According to the well-pled amended complaint (the **AC; NYSCEF Doc. No. 23**), the Offering Documents were materially misleading and violated the 1933 Act because, among other things, the Offering Documents (i) indicated that the Company's dollar-based net customer retention rate was stable at a high rate when in fact it had nose-dived from approximately 95% to 63% in Q4 of 2020, which quarter closed approximately two months before the IPO (NYSCEF Doc. No. 23, ¶¶ 60-64 and 76-79) and (ii) indicated that the Series F Warrant had a value of approximately $34 million (based on a $2.8814 exercise price and 11,799,685 shares) but failed to disclose the massive known looming liability associated with the Series F Warrant.[1] This undisclosed liability ultimately caused the Company's net loss to skyrocket to 466.9% year-over-year (*id.,* ¶ 8).

Given that the Q4 2020 dollar-based net customer retention rate decline was material and substantially different than the stabilizing picture that the Offering Documents otherwise portrayed, it does not matter that the omission was one of interim financial data or that Offering Documents disclosed that the dollar-based net customer retention rate had experienced decline in the past (*cf. Asay v Pinduoduo Inc.,* 2021 WL 3871269 [2d Cir 2021]). Nor can it be said that

---

[1] The Series F Warrant gave the warrant holder the right within six months of issuance to subscribe for an aggregate of 11,799,685 Series F Preferred Shares (par value of $0.0001 per share and exercise price of $2.8814 per share) which warrant shares were to be converted and re-designated into Class A ordinary shares. The fair value of the Series F Redeemable Convertible Preferred Shares underlying the Series F Warrant, issued in November 2020 and exercised in January 2021 (*i.e.,* ahead of the IPO), was, as of December 31, 2020, $5.50 per share (*id.,* ¶¶ 48, 51, 81-84 and 91-98).

652617/2021    vs.
Motion No.  003 004 005
Page 2 of 15

2 of 15

the statements in the Offering Documents were inactionable puffery because nothing here bespoke caution.

The Company also can not whisk away its alleged Series F Warrant 1933 Act violation because it disclosed the methodology in which liabilities are calculated or because the Offering Documents indicated that the Company adjusts warrant liabilities periodically given the known liability at the time of the IPO. The Company disclosed its Series E Warrant liability and should have disclosed its Series F Warrant liability. Under the circumstances, only disclosing that it had a $34 million Series F Warrant when it knew of its significant Series F Warrant liability was a material omission because it would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available (*Asay*, 2021 WL 3871269, * 4, citing *Stadnick v Vivint Solar, Inc.* 861 F3d 31, 37 [2d Cir 2017], quoting *DeMaria v Andersen,* 318 F3d 170, 180 [2d Cir 2003]).

Thus, the Company's motion to dismiss (Mtn. Seq. No. 003) and Goldman Sachs (Asia) LLC (**Goldman Sachs**), Citigroup Global Markets Inc. (**Citigroup**), Tiger Brokers (NZ) Limited (**Tiger Brokers**), and Futu, Inc.'s (**Futu**; Goldman Sachs, Citigroup, Tiger Brokers, and together with Futu, hereinafter, collectively, the **Underwriters**) motion to dismiss (Mtn. Seq. No. 004) pursuant to CPLR 3211 (a)(1) and (a)(7) must be denied.

For the avoidance of doubt, by Stipulation (NYSCEF Doc. No. 43) dated January 14, 2022, the claims asserted against Colleen DeVries and the second and third causes of action against

Cogency Global Inc. (**Cogency**) were voluntarily dismissed. Ms. DeVries and Cogency's

motion to dismiss (Mtn. Seq. No. 005) is therefore denied as moot.

## The Relevant Facts and Circumstances

The Company is a cloud-based communications solution provider in China which conducted an

IPO through its agent Cogency on February 9, 2021. The Registration Statement was signed by

Ms. DeVries as an employee of Cogency and by Changxun Sun, Yipeng Li, Kui Zhou,

Qingsheng Zheng, Xiaodong Liang, Zi Yang, Ming Liao, Feng Zhu, Lok Yan Hui, Jianhong

Zhou, Ching Chiu (the **Individual Defendants**), each of whom were on the board of the

Company at the time of the IPO. The Underwriters were the underwriters for the IPO who

performed a due diligence investigation, helped draft the Offering Documents, caused the

Registration Statement to be filed with the SEC, and met with investors to present information in

connection with the IPO (NYSCEF Doc. No. 23, ¶ 35). At the time of the IPO, the Company

priced its shares at $16 per ADS (*id.*, ¶ 57).

