**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

**GUOZHANG WANG,**

                    **Lead Plaintiff,**          **21-cv-10610 (JGK)**

          **- and –**                    <u>**OPINION AND ORDER**</u>

**BOYAN DONG, ET AL.,**

                    **Plaintiffs,**

          **- against -**

**CLOOPEN GROUP HOLDING LIMITED,**
**ET AL.,**

                    **Defendants.**

─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    This case is a securities action brought on behalf of a
putative class of investors who purchased or acquired American
Depositary Shares of Cloopen Group Holding Limited ("Cloopen")
traceable to a registration statement and prospectus (together,
the "Registration Statement") issued in connection with Cloopen's
February 9, 2021 initial public offering ("IPO" or "Offering"),
or who purchased or acquired such Cloopen securities between the
time of the IPO and May 10, 2021, inclusive. The lead plaintiff,
Guozhang Wang, alleges causes of action against Cloopen, fourteen
of Cloopen's officers and directors (collectively, the "Cloopen
Individual Defendants"), Cloopen's authorized U.S. representative
Cogency Global Inc. and one of its employees (collectively, the
"Cogency Defendants"), and five underwriters of Cloopen's IPO

(collectively, the "Underwriter Defendants"), under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o; Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The defendants now move to dismiss the Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion to dismiss is **denied.**

## I.

Unless otherwise noted, the following facts are taken from the Amended Class Action Complaint, ECF No. 84 (the "Complaint") and are accepted as true for purposes of the motion to dismiss.[1]

## A.

Cloopen is a cloud-based communications solutions provider founded in 2014 and headquartered in Beijing, China. See Compl. ¶¶ 24-25, 50. Cloopen "claims to be the largest multi-capability cloud-based communications solution provider in China," with a customer base "consisting of enterprises of all sizes across a variety of industries, including internet, telecommunications, financial services, education, industrial manufacturing, and

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

energy." Id. ¶¶ 51, 2. Cloopen is supposedly the only Chinese provider offering a "full suite of cloud-based solutions" that covers "Communications Platforms as a Service ('CPaaS'), cloud-based Contact Centers ('cloud-based CC'), and cloud-based Unified Communications and Collaborations ('cloud-based UC&C')." Id. ¶ 2.

On November 13, 2020, Cloopen filed a draft Registration Statement on Form F-1 with the Securities and Exchange Commission ("SEC") in anticipation of its IPO. Id. ¶ 64. Cloopen revised and amended that document several times before the SEC declared the Registration Statement effective on February 8, 2021. Id. ¶¶ 65-69. The following day, Cloopen submitted its prospectus on Form 424B4, which incorporated and formed part of the Registration Statement. Id. ¶ 70. With that, Cloopen launched its IPO, during which Cloopen sold 23 million American Depositary Shares ("ADS") at $16 per ADS. Id. ¶ 71. The IPO raised over $340.2 million in total net proceeds from investors. Id. Cloopen's ADSs currently trade on the New York Stock Exchange under the ticker symbol "RAAS." Id. ¶ 24.

The Underwriter Defendants are Goldman Sachs (Asia) L.L.C., Citigroup Global Markets Inc., Tiger Brokers (NZ) Limited, China International Capital Corporation Hong Kong Securities Limited, and Futu Inc., id. ¶¶ 42-46, five financial services companies that served as underwriters for Cloopen's IPO. The Underwriter Defendants assisted in drafting, revising, and submitting the

Registration Statement, in planning the IPO, and in soliciting investors to purchase Cloopen ADSs. Id. ¶¶ 47-49. The Underwriter Defendants were also responsible for conducting a due diligence investigation, in which they met with Cloopen's executives and enjoyed "virtually unlimited" access to Cloopen's then-current internal, financial, and operational information. Id. ¶ 49(c)-(d). One of the two Cogency Defendants, Cogency Global Inc. ("Cogency"), acted as Cloopen's authorized U.S. representative for purposes of the IPO. Id. ¶ 40.

The Cloopen Individual Defendants include Cloopen's founder Changxun Sun, who has served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors since Cloopen's inception; Yipeng Li, Cloopen's Chief Financial Officer ("CFO") and also a Board member; and Kui Zhou, Qingsheng Zheng, Xiaodong Liang, Zi Yang, Ming Liao, Feng Zhu, Lok Yan Hui, Jianhong Zhou, Ching Chiu, Xiegang Xiong, Cheng Luo, and Yunhao Liu, all of whom either were or became members of Cloopen's Board at the time of the IPO (the "Board Defendants"). Id. ¶¶ 25-39. Sun, Li, and all of the Board Defendants signed the Registration Statement issued in connection with the Offering. Id. ¶ 41. The Registration Statement was also signed by Cogency employee Colleen A. DeVries, the other Cogency Defendant. Id. ¶ 40.

The lead plaintiff alleges that the Registration Statement for the IPO "contained materially false and misleading statements

4

of fact" and "failed to disclose material facts" required to make those representations not misleading. Id. ¶ 72. These alleged misstatements and omissions relate to three subjects covered in the Registration Statement: (1) the issuance and exercise of a particular warrant for Cloopen's series F preferred shares (the "Series F Warrant" or the "Warrant"); (2) Cloopen's customer retention strategy and a related metric, its dollar-based net customer retention rate; and (3) lack of payment from Cloopen customers and associated increases in Cloopen's accounts receivable and allowances for doubtful accounts.

With respect to the Series F Warrant, the Registration Statement disclosed that in November 2020, Cloopen had issued a warrant valued at $34 million to Novo Investment HK Limited ("Novo"), pursuant to which the "warrant holder [was entitled], within six months commencing from the issuance date, [to] subscribe for an aggregate of 11,799,685 series F preferred shares of [Cloopen] . . . at the exercise price of US$2.8814 per share." Id. ¶ 73. Cloopen is allegedly obligated to treat such warrants as liabilities, id. ¶ 60, and the Registration Statement explained that Cloopen "record[s] the[se] warrant liabilities on [its] consolidated balance sheets at their estimated fair value," a number "subject to remeasurement at each reporting period," id. ¶ 75. The Registration Statement also disclosed, in a section for "Subsequent Events," that "[o]n January 7, 2021, [the] Series F

[W]arrant was fully exercised with the exercise price of . . . $34,000,000 and [Cloopen] issued 11,799,685 Series F Redeemable Convertible Preferred Shares to Novo Investment." Id. ¶ 78. Cloopen made this disclosure regarding the exercise of the Series F Warrant "notwithstanding that the Registration Statement" was generally limited to "financial data as of September 30, 2020," id. ¶ 81, which marked the end of the third quarter ("3Q") of that year.

The Complaint alleges that these disclosures were incomplete and misleading because they omitted a material fact: namely, that the original fair value of the Series F Warrant at issuance was only $4.8 million. Id. ¶¶ 74, 78, 80. Without this information, investors lacked the ability to calculate the massive liability that Cloopen incurred when the Series F Warrant was exercised on January 7, 2021. Id. ¶¶ 77-78, 80. The Complaint alleges that the resulting loss of roughly $26 million, which reflects the increase in the fair value of the Series F Warrant between its issuance and its exercise, contributed to a net loss for Cloopen of 466.9% year-over-year in the fourth quarter ("4Q") of 2020.[2]

---

[2] According to the Complaint, the loss incurred upon the exercise of the Series F Warrant is calculated by subtracting the Series F Warrant's original fair value at issuance ($4.8 million on November 13, 2020) from the last recorded estimate of its fair value before the January 7, 2021 exercise date ($31 million on December 31, 2020). This calculation yields the increase in the Warrant's fair value between the time of issuance and the time

Id. ¶ 4. Because the original fair value of the Series F Warrant was available to Cloopen in November 2020, and because the loss stemming from the increase in that fair value materialized on January 7, 2021, Cloopen "had all of the information [it] needed" to determine the "tremendous costs" associated with the Series F Warrant at least one month before the IPO. Id. ¶¶ 182, 4. But neither the original fair value nor the eventual loss was disclosed in the Registration Statement. Id. ¶ 5.