As set forth in the Offering Documents, the Company's plan to grow its customer base involved

using a "land and expand" strategy, which consisted of (i) contacting prospective customers and

(ii) cross-selling and up-selling opportunities to existing customers (NYSCEF Doc. No. 23, ¶

40).

The Company identified certain risks in its Offering Documents, including, among other things,

that (i) the Company was subject to extensive regulation and the failure to obtain or maintain

required licenses and permits could result in government enforcement actions, fines, or

**652617/2021 vs.**
**Motion No. 003 004 005**

**Page 4 of 15**

Case 1:21-cv-10610-JGK-RWL   Document 105-1   Filed 08/15/22   Page 6 of 16

restrictions on the Company, (ii) the Company could be adversely affected by third-party misconduct or misuse of Company solutions beyond the Company's control, (iii) the discontinuation of preferential tax treatments available to the Company in China could adversely affect the Company, (iv) the Company's lease agreements were not registered with the government authorities and could be challenged by property owners or other third parties, and (v) the Company had identified a material weakness in its internal control over financial reporting (NYSCEF Doc. No. 28, at 42-45).

The Company used a dollar-based net customer retention rate as an operating metric to show its ability to increase revenue generated from its existing customer base. According to the Offering Documents, this rate was allegedly 135.7% in 2018, 102.7% in 2019, and 94.7% in the first nine months of 2020 (*id.*, ¶ 63).

Based on these numbers disclosed in the Offering Documents, the Company indicated that although there had been a decline in its dollar-based net customer retention rate, the rate was stabilizing and at a high level. To wit, the Company experienced a 24% decline between 2018 and 2019 (*i.e.,* 135.7% to 102.7%) and an 8% decline between 2019 and the first nine months of 2020 (*i.e.,* 102.7% to 94.7%). The Offering Documents also suggested that the events causing the decrease in the dollar-based net customer retention rate had already been absorbed by the Company, that the dollar-based net customer retention rate was stable at a high level and that it would continue to stabilize at a high level as the regulatory framework became more established and as the Company optimized its existing solutions and as it developed new features and new solutions:

652617/2021    vs.                                              Page 5 of 15
Motion No.  003 004 005

5 of 15

> Our dollar-based net customer retention rate decreased from 135.7% in 2018 to 102.7% in 2019, primarily because (1) relevant PRC authorities took stringent government measures in 2019 to regulate the operation of P2P online lending platforms, and we, after assessing potential risks, chose to voluntarily terminate certain transactions with existing customers in the online consumer finance industry to ensure compliance with relevant laws and regulations, which led to a decrease in our existing customer base and our revenues primarily related to cloud-based CC solutions that we offer on a recurring basis, which decreased by 24.8% as compared to 2018, in 2019; and (2) relevant regulatory authorities promulgated enhanced regulations on application-to-person voice calls in China out of concerns of consumer harassment, which reduced enterprise customers' usages of voice calls in general and adversely affected our related operations. See "Risk Factors — Risks Related to Our Business and Industry — Certain of our customers, such as internet finance companies, may be subject to more stringent laws and regulations, which could adversely affect their operations and therefore their IT spending levels, and in turn could cause our customer base to shrink" and "Regulation — Regulations Relating to Cyber Security and Privacy Protection — Unauthorized calls and text messages". Our dollar-based net customer retention rate further decreased to 94.7% in the nine months ended September 30, 2020, primarily due to a decrease in the number of enterprise customers of smaller sizes that are less equipped to withstand the impact of COVID-19. ***We expect that,*** as the applicable regulatory framework becomes more established and China's economy recovers from the COVID-19 pandemic, and as we continuously optimize our existing solutions and develop new features and solutions, ***our dollar-based net customer retention rate will remain stable at a relatively high level***

(NYSCEF Doc. No. 28, at 103-104 [emphasis added]).