Next, the Complaint alleges that the Registration Statement contained a number of representations regarding the strength of Cloopen's customer retention strategy, including, for example, statements that "customers tend to stay with [Cloopen] due to the critical role [Cloopen's] solutions play in their business operations," id. ¶ 86, that Cloopen maintains a "diverse and loyal customer base" and a "steady revenue stream from repeat customers," id. ¶ 83, and that Cloopen's "net customer retention present[s] significant cross-selling and up-selling potential," id. ¶ 86; see also id. ¶¶ 83-90, 98-104 (identifying other statements). Relatedly, the Registration Statement highlighted Cloopen's "dollar-based net customer retention rate," a "key operational metric" that measures the change in revenue obtained over time from customers for Cloopen's CPaaS and cloud-based CC

---

of exercise ($26 million), which is in turn the amount that Cloopen was required to treat as a loss. Compl. ¶¶ 74, 79, 80.

solutions. Id. ¶ 54. According to the Registration Statement, this metric "illustrates [Cloopen's] ability to increase revenue generated from [its] existing customer base." Id. The Complaint alleges that the dollar-based net customer retention rate is therefore "crucial" to evaluating Cloopen's "business and prospects," id. ¶ 179, because, as Cloopen stated in its Registration Statement, its "results of operations are highly dependent on the total number and the lifetime value of [its] customers," id. ¶ 99.

Cloopen's Registration Statement disclosed that "[i]n 2018, 2019 and the nine months ended September 30, 2020, [Cloopen's] dollar-based net customer retention rate . . . was 135.7%, 102.7% and 94.7%, respectively." Id. ¶ 90. The Registration Statement then stated as follows:

> We expect that, as the applicable regulatory framework becomes more established and China's economy recovers from the COVID-19 pandemic, and as we continuously optimize our existing solutions and develop new features and solutions, our dollar-based net customer retention rate will remain stable at a relatively high level.

Id. ¶ 102.

The Complaint alleges that all of these statements, as well as several others regarding the retention of existing customers, were false and misleading because the Registration Statement did not disclose that Cloopen's dollar-based net customer retention

rate had "plunged from 94.7% for the nine months ended September 30, 2020 . . . to 63.1% during 4Q 2020 -- a drop of over 30%." Id. ¶¶ 85, 103. Thus, Cloopen's dollar-based customer retention rate was neither "stable" nor at a "relatively high level" at the time of the IPO. Id. ¶ 102. Rather, the precipitous drop in 4Q 2020 indicated that Cloopen's "existing customer business" had "deteriorated materially," and that the retention strategy touted in the Registration Statement was "failing." Id. ¶¶ 103, 83. The fact of this 30-percent decline in the dollar-based net customer retention rate was allegedly available to Cloopen over one month prior to the February 2021 IPO. See id. ¶¶ 7-8.

With regard to customer nonpayment, the Complaint alleges that the Registration Statement failed to disclose a significant increase in delayed or uncollectible payments during 4Q 2020, a trend that "forced Cloopen to recognize massive increases in its accounts receivable and its allowance for doubtful accounts." Id. ¶¶ 106, 10. In view of this omission, the Complaint alleges that the Registration Statement's representations regarding Cloopen's reliable customer base and "clos[e] monitor[ing]" of its accounts receivable were incomplete and misleading. Id. ¶¶ 105-106. The fact of this 4Q 2020 increase in customer nonpayment, like the coinciding 30-percent decline in the customer retention rate, was allegedly also available to Cloopen over one month before the Offering.

Additionally, the Complaint alleges that the omission of the 4Q 2020 increase in customer nonpayment rendered the Registration Statement's related risk disclosures "inadequate," "ineffective," and "misleading," because they framed the risk of such increasing nonpayment as prospective or hypothetical. Id. ¶¶ 91, 105-107. The omission of the steep 4Q 2020 decline in the dollar-based net customer retention rate allegedly had the same effect on the Registration Statement's risk warnings regarding customer growth and retention, which similarly described declining retention as a future risk. Id. ¶¶ 91-97, 103. These risk disclosures regarding customer retention and nonpayment were allegedly incomplete and misleading because, at the time of the Offering, the risks warned of had "already occurred." Id. ¶ 12.

The Complaint alleges that the omissions described above not only rendered certain statements materially misleading, but also violated the defendants' affirmative disclosure obligations pursuant to SEC regulations. Specifically, the Complaint alleges that in failing to disclose (1) the liability associated with the Series F Warrant, (2) the precipitous drop in customer retention, and (3) the increase in nonpayment, the Registration Statement violated Items 303 and 105 of SEC Regulation S-K, which required the disclosure of certain material trends, uncertainties, and risks known to Cloopen at the time of the IPO. Id. ¶¶ 108-114.

According to the Complaint, the Registration Statement's misrepresentations and omissions came to light not long after the IPO. On March 26, 2021, Cloopen published its financial results for 4Q 2020, which reported revenues of "just $39.6 million ($2 million shy of analysts' consensus), net losses of $46.8 million (representing a staggering loss of 466.9% year-over-year), and operating expenses of $27.6 million (representing a 30% increase over 4Q 2019)." Id. ¶¶ 13, 116. These "disappointing" quarterly numbers "also dragged down" Cloopen's FY 2020 financial results, which were reported on the same day. Id. ¶ 119. In its March 26, 2021 disclosures, Cloopen revealed that the surge in 4Q net loss was largely attributable to a "change in fair value of warrant liabilities." Id. ¶ 116. Cloopen also disclosed that one of the "primar[y]" reasons for the spike in its administrative and general expenses, which were 59.2% higher in 4Q 2020 than in 4Q 2019, was an "increase in the provision for doubtful accounts resulting from increased accounts receivables." Id. With these disclosures, the value of Cloopen's ADSs declined by 18.5%, from $14.42 per ADS on March 25, 2021, to $11.75 per ADS when the market closed on March 26, 2021. Id. ¶¶ 14, 121.

The remainder of the truth was allegedly revealed on May 10, 2021, after the market closed, when Cloopen filed its Annual Report on SEC Form 20-F. Id. ¶ 122. The Form 20-F disclosed that Cloopen's dollar-based net customer retention rate had "dropped

by year-end 2020 . . . to 86.8%," a percentage "far below [that of] historical periods," id. ¶ 16, making clear "for the first time" that Cloopen had been "losing existing customer business during 4Q 2020 at a rapidly increasing rate," id. ¶ 122. The Form 20-F also disclosed that the original fair value of the Series F Warrant had been $4.8 million, and that the fair value of the underlying stock had increased to $5.50 per share as of December 31, 2020. Id. ¶ 123. With this information, investors could finally calculate the $26 million loss that materialized when the Series F Warrant was fully exercised one month before the IPO. See id.

Between May 10, 2021, and May 11, 2021, the value of Cloopen's ADSs increased slightly. Id. ¶ 124. Then, as the market allegedly "absorbed" the revelations in Cloopen's Form 20-F, "the value of Cloopen's ADSs fell from $9.89 [per share] on May 11, 2021 . . . to close at $8.97 per [share] on May 12, 2021." Id. Since that time, Cloopen's ADS price has "continued to decline." Id.

Finally, the Complaint alleges that on May 3, 2022, Cloopen announced in a press release that it had "formed an independent special committee to investigate certain employee misconduct and transaction irregularities . . . brought to [its] attention by KPMG Huazhen LLP ('KPMG')," and that KPMG had recently resigned as Cloopen's independent registered public accounting firm. Id.

¶ 125. Cloopen stated that it had not yet determined the impact of these issues "on its consolidated financial statements" for "previous years," including the year preceding the IPO. Id.