However, at the time of the IPO, this was not so. In the fourth quarter of 2020 which closed approximately two months <u>before</u> the IPO, the dollar-based net customer retention rate plunged from 94.7% to 63.1% - *i.e.,* a 33 1/3% drop. Stated differently, far from having stabilized at a high level, the annualized dollar-based net customer retention rate for 2020 decreased to approximately 86.8% (or an approximately 15.48% further decline from 2019 – *i.e.,* almost double the 8% decline that the Company disclosed in the Offering Documents.) This was material and known but not disclosed.

**652617/2021    vs.
Motion No. 003 004 005**

**Page 6 of 15**

The Offering Documents also described several financing transactions. Most significantly, as relevant to the instant motions, the Company issued a Series F Warrant in November 2020. The Offering Documents however omitted the substantial known liability associated with the Series F Warrant. Instead, the Offering Documents merely indicated that the warrant had a value of approximately $34 million (disclosing the exercise price [$2.8814] and the number of shares [11,799,685] attributable to the warrant but failing to disclose that the stock associated with the warrant as of December 31, 2020 had a fair value price of $5.50 when the warrant was exercised in January 2021 and had an enormous unrecognized liability):

> In November 2020, we issued a warrant to Novo Investment HK Limited with the value of US$34,000,000, or the series F warrant. The warrant holder may, within six months commencing from the issuance date, subscribe for an aggregate of 11,799,685 series F preferred shares of our company, par value of US$0.0001 per share, at the exercise price of US$2.8814 per share, subject to adjustment. The series F warrant is, prior to the expiration date, transferrable, subject to certain restrictions, and the warrant shares issuable thereunder will be converted and re-designated into Class A ordinary shares after this offering. We have granted the warrant holder the same registration rights as holders of registrable securities, including demand registration rights, F-3/S-3 registration rights and piggyback registration rights. See "— Shareholders Agreement — Registration rights". The series F warrant was exercised in full in January 2021.

(NYSCEF Doc. No. 28, at 212).

By comparison, the Company had also issued Series E Warrants in October 2019, March 2020, and July 2020. These Series E Warrants had also been exercised at the time of the IPO. With respect to the Series E Warrants, the Company, however, disclosed the liability associated with these warrants:

> In October 2019, we issued warrants to Guizhou Province Yunli High-tech Industry Investment Partnership (Limited Partnership) and Guizhou Province Chuangxin Chuangye Equity Investment Fund (Limited Partnership) with the

652617/2021    vs.
Motion No. 003 004 005

Page 7 of 15

Case 1:21-cv-10610-JGK-RWL Document 105-1 Filed 08/15/22 Page 9 of 16

right to purchase an aggregate of 6,112,570 series E preferred shares, as adjusted, at the aggregate exercise price of US$15,000,000. In connection with such series E warrants, the warrant holders extended loans to Ronglian Yitong in the aggregate principal amount of RMB equivalent to US$15,000,000 in 2019, or the series E loans. In March 2020 and July 2020, we issued additional warrants to such warrant holders with rights to purchase an aggregate of 314,274 series E preferred shares at nominal value for anti-dilution purpose. The series E warrants were exercised in full in November 2020. In connection with the exercise, we extended promissory notes to such holders in the aggregate principal amount of US$15,000,000, which will be repaid by such holders upon receipt of the repayment made by Ronglian Yitong pursuant to the series E loans. See "—History of Securities Issuances — Preferred shares"

…

The fair value of the warrant liability issued to two PRC onshore investment funds for purchasing Series E Convertible Preferred Shares as of December 31, 2019 and September 30, 2020 are estimated with the following assumptions used:

|  | December 31, 2019 | September 30, 2020 |
| --- | --- | --- |
| Risk-free rate of return | 2.58% | 1.09% |
| Volatility | 55% | 30% |
| Expected dividend yield | 0% | 0% |
| Fair value of underlying Series E Redeemable Convertible Preferred Shares | US$2.49 | US$2.70 |
| Expected term | 1.2 years | 0.4 years |

The risk-free interest rate was based on the U.S. Treasury rate for the expected remaining life of preferred shares warrants. The expected volatility was estimated based on the historical volatility of comparable peer public companies with a time horizon close to the expected term of the Company's warrant liabilities. Expected dividend yield is zero as the Company does not anticipate any dividend payments in the foreseeable future. Expected term is the remaining life of the warrant liabilities.