**B.**

This securities action commenced in December 2021. In April 2022, the Court appointed Guozhang Wang as lead plaintiff for the putative class pursuant to the Private Securities Litigation Reform Act ("PSLRA"). See 15 U.S.C. §§ 77z-1(a)(3)(B)(iii), 78u-4(a)(3)(B)(iii); see also ECF No. 71. On May 31, 2022, the lead plaintiff filed the Complaint at issue, asserting federal causes of action under Sections 11 and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act. The lead plaintiff seeks to represent a class of "all persons who: (a) purchased or otherwise acquired Cloopen [ADSs] pursuant and/or traceable to the [R]egistration [S]tatement . . . issued in connection with Cloopen's February 9, 2021 initial public offering . . . and/or (b) purchased or otherwise acquired Cloopen [ADSs] between February 9, 2021 and May 10, 2021, inclusive (the 'Class Period')." Compl. ¶¶ 1, 127.

Cloopen filed its motion to dismiss on July 15, 2022.[3] ECF No. 92. The Underwriter Defendants joined in the motion. See ECF

---

[3] Cloopen's motion seeks dismissal not only of the claims against Cloopen, but also of the claims against the Cloopen Individual Defendants, who have not yet appeared in this case. See Cloopen Memo. at 6 n.5. An affidavit of service filed on January 5, 2023

Nos. 95, 109. The Cogency Defendants also joined in the motion and separately asserted several additional arguments pertaining to the claims against them. ECF No. 96.

## II.

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for

---

indicates that the summons and Complaint were submitted to the China Ministry of Justice on October 24, 2022, for service on the Cloopen Individual Defendants in accordance with the Hague Convention, a process that could take up to a year. See ECF No. 112. If, upon service, any of the Cloopen Individual Defendants wish to raise arguments for dismissal of the claims against them that differ from the arguments raised in Cloopen's motion, they may request an opportunity to do so in a manner consistent with this Court's Individual Practices. The Court will determine how best to proceed at that time.

the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Id.</u>

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it also adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); <u>ATSI</u>, 493 F.3d at 99.

When presented with a motion to dismiss a complaint, the Court may consider documents attached to or referenced in the complaint, documents that the plaintiff either possessed or knew about and relied on in bringing the lawsuit, or matters of which

judicial notice may be taken. Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). The Court can take judicial notice of public disclosures that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773–74 (2d Cir. 1991). In this case, the Court considers the full Registration Statement because it is both integral to the Complaint and subject to judicial notice. See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991) ("In considering whether [the] complaint states a claim under either Section 10(b) or Section 11, we examine the prospectus together with the [plaintiff's] allegations."); In re Bioscrip, Inc. Sec. Litig., No. 13-cv-6922, 2015 WL 3540736, at *5 (S.D.N.Y. June 5, 2015) ("[W]here a plaintiff's claims . . . are based upon alleged misrepresentations and omissions contained in the prospectuses and other offering materials, those documents are integral to the complaint.").

### III.

The Complaint alleges violations of the following: Section 11 of the Securities Act, against all of the defendants; Section 15 of the Securities Act, against Cloopen, the Cloopen Individual Defendants, and the Cogency Defendants; Section 10(b) of the Exchange Act and Rule 10b-5, against Cloopen, Sun, and Li (the

16

"Exchange Act Defendants"); and Section 20 of the Exchange Act, against the Exchange Act Defendants.

Sections 11 and 15 of the Securities Act "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). Section 11(a) provides that any signatory to a registration statement, director of the issuer of securities, or underwriter with respect to such securities, among others, may be held liable to purchasers of registered securities if the registration statement contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). This Section imposes "a stringent standard of liability on the parties who play a direct role in a registered offering." Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983); see In re Flag Telecom Holdings, Ltd. Secs. Litig., 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009). "To establish a prima facie claim under Section 11, a plaintiff need only plead a material misstatement or omission in the registration statement." Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc., 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017). Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while

"[o]ther defendants bear the burden of demonstrating due diligence." Herman & MacLean, 459 U.S. at 382.

"Section 15, in turn, creates liability for individuals or entities that 'control[] any person liable' under [S]ection 11," among other Securities Act provisions. In re Morgan Stanley, 592 F.3d at 358 (quoting 15 U.S.C. § 77o). Accordingly, the success of a Section 15 claim depends in part on the plaintiff's ability to prove a primary violation of the Securities Act. Id.

Section 10(b) of the Exchange Act, as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To state a claim under Rule 10b-5, the plaintiff must allege that, in connection with the purchase or sale of a security, the defendants made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendants' action caused injury to the plaintiff. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also In re Lions Gate Ent. Corp. Sec. Litig., 165 F. Supp. 3d 1, 10 (S.D.N.Y. 2016).

Section 20(a) of the Exchange Act imposes liability on individuals or entities that "control[] any person liable" under

Section 10(b). 15 U.S.C. § 78t(a); see S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) ("First Jersey"). A primary violation of the Exchange Act is a prerequisite to control person liability under Section 20(a). See First Jersey, 101 F.3d at 1472.

Cloopen raises the following arguments in support of its motion to dismiss: first, that the Complaint fails to allege any actionable statements under Sections 11 or 10(b); second, that the Complaint does not adequately plead scienter, an essential element of a Section 10(b) claim; and third, that the claims for control person liability must be dismissed for lack of a primary violation of the securities laws. Each of these arguments is addressed in turn.

### A. Actionable Misstatements and Omissions

Cloopen's first argument is that the Complaint fails to allege any actionable representations in Cloopen's February 2021 Registration Statement. To pursue any claim under Section 11 of the Securities Act or Section 10(b) of the Exchange Act, a party must plead an actionable, material misstatement or omission. See In re Morgan Stanley, 592 F.3d at 360-61; see also Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007). In this case, the Complaint identifies various statements that are alleged to be materially misleading in view of one of the following omitted facts: (1) the original fair value of the

19

Series F Warrant when it was first issued; (2) the precipitous
30-percent decline in the dollar-based net customer retention
rate during 4Q 2020; or (3) the contemporaneous increase in
customer nonpayment. For the reasons set forth below, each of
these omissions is actionable under the securities laws because
their disclosure was necessary to make certain representations
in the Registration Statement not misleading. The Complaint also
adequately alleges that these omissions were inconsistent with
Cloopen's disclosure obligations under Items 303 and 105 of
Regulation S-K.[4]

---

[4] At the threshold, the parties dispute whether the Securities
Act claims in this case are subject to the heightened pleading
standards applicable to the Section 10(b) claims. Generally,
Securities Act claims are analyzed under Rule 9(b) insofar as the
claims are premised on allegations of fraud, but are analyzed
under the more liberal pleading standards of Rule 8 otherwise.
See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir.
2011); Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). Here,
the lead plaintiff has "gone beyond the mere inclusion of a pro
forma repudiation of a fraud theory," which would be inadequate
on its own to trigger the application of Rule 8 to the Securities
Act claims. City of Roseville Emps.' Ret. Sys. v. EnergySolutions,
Inc., 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011). Rather, the lead
plaintiff has also "framed [the] allegations with regard to the
Securities Act in terms of negligence, claiming that the various
defendants had a duty to investigate and ensure the truth of the
statements in the Registration Statement[]." Id. (applying Rule
8 standard to Securities Act claims); see, e.g., Compl. ¶¶ 48-
49, 72, 139, 146, 153. Moreover, the lead plaintiff "provided
additional scienter allegations limited to the Exchange Act
claims in a separate section after the Securities Act claims."
City of Roseville, 814 F. Supp. 2d at 424; see, e.g., Compl.
¶¶ 178-183. Thus, as in City of Roseville and similar cases, the
Complaint "specifically [pleads] alternate theories of fraud and
negligence" and "ha[s] made it easy to distinguish between the
two," such that the application of Rule 8 to the Securities Act

### 1. Series F Warrant

With respect to the Series F Warrant, Cloopen argues that the Registration Statement's omission of the original fair value is not actionable because "there was no duty to disclose" such information. See Cloopen Memo., ECF No. 93, at 11. Specifically, Cloopen contends that: (1) Cloopen's Registration Statement was limited to financial data from 3Q 2020, and accordingly, the defendants were under no duty to disclose information postdating that reporting period; and (2) in any event, Cloopen's other statements regarding warrant liabilities were sufficient to satisfy any disclosure obligations relating to the Series F Warrant. These arguments are without merit.