(*id.*, at 212, F-99).

In other words, unlike the Series E Warrants, there was no actual disclosure as to the Series F Warrant liability. With respect to the undisclosed massive Series F Warrant liability, the only

652617/2021    vs.                                                                 **Page 8 of 15**
Motion No.  003 004 005

disclosure that the Company did make was the methodology by which warrant liabilities are accounted for and that the carry value is subject to remeasurement at each reporting period:

> The freestanding warrants to purchase redeemable convertible preferred shares at a future date were determined to be freestanding instruments that were accounted for as liabilities. At initial recognition, the Group recorded the warrant liabilities on the consolidated balance sheets at their estimated fair value and changes in estimated fair values were included in the change in fair value of warrant liabilities on the consolidated statement of comprehensive loss or allocated to the proceeds from the issuance of the debt instrument to the warrants based on the warrant liabilities fair value. The warrant liabilities are subject to remeasurement at each reporting period and the Group adjusted the carrying value of the warrant liabilities to fair value at the end of each reporting period utilizing the binominal option pricing model, with changes in estimated fair value included in the change in fair value of warrant liabilities on the consolidated statement of comprehensive loss.

(*id.*, at F-80).

On March 26, 2021, the Company published its report for Q4 2020 and the fiscal year 2020 (NYSCEF Doc. No. 23, ¶ 92). The Q4 2020 $39.6 million revenue was $2 million short of analysts' consensus, net losses of RMB 305.4 million represented a 466.9% increase year-over-year net loss, and operating expenses of RMB 180.4 million represented a 30% increase from operating expenses in the fourth quarter of 2019 (*id.*, ¶ 93). As a result of this news, the Company's stock price fell from $14.42 per ADS on March 25, 2021 to $11.75 per ADS on March 26, 2021 (*id.*, ¶ 96). When the Company filed its annual report on Form 20-F, finally revealing that its dollar-based net customer retention rate fell from 102.7% in 2019 to 86.8% in 2020 and that the fair value of the Series F Shares issued when the Series F Warrant was exercised was, as of December 31, 2020, $5.50 per share, the value of the Company's ADS fell from $9.89 to $8.97 (*i.e.,* 9.3%) between May 11, 2021 and May 12, 2021 (*id.*, ¶¶ 97-99). As of the date of the filing of the AC, the stock traded as low as $3.98 per ADS (*id.*, ¶ 100).

652617/2021 vs.
Motion No. 003 004 005

Page 9 of 15

9 of 15

## Discussion

The 1933 Act "protects investors by ensuring that companies issuing securities make a full and fair disclosure of information relevant to a public offering" (*Omnicare, Inc. v Laborers Dist. Council Const. Indus.,* 135 S Ct 1318, 1323 [2015] [internal quotation marks and citation omitted]). The "linchpin" of the 1933 Act "is its registration requirement," which "must contain specified information about both the company itself and the security for sale" (*Omnicare*, 135 S Ct at 1323). Sections 11, 12, and 15 of the 1933 Act impose "strict liability for material misstatements contained in registered securities offerings" (*NECA-IBEW Health & Welfare Fund v Goldman Sachs & Co.*, 693 F3d 145, 148 [2d Cir 2012]).

On a motion to dismiss pursuant to CPLR 3211, the court must afford the pleading a liberal construction and accept the facts as alleged in the complaint as true, according the plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit any cognizable legal theory (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]).

It is well settled that in order to survive a CPLR 3211 motion to dismiss, a claim brought under the 1933 Act need not satisfy the heightened pleading standing of CPLR 3016(b) and must only satisfy CPLR 3013's notice pleading requirements (*see Feinberg v Marathon Patent Group Inc.*, 193 AD3d 568, 570-571 [1st Dept 2021]; *In re Netshoes Sec. Litig.*, 68 Misc 3d 788, 794-795 [Sup Ct, NY County 2020]; *In re PPDAI Group Sec. Litig.,* 66 Misc 3d 1226[A], *6 [Sup Ct, NY County 2020]; *In re Uxin Limited Sec. Litigation,* 2020 WL 1146636, *6 [Sup Ct, NY County 2020]).