An omission is actionable under the federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). While parties generally have no independent duty to disclose all material nonpublic information, once a

_____

claims is proper. City of Roseville, 814 F. Supp. 2d at 425; see also Fresno Cnty. Emps. Ret. Ass'n, 268 F. Supp. 3d at 557-60; In re Refco Sec. Litig., 503 F. Supp. 2d 611, 631-33 (S.D.N.Y. 2007). In any event, because the Complaint satisfies the heightened Rule 9(b) pleading standard, its allegations are necessarily sufficient under Rule 8. See, e.g., In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 274-75 (S.D.N.Y. 2010) (declining to resolve whether Securities Act claims "sound[ed] in fraud," because the "plaintiffs ha[d] met the Rule 9(b) standard by specifying the 'who, what, when, where and how' of the alleged misstatements").

party "choos[es] to speak," it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002). Thus, "an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008); see also In re Time Warner, 9 F.3d at 268 ("[A] duty to disclose [a material fact] arises when disclosure is necessary to make prior statements not misleading."). An omitted fact is material where "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" In re Time Warner, 9 F.3d at 267-68 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

In this case, while Cloopen's Registration Statement was primarily limited to financial information from the reporting period ending on September 30, 2020, the Registration Statement nevertheless disclosed certain material details regarding both the issuance and the exercise of the Series F Warrant -- facts that arose after the close of 3Q 2020, but prior to the February 2021 IPO. Indeed, in a section titled "Subsequent Events" and elsewhere in the Registration Statement, Cloopen reported that it had issued the Series F Warrant to Novo in November 2020,

that the aggregate exercise price at issuance was $34 million
(or $2.8814 per share), and that the Series F Warrant was fully
exercised at that price on January 7, 2021. See Compl. ¶¶ 73, 78.
Once Cloopen chose to speak on the Series F Warrant, it assumed a
duty to speak completely and accurately on the subject, and thus
to disclose any additional material information necessary to
make the existing disclosures not misleading. See Caiola, 295
F.3d at 331; In re Time Warner, 9 F.3d at 268.

The Complaint plausibly alleges that the original fair
value of the Series F Warrant at its November 2020 issuance, a
number available to Cloopen roughly three months before the IPO,
was a material fact that should have been disclosed to ensure
the completeness and accuracy of the Registration Statement's
other disclosures regarding the Series F Warrant. The Series F
Warrant's original fair value, estimated to be $4.8 million, was
allegedly necessary to calculate the massive liability that
Cloopen incurred when the Series F Warrant was exercised in full
on January 7, 2021. See, e.g., Compl. ¶¶ 74, 80. And because the
Registration Statement omitted the then-existing fact of that
original fair value, investors were left in the dark about the
magnitude of that liability -- a liability that materialized one
month before the IPO, and that contributed to a staggering 466.9%
increase in net loss year-over-year from 4Q 2019 to 4Q 2020. See
id. ¶¶ 4, 74, 116.

Cloopen contends that, because the Registration Statement already disclosed (1) a steady increase in warrant liabilities, and (2) its methods for recalculating estimated fair value on a periodic basis, its disclosures regarding the Series F Warrant were sufficiently complete to discharge any duty to disclose. See Cloopen Memo. at 12. But even against the backdrop of these disclosures, the Complaint supports an inference that reasonable investors would have viewed the fact of the Series F Warrant's original fair value as "having significantly altered the total mix of information available." In re Time Warner, 9 F.3d at 267-68. Cloopen's existing disclosures did not so much as hint at the fact that Cloopen, as a result of the Series F Warrant's increased fair value, was forced to recognize a substantial $26 million loss for 4Q 2020 upon the Warrant's pre-IPO exercise.

In short, the omission of the Series F Warrant's original fair value, a fact essential to calculating the significant loss associated with the Warrant, made the Registration Statement's other affirmative disclosures regarding the Warrant incomplete and misleading.[5] Therefore, the defendants' failure to disclose the original fair value of the Series F Warrant is actionable.

---

[5] In his opposition papers, the lead plaintiff argues that the material omission of the Series F Warrant's original fair value also violated Accounting Standards Codification ("ASC") 855, a Generally Accepted Accounting Principles ("GAAP") standard related to "subsequent event" disclosures. See Opp'n, ECF No. 104, at 7-9. However, the Complaint never mentions ASC 855, and

## 2. Customer Retention

The Complaint alleges that Cloopen's failure to disclose
the dramatic 30-percent decline in its dollar-based net customer
retention rate during 4Q 2020 was a material omission, which in
turn rendered Cloopen's statements regarding the strength of its
customer retention strategy incomplete and misleading. Cloopen
argues that it cannot be held liable for this alleged omission
because (1) its disclosures regarding customer growth were not
misleading in context, (2) it had no duty to disclose customer
retention metrics postdating 3Q 2020, and (3) the Registration
Statement revealed the allegedly adverse trend with which the
Complaint takes issue, given that Cloopen "disclosed the precise
percentage declines in the net customer retention rate between
2018 and the first nine months of 2020." Cloopen Memo. at 16.

Cloopen's contentions lack merit. The Complaint plausibly
alleges that, given the Registration Statement's representations
concerning Cloopen's existing customer base and the dollar-based
net customer retention rate, inclusion of the dramatic 4Q 2020
decline in that rate was necessary to make those representations

---

"[i]t is long-standing precedent in this circuit that parties
cannot amend their pleadings through issues raised solely in
their briefs." Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 516
(S.D.N.Y. 2005) (collecting cases). In any event, the Complaint
plausibly alleges that the omission is actionable based on the
theory discussed above, namely that a "duty to disclose arises"
where such "disclosure is necessary to make [other] statements
not misleading." In re Time Warner, 9 F.3d at 268.

not misleading, giving rise to a duty of disclosure. As alleged in the Complaint, the Registration Statement could reasonably be read as conveying a legitimate expectation of stability and even growth in Cloopen's dollar-based net customer retention rate, which Cloopen itself describes as a "Key Operating Metric." See, e.g., Compl. ¶¶ 8, 56, 87, 89; see Registration Statement ("Reg. Stmt."), ECF No. 94-1, at 17, 103. For example, the Registration Statement made various representations regarding Cloopen's comprehensive customer retention strategy, its loyal customer base, its steady revenues from existing customers, and its expected opportunities to increase sales among those customers. See, e.g., Compl. ¶¶ 82, 83, 86, 88. Moreover, in a disclosure on the "seasonality" of its revenues, the Registration Statement reported that Cloopen's results typically improve "in the second half of the year," when customers "tend to enter into contracts with [Cloopen]." Id. ¶ 101; Reg. Stmt. at 103. It is reasonable to infer that such statements would have left investors with an impression of strong and stable results in Cloopen's customer retention, a critical component of Cloopen's business model, when in fact Cloopen's dollar-based net customer retention rate had plummeted from 94.4% to 63.1% in the quarter before the IPO.

Likewise, the Registration Statement contained cautionary disclosures about factors that might adversely affect Cloopen's customer retention going forward, which reasonably could have

been read to suggest that any risk of a serious decline in the dollar-based net customer retention rate was only prospective or hypothetical. See, e.g., Compl. ¶¶ 91-92. The Complaint permits an inference that these risk warnings were materially misleading because a reasonable investor, equipped with the then-existing but undisclosed fact of the steep 4Q decline in the dollar-based net customer retention rate, would have concluded that the warned-of prospective risks had occurred. See In re Facebook, Inc. IPO Sec. & Derivative Litig., 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when the risk has already materialized."); cf. Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Moreover, while Cloopen did disclose that its dollar-based net customer retention rate had fallen from "135.7%, [to] 102.7% [to] 94.7%" in "2018, 2019, and the nine months ended September 30, 2020," respectively, see Compl. ¶ 98, the context of this disclosure lends support to the allegation that the failure to disclose the additional 4Q 2020 decline was misleading. Cloopen's Registration Statement attributed the reported decrease in the dollar-based net customer retention rate to the effects of new Chinese regulatory regimes and the early economic fallout from

27

the COVID-19 pandemic, and then went on to disclose Cloopen's
expectation that this rate would "remain stable at a relatively
high level." Id. ¶ 102. The reasonable import of these
statements, particularly when considered in light of the other
representations discussed above, is that Cloopen had already
absorbed the impact of the factors responsible for the declining
dollar-based net customer retention rate, and that the rate was
therefore stabilizing at around 94 percent. But to the contrary,
the customer retention rate had in fact plummeted during the last
quarter of 2020 -- a datapoint available to Cloopen well before
its Registration Statement was issued.