652617/2021    vs.                                                              Page 10 of 15
Motion No.  003 004 005

10 of 15

Case 1:21-cv-10610-JGK-RWL    Document 105-1    Filed 08/15/22    Page 12 of 16

Section 11 of the 1933 Act imposes liability based on the contents of a registration statement, both for what it includes and for what it omits (*Omnicare*, 1315 S Ct at 1327-1330; *In re Uxin Limited Sec. Litig.*, 2020 WL 1146636, *7).  Whether a statement is materially false or misleading is viewed at the time such statement is made — not retroactively, in hindsight (*In the Matter of Netshoes Sec. Litig.*, 64 Misc 3d 926, 933 [Sup Ct, NY County 2019]).  Neither scienter, reliance, nor loss causation is an element of claims under the 1933 Act (*In re Netshoes Sec. Litig.*, 68 Misc 3d at 795).

Item 303 requires the disclosure of "trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations'" (*Litwin v Blackstone Group, L.P.*, 634 F3d 706, 716 [2d Cir 2011]).

Section 12 imposes liability on any person who offers or sells securities of a prospectus containing material misstatements (*Mahar v General Electric*, 65 Misc 3d 1121, 1129 [Sup Ct, NY County 2019], *affd* 188 AD3d 534 [1st Dept 2020], *citing In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F3d 347, 359 [2d Cir 2010]).

Neither accurate statements about past performance, nor expressions of puffery and corporate optimism are actionable under the securities laws (*In the Matter of Netshoes Sec. Litig.*, 64 Misc 3d at 926; *Rombach v Chang,* 355 F3d 164, 174 [2d Cir 2004]; *Nadoff v Duane Reade, Inc.*, 107 Fed Appx 250, 252 [2d Cir 2004]). Statements of puffery and/or corporate optimism are also inactionable (*Rombach, supra,* 355 F3d at 174).

Case 1:21-cv-10610-JGK-RWL Document 105-1 Filed 08/15/22 Page 13 of 16

The defendants argue that the AC must be dismissed because, among other things, they never said their strategy was working, they disclosed certain risks in the Offering Documents associated with government regulations and COVID-19's effect on certain smaller customers less equipped to manage the impact of COVID-19, they did not say that the customer base was stable, and they otherwise did not have to disclose their 2020 Q4 performance because the time to report such performance had not yet come.  The arguments fail.

The test of whether an omission of interim financial data is material and therefore violates Section 11 of the 1933 Act is

> whether there is a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.  *Stadnick v Vivint Solar, Inc.,* 861 F.3d 31, 37 (2d Cir. 2017) (quoting *DeMaria v Andersen,* 318 F.3d 170, 180 (2d Cir. 2003)

(*Asay*, 2021 WL 3871269, *4 [parenthesis in original])

As discussed above, although the Offering Documents disclosed a prior decline in the dollar-based net customer retention rate, the Company indicated that its results were based on the imposition of certain government regulations in 2019 and COVID's impact on smaller businesses.  In reporting the first nine months of 2020, the Company indicated that the dollar-based net customer retention rate was stabilizing at a very high level – *i.e*., approximately 95%. With this as a backdrop, the Offering Documents were materially misleading in indicating that the Company expected that as the regulatory framework becomes more established, as China recovers from the pandemic and as the Company continuously optimizes its existing solutions and developed new ones, that the dollar-based net customer retention rate "will remain stable at a

relatively high level" (NYSCEF Doc. No. 28, at 103-104). This was materially misleading because the disclosure suggests a number of things which simply were not so. Among other things, it suggests that the impact of these risk factors had already hit and been absorbed in the Company's performance. It also suggests that the Company's solutions are successful and with the numbers disclosed alongside these statements, that the dollar-based net customer retention rate was stable and at a relatively high level. What it does not suggest however is that the Company had just experienced a 33 1/3% nose-dive in its dollar-based net customer retention rate in Q4 2020. This is what actually occurred.