Thus, when the Registration Statement and the Complaint's
allegations are viewed as a whole, it is reasonable to infer
that the failure to disclose the 30-percent decline in the net
customer retention rate during 4Q 2020 was a material omission,
rendering other statements regarding customer retention
incomplete and misleading. At the very least, fact questions
exist as to the materiality of the alleged omission, and such
questions cannot be resolved on this motion to dismiss. See
Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir.
2011) ("Materiality is an inherently fact-specific finding.");
see also Ganino, 228 F.3d at 162 ("[W]hen presented with a Rule
12(b)(6) motion, a complaint may not properly be dismissed . . .
on the ground that the alleged misstatements or omissions are

28

not material unless they are so obviously unimportant to a
reasonable investor that reasonable minds could not differ on
the question of their importance.").

Cloopen separately contends that the allegedly misleading
representations regarding customer retention are nonactionable
opinions, puffery, and forward-looking statements. See Cloopen
Memo. at 18-20. This argument is also unpersuasive. While it is
true that statements of opinion are often immune from liability,
such statements are actionable in limited circumstances,
including where "the speaker omits information whose omission
makes the statement misleading to a reasonable investor." Tongue
v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016) (citing Omnicare,
Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575
U.S. 175, 194 (2015)). That rule is rooted in the principle that
a reasonable investor "expects not just that the issuer believes
the opinion," "but that it fairly aligns with the information in
the issuer's possession at the time." Omnicare, 575 U.S. at 188-
89. Accordingly, the "core inquiry is whether the omitted facts
'conflict with what a reasonable investor would take from the
statement itself.'" Tongue, 816 F.3d at 210 (quoting Omnicare,
575 U.S. at 189).

The allegedly misleading statements of opinion here are
statements that convey positive beliefs and expectations about
the strength of Cloopen's customer retention strategy and the

stabilization of its dollar-based net customer retention rate. See, e.g., Compl. ¶¶ 82, 86, 89, 100, 102, 146, 158. And the Complaint plausibly alleges that such statements conflict with the precipitous 30-percent decline in the net customer retention rate during 4Q 2020, an undisclosed fact available to Cloopen when it issued its Registration Statement. Thus, the challenged statements of positive opinion and belief are actionable.

Cloopen also argues that many of its optimistic statements concerning the strength and loyalty of its existing customer base and associated business opportunities are nonactionable puffery. But the challenged statements are not the sort of enthusiastic or vague "generalizations regarding business practices" that amount to puffery; instead, the statements are "fact-based expressions of opinion" which, for the reasons just discussed, are plausibly alleged to be misleading in light of the omitted 4Q 2020 decline in the dollar-based net customer retention rate. See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig., 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (observing that "there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts"); see also Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (concluding that statements of supposed "puffery" were actionable where the plaintiff's complaint "allege[d] that the defendants did more than just offer rosy predictions; the

30

defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").

Finally, Cloopen's representations regarding its customer retention strategies and related expectations are not protected under the PSLRA's safe harbor for "forward-looking statements." See 15 U.S.C. § 78u-5; In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 555 (S.D.N.Y. 2010) (describing the safe harbor). While certain of the allegedly misleading statements contain forward-looking language, they are generally grounded in descriptions of Cloopen's existing customer retention practices and supposedly reliable customer base. And "when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." In re SLM, 740 F. Supp. 2d at 556. Cloopen's reliance on the "bespeaks caution" doctrine, which provides that forward-looking statements are shielded from liability when "accompanied by meaningful cautionary language," Slayton v. Am. Exp. Co., 604 F.3d 758, 766 & 770 n.5 (2d Cir. 2010), is also unavailing. "[C]autionary language that is misleading in light of historical fact cannot be meaningful." Id. at 770 n.5 (citing Rombach, 355 F.3d at 173). In this case, the lead plaintiff adequately alleges that Cloopen's warnings regarding the future risk of declining customer retention were

misleading, in view of the then-existing but omitted fact of the steep 4Q 2020 decline in the net customer retention rate.

In short, the Registration Statement's omission of the 30-percent decline in Cloopen's dollar-based net customer retention rate during 4Q 2020, the period preceding the IPO, is actionable.[6]

### 3. Customer Nonpayment

Cloopen contends that it was under no duty to disclose the allegedly significant increase in customer nonpayment during 4Q 2020, and that its Registration Statement adequately warned of that risk. Cloopen Memo. at 20-21. The lead plaintiff responds

---

[6] Initially, the lead plaintiff also alleged that the defendants made continuing misstatements and omissions regarding customer retention in Cloopen's March 26, 2021 post-IPO disclosures. See, e.g., Compl. ¶¶ 15, 117, 120. Cloopen argues in its motion to dismiss that these post-IPO statements are not actionable. See Cloopen Memo. at 23-24. The lead plaintiff's opposition never responds to that argument or explains why the alleged misstatements and omissions from March 26, 2021 supply a basis for liability; instead, the lead plaintiff relies on post-IPO statements only to support the allegations of materiality and scienter with respect to the omissions in the February 2021 Registration Statement. Accordingly, the lead plaintiff has waived any argument that Cloopen's March 26, 2021 disclosures contained actionable misstatements or omissions. See Ventillo v. Falco, No. 19-cv-03664, 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020) (collecting cases where courts in this Circuit treated an argument or claim as waived or forfeited because the plaintiff failed to address the relevant argument or claim in response to a motion to dismiss); see also Tarrant v. City of Mount Vernon, No. 20-cv-9004, 2021 WL 5647820, at *5 (S.D.N.Y. Dec. 1, 2021) ("Plaintiff chose consciously, by his silence [in opposition], to waive and abandon any argument he could have made."); Felske v. Hirschmann, No. 10-cv-8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them.").

that the failure to disclose the 4Q 2020 increase in nonpayment, which translated into substantial increases in Cloopen's accounts receivable and allowances for doubtful accounts, was a material omission that rendered Cloopen's warnings regarding the future risk of customer nonpayment incomplete and misleading.

Cloopen's Registration Statement represented that Cloopen "closely monitor[s]" its accounts receivable, that it contacts customers on "a continuous basis" to "collect overdue balances," and that Cloopen's existing customer base generally presented valuable opportunities for increased sales of Cloopen's cloud-based solutions. See, e.g., Compl. ¶¶ 10, 86, 105. With these statements in the background, the Registration Statement went on to caution investors regarding the risk of customer nonpayment, stating, for instance, that Cloopen was "exposed to the risks that [its] customers may delay or even be unable to pay," and that Cloopen's results "may be materially and adversely affected" "if [Cloopen] fail[s] to collect contract assets and accounts receivable[]" from customers. Compl. ¶ 105. Taking these risk warnings in context, it is plausible to infer that a reasonable investor would have viewed the possibility of customer nonpayment as prospective or hypothetical. But as alleged in the Complaint, Cloopen had experienced a drastic uptick in delayed or missing payments in the months preceding the IPO, resulting in "massive

increases in [Cloopen's] accounts receivable and its allowance for doubtful accounts." Id. ¶ 106.

These allegations are sufficient to allege that the hypothetical risk of customer nonpayment had, in fact, already begun to materialize. And given Cloopen's own representations that revenues generated from existing customers were a crucial component of its business, a reasonable investor likely would have viewed the large 4Q 2020 increase in customer nonpayment as "significantly alter[ing] the total mix of information available." In re Time Warner, 9 F.3d at 268. Accordingly, the Complaint adequately alleges that the increase in nonpayment was a material fact necessary to make the Registration Statement's risk warnings not misleading, and that the defendants were therefore obligated to disclose that fact. See In re Facebook, 986 F. Supp. 2d at 516; Rombach, 355 F.3d at 173. At the very least, the Complaint raises questions of fact as to the materiality of the increase in customer nonpayment, which cannot be resolved on this motion to dismiss.