None of the cases cited by the Defendants compel a different result. For example, in *Asay v Pinduoduo Inc.*, 2021 WL 3871269 (2d Cir 2021), the court held that the "interim data" that was not disclosed was not material because the disclosures made in the registration statement were supported by the financial data that was provided. As discussed above, a Venn diagram of the numbers and the disclosure in this case is bereft of such overlap. In *Stadnick v Vivint Solar, Inc.*, 861 F3d 31 (2d Cir 2017), the court held that the omitted information about the previous periods performance did not make the offering documents materially misleading because the company had a history of volatility. The Company's nine-month disclosure in this case by contrast was inconsistent with the prior disclosed year because the nine-month disclosure suggested a substantial improvement in the decline (*i.e.,* only an 8% decline from the prior year as opposed to 24% from the prior year). This together with the disclosure that the dollar-based net customer retention rate was stable presents a vastly different picture than the 33 1/3% plunge which occurred in Q4 2020 -- approximately two months prior to the IPO.

652617/2021 vs.
Motion No. 003 004 005

Page 13 of 15

13 of 15

Case 1:21-cv-10610-JGK-RWL Document 105-1 Filed 08/15/22 Page 15 of 16

The failure to disclose the Series F Warrant is also actionable. The Series F Warrant was exercised in January 2021, prior to the IPO, and the Company knew of the looming substantial liability associated with the Series F Warrant at the time of the IPO. Liability can not be avoided because the Offering Documents described how warrant liabilities are calculated or that they are adjusted periodically. The Offering Documents failed to disclose the significant amount by which the warrants were in the money (*i.e.,* approximately $2.62 higher than the $2.88 exercise price) at the time the warrants were exercised and the known massive liability to be recognized. Describing the Series F Warrant as having a value of $34 million and otherwise indicating that the warrant liabilities are adjusted periodically was, at best, a half truth (*In re Netshoes Sec. Litig.*, 68 Misc 3d at 801) and otherwise did not "fairly align [ ] with the information in the issuer's possession at the time" (*Tongue v Sanofi,* 816 F3d 199, 210 [2d Cir 2016]). At worst, it was a deliberate and calculated attempt to hide this massive known liability. As the Supreme Court made clear in *Omnicare,* 1933 Act liability may be imposed not only where the speaker does not "hold the belief she professed" or the "supporting facts she supplied were untrue," but also where an opinion is expressed in the offering documents that – though sincerely held and technically true – omits information in a way that makes the statement misleading to a reasonable investor (135 S Ct at 1327, 1332).

The AC also sufficiently alleges claims for violation of Section 12(a)(2) of the 1933 Act. The Company and the Underwriters do not dispute that they are statutory sellers. According to the AC, the Underwriters helped prepare the Offering Documents, filed the Offering Documents with the SEC and met with potential investors to provide them information about the IPO. This is sufficient to state a cause of action under Section 12(a)(2).

**652617/2021 vs.**
**Motion No. 003 004 005**

**Page 14 of 15**

Section 15 of the 1933 Act creates liability for individuals or entities that control any person liable under Section 11 or 12 of the 1933 Act, and thus relies in part on the plaintiff's ability to demonstrate liability under Section 11 or Section 12 (*In re Uxin Limited Sec. Litig.*, 2020 WL 1146636, \*10). Although the individual defendants have not yet been served, because the Court is not dismissing the claims brought under Section 11 or Section 12, the claims brought under Section 15 must go forward as well.

Accordingly, it is hereby ORDERED that the motions to dismiss are denied in their entirety; and it is further

ORDERED that the defendants shall file an answer within 20 days of the date of this order; and it is further

ORDERED that the parties shall appear at a preliminary conference on September 8, 2022, at 12pm.

20220810133728ABORROK17A7B3D59CBB44FBBF705CBB463FA2A1

_____
**8/10/2022**
**DATE**

_____
**ANDREW BORROK, JSC**

| CHECK ONE: | | CASE DISPOSED | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|
| | | GRANTED | X DENIED | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | | REFERENCE |

652617/2021   vs.
Motion No.  003 004 005

Page 15 of 15

15 of 15