Thus, the failure to disclose the allegedly material increase in customer nonpayment during 4Q 2020 is actionable.

### 4. Disclosures Required Under Regulation S-K

The Complaint also alleges that the defendants are liable under Section 11 of the Securities Act because Items 303 and 105 of SEC Regulation S-K required disclosure of the material facts

34

described above. In cases involving an alleged omission from a company's registration statement, Section 11 imposes liability where the plaintiff establishes either "a material omission of information that is necessary to prevent existing disclosures from being misleading," or "a material omission in contravention of an affirmative legal disclosure obligation." Litwin, 634 F.3d at 715-16. Such affirmative obligations include the requirements set forth in Items 303 and 105 of Regulation S-K. The parties in this case dispute whether the Complaint adequately alleges violations of those Items.

Item 303 requires that registrants disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). This Item "imposes a disclosure duty where a trend, demand, commitment, event, or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012). Cloopen argues that the Complaint fails to allege an Item 303 violation because (1) the allegedly omitted facts do not concern "material trend[s]," and (2) in any event, the Registration Statement already disclosed

35

the trends of increasing warrant liabilities, decreasing customer retention, and increasing nonpayment.[7] Cloopen Memo. at 22.

These arguments fail because the Complaint plausibly alleges that the Registration Statement's disclosures were insufficient to apprise investors of then-existing developments "reasonably likely to have a material . . . unfavorable impact" on Cloopen's results. 17 C.F.R. § 229.303(b)(2)(ii). While the Registration Statement disclosed generally that net losses had increased between 2018 and the end of 3Q 2020, see Cloopen Memo. at 3, that disclosure left investors without any insight into the massive additional liability that Cloopen incurred upon the pre-IPO exercise of the Series F Warrant, which contributed to a staggering 466.9-percent increase in 4Q net losses year-over-year. Likewise, the Complaint supports an inference that both the precipitous 30-percent drop

---

[7] Cloopen also argues that the defendants cannot be held liable for an Item 303 violation because Item 303 does not apply to a registration statement filed by a foreign issuer on Form F-1. See Cloopen Memo. at 22. While it is true that, "[s]trictly speaking, Item 303 does not apply to foreign corporations," "the SEC has stated that its interpretations of Item 303 apply to . . . disclosures drafted pursuant to Item 5 of Form 20-F, which does apply to foreign corporations," and which is "in turn[] incorporated into Form F-1," i.e., the form that Cloopen used to file its Registration Statement. Willard v. UP Fintech Holding Ltd., 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021). Thus, courts in this Circuit have "treat[ed] Form F-1 as calling for the same disclosure as Item 303 of Regulation S-K." Id.; accord Panther Partners Inc. v. Jianpu Tech. Inc., No. 18-cv-9848, 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020); Johnson v. Sequans Commc'ns S.A., No. 11-cv-6341, 2013 WL 214297, at *11 (S.D.N.Y. Jan. 17, 2013).

in the 4Q 2020 customer retention rate and the coinciding uptick
in customer nonpayment were not just continuations of previous
trends, but material accelerations of such trends, which were
inconsistent with the Registration Statement's representations
regarding the expected stability and reliability of Cloopen's
existing customer base. See In re Facebook, 986 F. Supp. 2d at
511, 513 (observing that the "[i]dentification of a past trend"
does not necessarily "satisfy a company's disclosure obligations"
pursuant to Item 303, and concluding that "under Item 303, [the]
[d]efendants were required to disclose" certain trends in mobile
usage that were adversely affecting its revenues "even though
[the trends] arose intra-quarter"). In sum, "disclosures under
Item 303 [are] required to be accurate and complete as of the
time [the] Registration Statement became effective," id. at 513,
and the Complaint adequately alleges that Cloopen's disclosures
did not fulfill this requirement.

The other SEC provision at issue, Item 105, requires that
registrants provide "a discussion of the material factors that
make an investment in the registrant or offering speculative or
risky." 17 C.F.R. § 229.105(a). Cloopen contends that its risk
warnings regarding future warrant liabilities, existing customer
retention, and customer nonpayment were sufficient to satisfy its
Item 105 disclosure obligations. However, the Complaint permits
an inference that Cloopen's disclosures regarding its prior and

future warrant liabilities left investors without the information they needed to calculate the substantial loss incurred upon the exercise of the Series F Warrant and to evaluate its impact on the riskiness of the investment. And, for the reasons set forth above in sections III.A.2 and III.A.3, the Complaint plausibly alleges that Cloopen's risk warnings regarding existing customer retention and customer nonpayment were themselves misleading. Thus, the Complaint sufficiently pleads a violation of Item 105.

\* \* \*

In light of all the above, Cloopen's motion to dismiss the Section 11 claims for lack of an actionable misrepresentation or omission is **denied**, and the Court rejects Cloopen's argument that the Section 10(b) claims also fail on those grounds.

### B. Scienter

Cloopen argues that dismissal of the Section 10(b) claims is independently warranted because the Complaint fails to allege particularized facts supporting a strong inference of scienter against the Exchange Act Defendants -- namely Sun, Li, and Cloopen. See Cloopen Memo. at 24. The scienter needed to sustain a Section 10(b) claim is "intent to deceive, manipulate, or defraud, or at least knowing misconduct." First Jersey, 101 F.3d at 1467. To plead such scienter adequately under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2). A plaintiff "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. In either case, the facts must support a strong inference of scienter with respect to each defendant alleged to be liable. See Fresno Cty. Emps. Ret. Ass'n, 268 F. Supp. 3d at 550-51; see also Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488-91 (S.D.N.Y. 2010) ("Arbitron").

Moreover, "in determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton, 604 F.3d at 766. Courts conduct the scienter analysis holistically, in order to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, Inc., 551 U.S. at 323.

In this case, the lead plaintiff does not attempt to allege "motive and opportunity," instead relying solely on a "conscious

misbehavior or recklessness" theory to support the allegations of scienter. See Opp'n at 23. And where, as here, a "motive to commit fraud is not apparent, the strength of the circumstantial allegations that a defendant consciously or recklessly misbehaved must be correspondingly greater." Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015) ("Orthofix"); Kalnit v. Eichner, 264 F.3d 131, 142 (2d Cir. 2001). The Court of Appeals for the Second Circuit has defined "conscious" or "reckless" misbehavior to mean, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at 142; see also Novak, 216 F.3d at 308. "Plaintiffs typically allege [such] conscious or reckless misbehavior by pleading with specificity that the defendants had 'knowledge of facts or access to information contradicting their public statements,'" Orthofix, 9 F. Supp. 3d at 614 (quoting Novak, 216 F.3d at 308), which in turn permits the inference that the "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation," Kalnit, 264 F.3d at 142.

Cloopen argues that the Complaint fails to allege conscious or reckless misbehavior because it never pinpoints "specific

instances" in which the Exchange Act Defendants received reports or statements containing information "contrary to their public declarations." Cloopen Memo. at 25-26. It is true that, in many circumstances, plaintiffs "contend[ing] that defendants had access to contrary facts . . . must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309. However, facts contrary to a defendant's public representations "may also be learned in other ways." In re Turquoise Hill Res. Ltd. Sec. Litig., No. 20-cv-8585, 2022 WL 4085677, at *45 (S.D.N.Y. Sept. 2, 2022); see, e.g., City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc., 477 F. Supp. 3d 123, 136 (S.D.N.Y. 2020) (finding that plaintiff alleging "access to contrary facts" adequately pleaded scienter, even though complaint did not specify relevant "reports or statements," because other alleged facts "constitute[d] circumstantial evidence supporting an inference of scienter"). The Complaint in this particular case, viewed holistically and with all reasonable inferences drawn in the lead plaintiff's favor, permits an inference of scienter that is cogent and at least as compelling as any competing inference.

Initially, the lead plaintiff identifies a number of facts which, when taken together, support a strong inference that Sun (Cloopen's CEO) and Li (Cloopen's CFO) either knew or should have known that omitting the Series F Warrant's original fair value was

misleading. As the lead plaintiff points out, Sun executed the Series F Warrant on Cloopen's behalf in November 2020, and thus was presumably privy to important details of that transaction -- including the original fair market value assigned to that Warrant at issuance. See Opp'n at 24; see also Cloopen Series F Warrant, Podell Decl., Ex. 2, ECF No. 105-2, at 16.[8] The Complaint also alleges that the issuance of the Series F Warrant was part of a series of large "pre-IPO financing" transactions undertaken by Cloopen, Compl. ¶¶ 57-63, that Cloopen is required to record its warrants as financial liabilities, id. ¶¶ 60, 74, and that Cloopen recalculates the estimated fair value of such warrants routinely, id. ¶ 75. In view of these allegations, it is plausible to infer that Li, the officer responsible for managing Cloopen's finances, knew the basic facts related to the Series F Warrant -- including its fair value at issuance -- well before the IPO. See, e.g., In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig., No. 13-cv-

---

[8] The Court may consider the Series F Warrant, which was attached to Cloopen's Form F-1 Registration Statement and thus comprises part of a document integral to the Complaint. See I. Meyer Pincus & Assocs., P.C., 936 F.2d at 762; see also In re Bioscrip, 2015 WL 3540736, at *5. In any event, the Series F Warrant is subject to judicial notice, because it is publicly available on the SEC's website and the defendants do not dispute its authenticity. See Podell Decl., Ex. 2, ECF No. 105-2, at 1 (listing URL in bottom left corner); see also Fed. R. Evid. 201(b); Kramer, 937 F.2d at 774 (courts may take judicial notice of public documents required to be filed with the SEC); Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts may take judicial notice of documents on official government websites).

214, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (concluding that plaintiff adequately alleged CFO's scienter where the CFO's "role in financial reporting should have alerted him to [the corporation's] sudden rise in revenues and history of inadequate financial controls"); see also In re AOL Time Warner, Inc. Sec. & ERISA Litig., 381 F. Supp. 2d 192, 222 (S.D.N.Y. 2004) (finding that CFO's role "as the executive most responsible for the Company's accounting" supported inference "that [the CFO] knew of the Company's [undisclosed] advertising issues"). At the very least, Li certainly had reason to consider such facts on or shortly after January 7, 2021, when Cloopen issued 11,799,685 shares to Novo in exchange for the Series F Warrant's full exercise price of $34 million. And it is difficult to believe that in the whole month between this transaction date and Cloopen's IPO, Sun and Li never contemplated the scale of the loss resulting from the Series F Warrant's exercise -- when the exercise of that Warrant was reported in the Registration Statement that they signed. See City of Warren, 477 F. Supp. 3d at 136 (drawing inference of scienter in part because "it [was] virtually inconceivable that the CEO and Co-Presidents . . . would not have been aware of the formal termination . . . of this important contract"); see also In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) ("[I]n employing a holistic analysis, surely an inference of knowledge may be

appropriate, even if not determinative, where it would be absurd to suggest that management was without knowledge of the matter.").

Other alleged facts strengthen the inference of scienter for Sun and Li with respect to the loss incurred upon the exercise of the Series F Warrant. For example, in addition to disclosing the exercise of the Series F Warrant in January 2021, the Registration Statement disclosed that a warrant for Cloopen's series E preferred shares ("Series E Warrant") was exercised in November 2020, a date that similarly postdated the September 30, 2020 cutoff for much of the financial information reported in the Registration Statement. See Compl. ¶¶ 73, 75. However, a key difference between these warrant-related disclosures is that the original fair value of the Series E Warrant was disclosed in the Registration Statement, while the original fair value of the Series F Warrant was not, see id. ¶¶ 76-78, such that investors could calculate the loss associated with the Series E Warrant but not the massive liability related to the Series F Warrant. Plainly, the original fair value of the Series E Warrant was deemed sufficiently material to be disclosed, suggesting that the original fair value of the Series F Warrant (which, like the Series E Warrant, was fully exercised before the IPO) merited the same treatment. And because Sun and Li signed the Registration Statement, it is reasonable to infer that they were aware of the disclosure of the Series E Warrant's original fair value, and

thus recklessly or consciously disregarded the omission of the same information for the Series F Warrant.

Also supporting an inference of scienter is the timing of Cloopen's post-IPO disclosures. All of the information needed to determine the loss associated with the Series F Warrant, such as the estimated fair value at issuance (in November 2020) and the increased fair value at exercise (in January 2021), was available to Cloopen before the IPO. And just over one month after the IPO, Cloopen disclosed that its warrant liabilities had contributed to a 466.9% increase year-over-year in 4Q net losses, indicating that Cloopen had closely evaluated the impact of the Warrant's exercise by that time. See Compl. ¶¶ 116, 123. Given the scale of the pre-IPO liability incurred when the Series F Warrant was exercised, as well as the fact that Cloopen was fully prepared to disclose the consequences of that liability so soon after the IPO, the short time period between the IPO and the March 26, 2021 disclosure lends additional support to the inference that Cloopen executives were aware of the Series F Warrant liability before the IPO took place. That inference is certainly as compelling as an inference that Cloopen's leadership did not even consider the loss flowing from the Series F Warrant's exercise -- a transaction reported in the Registration Statement -- until after the IPO, and then managed to calculate the precise effect of that loss on Cloopen's financials in time for the disclosures made a few

weeks later. In short, the facts and circumstances alleged in the Complaint, taken together, permit a strong inference that Sun and Li acted consciously or recklessly with regard to the Registration Statement's omission of the Series F Warrant's original fair value and the liability incurred upon exercise.

The Complaint similarly alleges various facts which, when considered collectively, support a strong inference that Cloopen executives Sun and Li either knew or should have known about the alleged material omissions regarding the net customer retention rate and customer nonpayment. For example, the Complaint alleges that Cloopen maintained an extensive and comprehensive customer support infrastructure, through which Cloopen could communicate with customers on a constant basis, identify changing customer needs, "keep tabs on its existing customer relationships," and collect information on customer retention from over 20 regional sales offices in "real time." Compl. ¶¶ 180, 181. Similarly, the Complaint alleges that Cloopen "closely monitor[s]" its accounts receivable and continuously "follow[s] up" with customers "to collect overdue balances." Id. ¶ 183. Accordingly, Cloopen is presumably sensitive to major changes in its existing customer base, particularly where those changes are as drastic as the ones alleged here -- a 30-percent drop in the dollar-based net customer retention rate during 4Q 2020 alone, and a coinciding uptick in uncollectible payments that was substantial enough to

fuel a dramatic increase in accounts receivable and associated expenses. The fact that Cloopen was constantly monitoring these very subjects, as Cloopen's own Registration Statement made clear, constitutes strong circumstantial support for an inference that the substantial 4Q 2020 changes in customer retention and payment were known to Cloopen's senior management before the IPO. See Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (drawing inference that defendants recklessly omitted an investment portfolio's "serious losses" in part from the fact that the "[d]efendants [were] alleged to have told the investing public that they monitored the value of their portfolio on a nearly real-time basis"). Moreover, just over one month after the IPO, Cloopen disclosed that the increase in accounts receivable had contributed to a 59.2% increase in Cloopen's administrative and general expenses between 4Q 2019 and 4Q 2020. See Compl. ¶ 116. As with the Series F Warrant, the fact that Cloopen was prepared to make this disclosure so soon after the IPO suggests that its leadership likely knew of the pre-IPO increase in customer nonpayment before the Registration Statement was issued.

Additional alleged facts support an inference of scienter on the part of Sun and Li specifically. For example, after the SEC reviewed Cloopen's draft Registration Statement, the SEC sent a letter to Sun that "focus[ed] on customer retention" and that

requested additional discussion on the "decreases in the dollar-based net customer retention rate" recorded in 2019 and mid-2020. Id. ¶ 65. Presumably, such a letter would have put Sun on notice that substantial decreases in the customer retention rate were of importance to the SEC, and therefore likely to be material to investors. And given Cloopen's own representation that its net customer retention rate is a crucial indicator of its "ability to increase revenue generated from [its] existing customer base," id. ¶¶ 8, 54, it is reasonable to infer that Sun and Li, as the executives primarily responsible for Cloopen's financial success, would have been aware that the retention rate plummeted by 30% in a single quarter. See, e.g., In re Gen. Elec., 857 F. Supp. 2d at 396 (noting, in the course of concluding that plaintiffs adequately alleged CFO's scienter, that it was "highly improbable that . . . the CFO of a company [deriving] 50% of [its] revenues . . . from financial services" would not inquire into the company's "expos[ure] to the subprime consumer borrower and its counterpart in the commercial sector").

Relatedly, the Complaint's scienter allegations find further support in the core operations doctrine, which refers to the principle that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have

known the statements were false when made." In re Atlas Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).[9] In this case, the Complaint alleges that customer retention and the ability to increase revenues derived from existing customers were "core aspect[s]" of Cloopen's business, and that the dollar-based net customer retention rate was a "key metric" "crucial to measur[ing] the effectiveness of Cloopen's growth strategies as to existing customers." Compl. ¶ 179; see also id. ¶ 54 (alleging that the retention rate "tracks a key component of Cloopen's core business," namely the ability to continue generating revenues from Cloopen's "CPaaS and cloud-based CC solutions," for which customers pay on a "recurring basis"). Indeed, the Registration Statement acknowledged that Cloopen's "results of operations are highly dependent on the total number and lifetime value of [its] customers," and it identified Cloopen's dollar-based net customer retention rate as a "Key Operating Metric." Id. ¶ 99; see, e.g., Reg. Stmt. at 17,

---

[9] Because the "core operations" doctrine predated the enactment of the PSLRA, the Second Circuit Court of Appeals has "not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter." Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir. 2012). But, at the very least, the doctrine can "provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently." New Orleans Emps. Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 14 n.3 (2d Cir. 2011); see Yannes v. SCWorx Corp., No. 20-cv-03349, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021).

103. Thus, while the importance of customer retention to
Cloopen's business cannot establish scienter on its own, it
certainly supplements the Complaint's other allegations that Sun
and Li were aware of the 4Q 2020 plunge in the dollar-based net
customer retention rate and the sharp increase in customer
nonpayment at the time of the IPO.

In short, viewing the Complaint as a whole, a reasonable
person would consider an inference of scienter as to Sun and Li
to be cogent and "at least as compelling as any opposing inference
one could draw from the facts alleged." Tellabs, 551 U.S. at 324.
And because the Complaint properly alleges scienter against these
two key officers of Cloopen, it necessarily alleges scienter with
respect to Cloopen itself. See, e.g., Teamsters Loc. 445 Freight
Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir.
2008) ("In most cases, the most straightforward way to raise [an
inference of scienter] for a corporate defendant will be to plead
it for an individual defendant."); Arbitron, 741 F. Supp. 2d at
491 ("Because the plaintiffs have successfully pleaded scienter
as to . . . Arbitron's then-president, CEO, and chairman, they
have also pleaded corporate scienter as to Arbitron.").

Accordingly, the Complaint alleges sufficient facts to
support a strong inference of scienter with respect to Sun, Li,
and Cloopen -- the Exchange Act Defendants. The motion to dismiss
the claims under Section 10(b) of the Exchange Act is **denied.**

## C. Control Person Liability

Finally, Cloopen contests the sufficiency of the claims for control person liability. To make out a claim for control person liability under Section 15 of the Securities Act or Section 20 of the Exchange Act, a plaintiff must adequately allege (1) "a primary violation by the controlled person," and (2) "control of the primary violator by the defendant." ATSI, 493 F.3d at 108; see also In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007). For a claim under Section 20 in particular, a plaintiff must also allege that "the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108; In re BioScrip., Inc. Sec. Litig., 95 F. Supp. 3d 711, 740, 746 (S.D.N.Y. 2015).

Cloopen argues that the control-person claims under Section 15 and Section 20 must be dismissed because the Complaint does not plausibly allege primary violations of the relevant securities laws. Cloopen Memo. at 28. With respect to the Section 20 claim, Cloopen also contends that the Complaint fails to allege any "culpable participation" in a primary Section 10(b) violation. Id. At this stage, both arguments are unpersuasive. Because the Complaint adequately alleges violations of Sections 11 and 10(b), it also sufficiently pleads the primary liability required to state a claim under Section 15 and Section 20, respectively. And for the reasons set forth above in connection with the scienter

element of the Section 10(b) claim, the Complaint plausibly
alleges the relevant parties' "culpable participation" under
Section 20. See Schwab v. E*TRADE Fin. Corp., 258 F. Supp. 3d
418, 436 (S.D.N.Y. 2017) ("Although the Second Circuit has not
defined what is meant by the requirement [of] . . . a 'culpable
participant,' . . . the weight of well-reasoned authority is
that to withstand a motion to dismiss a section 20(a) controlling
person liability claim, a plaintiff must allege some level of
culpable participation at least approximating recklessness in the
section 10(b) context."); accord SEC v. Yorkville Advisors, LLC,
305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018).

Thus, Cloopen's motion to dismiss the claims for control
person liability under Sections 15 and 20 is **denied.**

### IV.

The Cogency Defendants advance two additional arguments in
support of dismissal of the Securities Act claims against them.
Neither argument has merit.

First, the Cogency Defendants contend that the Securities
Act claims against DeVries must be dismissed because "she did not
sign the Registration Statement in her personal capacity but as an
employee of Cogency." Cogency Memo., ECF No. 96, at 1. However,
Section 11 of the Securities Act permits a claim against "every
person who signed the registration statement" at issue. 15 U.S.C.
§ 77k(a)(1); see also Fresno Cty. Emps. Ret. Ass'n, 268 F. Supp.

3d at 556 (noting that "any signatory to a registration statement

. . . may be held liable" under Section 11). Furthermore, "[t]he

presence of an individual's signature on an SEC filing is . . .

sufficient to allege control" for purposes of a control-person

claim. Fed. Housing Fin. Agency v. Merrill Lynch & Co., 903 F.

Supp. 2d 274, 278 (S.D.N.Y. 2012); see In re Refco, 503 F. Supp.

2d at 638. The Cogency Defendants do not cite any authority for

the proposition that a signatory to a registration statement is

exempt from Securities Act liability because the signatory

purported to sign the document on an employer's behalf. Thus,

the claims against DeVries under Sections 11 and 15 may proceed.

Second, the Cogency Defendants seek dismissal of the Section

15 claims on the grounds that a "duly authorized representative"

for purposes of a foreign issuer's IPO cannot be "considered a

control person." Cogency Memo. at 2. But the Cogency Defendants

do not cite any cases to support this position, and the Section

15 claim against DeVries is adequately alleged for the reasons

discussed above. With respect to Cogency itself, the relevant

question in determining control-person status is whether the

defendant exercised "actual control" over a primary violator.

See In re BioScrip, 95 F. Supp. 3d at 740-41, 746-47. In this

case, Cogency "concedes that it controls DeVries," Cogency Reply,

ECF No. 111, at 2, a signatory to the Registration Statement who

may be held liable under Section 11. And whether Cogency had

actual control over any of the other alleged primary violators "is a fact-intensive inquiry," one which "generally should not be resolved on a motion to dismiss." In re Tronox, Inc. Sec. Litig., 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011).

In light of the above, Cogency's supplemental arguments for dismissal of the claims against it are unpersuasive.

**CONCLUSION**

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, those arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **denied.** The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:     **New York, New York
           March 16, 2023**

                                      **John G. Koeltl
                              United States District Judge**